**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

JACOB KRUEGER and PATRICIA
KRUEGER, individually and as the
parents and next friends of AA, BB, and CC,

          Plaintiffs,

          v.

CHANNING PETRAK,
OSF ST FRANCIS MEDICAL CENTER,
JENNIFER INNESS, in her individual capacity,
ALISA COLLINS, in her individual capacity,
KIMBERLY TAYLOR, in her individual capacity,
LEANDRA TATE, in her individual capacity,
RAELYN GALASSI, in her individual capacity,
AUSTIN HADDOCK, in his individual capacity,
ANITA PARKER, in her individual capacity,
ANGELIQUE MAXWELL, in her individual
capacity, LINDSAY HORCHARIK,
in her individual capacity, and KIMBERLY
WILSON, in her individual capacity,

          Defendants.

**Case No. 22 cv 1016
JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

    Plaintiffs, JACOB KRUEGER and PATRICIA KRUEGER ("Patti"), individually and as

the parents and next friends of their minor children, who are referred to herein as AA, BB, and

CC, by and through their counsel, RAPIER LAW FIRM, bring this lawsuit against Defendants,

CHANNING PETRAK, OSF ST FRANCIS MEDICAL CENTER, JENNIFER INNESS, ALISA

COLLINS, KIMBERLY TAYLOR, LEANDRA TATE, RAELYN GALASSI, AUSTIN

HADDOCK, ANITA PARKER, ANGELIQUE MAXWELL, LINDSAY HORCHARIK, and

KIMBERLY WILSON. In support of the Complaint, Plaintiffs state as follows:

1

## INTRODUCTION

1.      This is a civil rights action, pursuant to 42 U.S.C. § 1983, in which Plaintiffs seek damages to redress the deprivation of rights secured to them under the Fourth and Fourteenth Amendments to the United States Constitution.

2.      Plaintiffs also seek declaratory relief pursuant to 28 U.S.C. § 2201, injunctive relief, and damages under Illinois law.

3.      The action arises out of the illegal investigation of the adult Plaintiffs, the unreasonable seizure of the minor Plaintiffs, the continued detention and withholding of the minor Plaintiffs from the adult Plaintiffs without probable cause or due process of law, and Defendants' interference with the liberty interests of the adult Plaintiffs and minor Plaintiffs in each other's care.

4.      DCFS is the state agency responsible for investigating reports of suspected abuse and neglect. 325 ILCS 5/2; 325 ILCS 5/7.3.

5.      To justify a child welfare investigation, there must be reasonable suspicion of child abuse. *Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000). Child welfare investigations are initiated by a hotline call to DCFS.

6.      Child welfare workers may not investigate abuse and neglect allegations arbitrarily. *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003).

7.      DCFS caseworkers and other state actors must gather and consider all evidence, including exculpatory evidence. *Hernandez v. Foster*, 657 F.3d 463 (7th Cir. 2011); *Sornberger* v. *City of Knoxville*, 434 F. 3d 1006 (7th Cir. 2006); *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003); *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986).

8.      A child may only be removed from his or her parents when there is a court order, exigent circumstances, or consent. *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003); *Brokaw v. Mercer*

*Cty.*, 235 F.3d 1000 (7th Cir. 2000).

9.     Where an official makes a threat to take an action that he or she has no legal authority to take, that is duress; and it is improper to obtain consent to a safety plan through duress or other illegal means. *Hernandez v. Foster,* 657 F.3d 463 (7th Cir. 2011).

10.     When probable cause for a removal dissipates, the child must be returned to his or her parents. *Hernandez v. Foster*, 657 F.3d 463 (7th Cir. 2011); *Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000).

## JURISDICTION AND VENUE

11.     Jurisdiction is conferred upon this Court by 28 U.S.C. § 1343, which provides original jurisdiction over all actions brought pursuant to 42 U.S.C. § 1983, by 28 U.S.C. § 1331, which provides jurisdiction over all cases brought pursuant to the Constitution and laws of the United States.

12.     The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this Judicial District because Plaintiffs' causes of action arose out of acts and omissions occurring in Peoria, Peoria County, Illinois.

## CASE SUMMARY

14.     The minor Plaintiffs were taken from their parents and continuously withheld without probable cause.

15.     The removal of the minor Plaintiffs and the continued withholding of the children from their parents was the product of an arbitrary and constitutionally deficient child welfare investigation.

16.     The adult Plaintiffs were not accused of physical abuse. There will be no

evidence or argument in this case that Plaintiffs physically injured their children.

17.    To the contrary, based on junk science and personal vendetta, Petrak initiated a chain of events leading to the constitutional violations set forth herein.

18.    AA was 3 years old when he was taken from his parents.

19.    AA was at home with his mother, Patti, when he was taken without consent, a court order, or exigent circumstances.

20.    AA was continuously detained and withheld from his parents between March 31, 2019, and July 8, 2020.

21.    The detention and continued withholding of AA were the products of an arbitrary investigation, misstatements of fact, the disregard and concealment of exculpatory evidence, and after any probable cause for his detention and continued withholding dissipated.

22.    AA was detained and withheld from his parents for 465 days.

23.    AA was returned home to his parents, Patti and Jacob, on July 8, 2020, when a Macon County, Illinois Juvenile Court exonerated Patti and Jacob of any alleged wrongdoing.

24.    BB was 2 years old when he was taken from his parents.

25.    BB was at OSF Hospital in Peoria with his father, Jacob, and paternal grandmother when he was taken without consent, a court order, or exigent circumstances.

26.    BB was continuously detained and withheld from his parents between March 29, 2019, and July 8, 2020.

27.    The detention and continued withholding of BB were the products of coercion, an arbitrary investigation, misstatements of fact, the disregard and concealment of exculpatory evidence, and after any probable cause for his detention and continued withholding dissipated.

28.    BB was detained and withheld from his parents for 467 days.

29.     BB was returned home to his parents, Patti and Jacob, on July 8, 2020, when a Macon County, Illinois Juvenile Court exonerated Patti and Jacob of any alleged wrongdoing.

30.     CC was 3 days old when he was taken from his parents.

31.     CC was at St. Mary's Hospital in Decatur with his mom and dad when he was taken without consent, a court order, or exigent circumstances.

32.     CC was continuously detained and withheld from his parents between August 13, 2019, and July 8, 2020.

33.     The detention and continued withholding of CC were the products of coercion, an arbitrary investigation, misstatements of fact, the disregard and concealment of exculpatory evidence, and after any probable cause for his detention and continued withholding dissipated.

34.     CC was detained and withheld from his parents for 330 days.

35.     CC was returned home to his parents, Patti and Jacob, on July 8, 2020, when a Macon County, Illinois Juvenile Court exonerated Patti and Jacob of any alleged wrongdoing.

## THE PARTIES

36.     Plaintiffs reside in and are citizens of the State of Illinois.  AA was born in 2016. BB was born in 2017. CC was born in 2019. Jacob Krueger works for a residential / commercial painting company in Decatur, Illinois. Patricia or "Patti" Krueger is a homemaker, who is active in her church.

37.     Defendant, Dr. Channing Petrak, is a resident and citizen of the State of Illinois. In March 2019 and at times relevant to the Complaint, Defendant / Petrak served as an agent of OSF. Defendant / Petrak did not provide medical care or treatment to Plaintiffs. She is a child abuse pediatrician who acts as a forensic consultant to DCFS and provides records reviews and medical evaluations on behalf of DCFS at OSF, among other facilities, pursuant to contracts with DCFS

and other state actors. Defendant / Petrak investigated the adult Plaintiffs for abuse and neglect of AA, BB, and CC. Defendant / Petrak was a state actor, serving as a functionary for DCFS when the suspected abuse or neglect involved potential medical issues. Petrak arbitrarily investigated the adult Plaintiffs for abuse and neglect of their children, directed the removal of AA, BB, and CC, dismissed and withheld exculpatory evidence, misstated facts she knew would be reported to the Macon County Juvenile Court, and otherwise contributed to the constitutional violations alleged herein.

38. Defendant, OSF St. Francis Medical Center, transacts business in the State of Illinois ("OSF"). Defendant / OSF authorized Petrak to perform investigations at its facility when child abuse or neglect was suspected. Defendant / OSF authorized Defendant / Petrak to perform child abuse and neglect investigations of AA and BB at its facility in Peoria, Illinois. Defendant / OSF ratified Petrak's investigative findings regarding AA and BB, including, without limitation, that the adult Plaintiffs had neglected and abused the minor Plaintiffs. Defendant / OSF continues to ratify Petrak's findings to this day even after the Macon County Juvenile Court exonerated the adult Plaintiffs of any wrongdoing. Defendant / OSF also ratified Defendant / Petrak's decisions about when or whether BB would be discharged from the hospital and its security guards assisted in the removal of BB from the adult Plaintiffs. OSF uses EPIC as a digital platform for the management of Electronic Medical Records (EMR). OSF maintains EMR for each one of the Plaintiffs in this case. EMR created and maintained by OSF is accessible to other health care providers licensed to use EPIC. Currently, OSF continues to maintain EMR falsely reporting that the adult Plaintiffs were guilty of medical child abuse and that the minor Plaintiffs were abused and neglected by the adult Plaintiffs.

39. Defendant, Jennifer Inness, is a resident and citizen of the State of Illinois.

Defendant / Inness was a Child Protection Specialist for Illinois DCFS at times relevant to the Complaint. Defendant / Inness is sued in her individual capacity. As is more fully set forth below, Defendant / Inness determined AA and BB were safe and that the investigation into the allegations of abuse and neglect were unfounded at the same time Defendant / Petrak directed DCFS to take protective custody of AA and BB. Even though Inness determined the allegations of abuse and neglect were unfounded and that the minor Plaintiffs were safe, she continued to investigate the Adult Plaintiffs for abuse and neglect of their children, misstated facts to the Macon County Juvenile Court, withheld exculpatory evidence, and otherwise contributed to the constitutional violations alleged herein.

40. Defendant, Alisa Collins is a resident and citizen of the State of Illinois. Defendant / Collins was a Public Service Administrator for Illinois DCFS at times relevant to the Complaint. Defendant / Collins supervised Defendant / Inness and was directly involved in the investigation of abuse and neglect involving AA, BB, and CC. Defendant / Collins is sued in her individual capacity. As is more fully set forth below, Defendant / Collins determined AA and BB were safe, that the allegations of abuse and neglect were unfounded, and that the investigation would be closed at the same time Defendant / Petrak directed DCFS to take protective custody of AA and BB. Even though Collins determined the allegations of abuse and neglect were unfounded and that the minor Plaintiffs were safe, she continued the arbitrary investigation of the adult Plaintiffs for alleged abuse and neglect of their children, directed the removal of AA and BB, disregarded exculpatory evidence, and otherwise contributed to the constitutional violations alleged herein.

41. Defendant, Kimberly Taylor is a resident and citizen of the State of Illinois. Defendant / Taylor was a Public Service Administrator for Illinois DCFS at times relevant to the Complaint Defendant / Taylor supervised Defendant / Horcharik and was directly involved in the

investigation of abuse and neglect involving AA, BB, and CC. Defendant / Taylor is sued in her individual capacity. Taylor illegally shifted the burden of proving innocence onto the adult Plaintiffs. Taylor told Patti that unless Patti admitted to the alleged abuse and neglect, the children would not be returned home. Knowing that Inness and Collins had determined the allegations of abuse and neglect were unfounded and that the minor Plaintiffs were safe, she continued the arbitrary investigation of the adult Plaintiffs for the alleged abuse and neglect of their children, misstated facts to the Macon County Juvenile Court, disregarded and withheld exculpatory evidence, and otherwise contributed to the constitutional violations alleged herein.

42. Defendant, Leandra Tate, is a resident and citizen of the State of Illinois. Defendant / Tate was a Child Protection Specialist for Illinois DCFS at times relevant to the Complaint. Defendant / Tate is sued in her individual capacity. Defendant / Tate took AA from his home without a court order, probable cause, or consent and she took CC from St. Mary's and his parents on August 16, 2019, without a court order, probable cause, or consent.

43. Defendant, Raelyn Galassi, is a resident and citizen of the State of Illinois. Defendant / Galassi was a Child Protection Specialist for Illinois DCFS at times relevant to the Complaint. Defendant / Galassi is sued in her individual capacity. As is more fully set forth below, Defendant / Galassi coerced Jacob into signing a safety plan under false pretenses on March 29, 2019, and thereby took BB from his parents without a court order, probable cause, or consent.

44. Defendant, Austin Haddock, is a resident and citizen of the State of Illinois. Defendant / Haddock was a Child Protection Specialist for Illinois DCFS at times relevant to the Complaint. Defendant / Haddock is sued in his individual capacity. Defendant / Haddock took BB from OSF and from his parents on April 2, 2019, without a court order, probable cause, or consent.

45. Defendant, Anita Parker, is a resident and citizen of the State of Illinois. Defendant /

Parker was a Child Protection Specialist for Illinois DCFS at times relevant to the Complaint. Defendant / Parker is sued in her individual capacity. As is more fully set forth below, Defendant / Parker coerced Patti and Jacob into signing a safety plan under false pretenses on August 13, 2019, and thereby took CC from his parents without a court order, probable cause, or consent.

46.     Defendant, Angelique Maxwell, is a resident and citizen of the State of Illinois. Defendant / Maxwell was a Public Service Administrator for Illinois DCFS at times relevant to the Complaint. Defendant / Maxwell is sued in her individual capacity. As is more fully set forth below, Defendant / Maxwell authorized and directed the taking of CC from St. Mary's and from his parents on August 16, 2019, without a court order, probable cause, or consent.

47.     Defendant, Lindsay Horcharik, is a resident and citizen of the State of Illinois. Defendant / Horcharik was a Child Welfare Specialist for Illinois DCFS at times relevant to the Complaint. Defendant / Horcharik is sued in her individual capacity. Defendant / Horcharik told Patti and Jacob that unless they admitted to the alleged abuse and neglect, the children would not be returned home. Horcahrik also told Jacob if he would divorce Patti, then the children would be returned to him.

48.     Defendant, Kimberly Wilson, is a resident and citizen of the State of Illinois. Defendant / Wilson was a Child Protection Advanced Specialist for Illinois DCFS at times relevant to the Complaint. Defendant / Wilson is sued in her individual capacity. Knowing Inness and Collins determined the allegations of abuse and neglect were unfounded and that the minor Plaintiffs were safe, she continued to investigate the adult Plaintiffs for abuse and neglect of their children, misstated facts to the Macon County Juvenile Court, withheld exculpatory evidence, and otherwise contributed to the constitutional violations alleged herein.

## BACKGROUND FACTS

49. This tragedy begins with Petrak. BB has a complex medical history. BB was born in 2017. Patti's pregnancy with BB was complicated by the development of a life-threatening syndrome commonly referred to as HELLP (a serious complication of pregnancy involving high blood pressure). BB was born premature and in respiratory distress. At three weeks, BB developed noisy breathing and had an Apparent Life-Threatening Event (ALTE). BB was diagnosed with Gastroesophageal Reflux, cardiac anomalies, Patent Foramen Ovale, and pulmonary artery stenosis. BB developed severe abdominal distention and was subsequently admitted to Lurie's Children's Hospital in Chicago, IL. There, BB was treated and discharged with an additional diagnosis of Infantile Dyscheiza (or an inability to pass soft stools after straining).

50. BB developed more intense noisy breathing or stridor and had episodes of apnea (or cessation of breathing for at least 15 seconds). BB was diagnosed with upper airway obstruction which caused temporary lack of oxygen, causing a blue color of the skin. In June 2017, BB was diagnosed with sleep apnea and oxygen was instituted. In July 2017, when BB was 5 months old, he underwent bronchoscopy, laryngoscopy, and surgical repair of his epiglottis which had an inadequate stiffness and was blocking BB's airway. A swallow study was performed, and it showed liquids were penetrating around the larynx with delayed swallowing.

51. Multiple sleep studies and swallow studies showed BB had a problem with obstructive sleep apnea, central sleep apnea, dysphagia, and chronic constipation. On September 20, 2017, BB started receiving physical therapy for exercise intolerance and easy fatigue. BB's oxygen saturations were below 60%. Normal rates for that age are in the mid to high 90% range.

52. The Krueger family did not have private health insurance. BB was a Medicaid beneficiary. Due to the complexity of BB's health issues, his young age, and the difficulty in  appropriate health care providers who accepted Medicaid, Jacob and Patti, in conjunction with

referrals from BB's primary care physician, took BB to multiple different providers in different states seeking proper diagnoses and treatment.

53.     On December 12, 2017, another sleep study was performed on BB. The results were grossly abnormal. BB had sleep apnea, causing a lack of oxygen and color changes in BB's skin. Between December 2017 and March 2019, BB was hospitalized several times due to respiratory symptoms. Continued testing throughout this time consistently showed *inter alia* difficulty eating and swallowing, low oxygen saturation rates, and apnea. During this time, two different health care providers suspected or diagnosed Xia Gibbs Syndrome. Common symptoms of Xia Gibbs Syndrome include (without limitation) respiratory difficulties, sleep apnea, hypotonia, feeding intolerance, seizures, and developmental delay.

54.     BB was seen by numerous specialists for diagnostic testing and care and treatment from birth through March 2019. Those specialists and sub-specialists include (without limitation): Dr. Manna (pulmonologist); Dr. De Alarcon and Dr. Gootee (otolaryngologist / ENT); Dr. Hopkins and Dr. Morgan (geneticists); Dr. Kang (gastroenterologist); Dr. Bash (cardiologist); Dr. Arnett (pediatric allergy, pulmonology, and sleep); Dr. Avula (neurologist); and an Endocrinologist.

## DEFENDANTS' INVOLVEMENT

55.     On or about October 16, 2017, a report or hotline call was made to DCFS from an anonymous source with concerns of medical child abuse of BB. DCFS investigated *inter alia* whether the adult Plaintiffs were providing either inaccurate, discrepant, or overstated histories for BB resulting in BB having undergone procedures that placed him at risk of harm. That type of suspected abuse or neglect is sometimes referred to as medical child abuse, Munchausen by Proxy, or Factitious Disorder by Proxy. The investigation number assigned to the case was 2324824A.

56.     DCFS investigations are supposed to be completed within 60 days. After 60 days,

DCFS is supposed to determine whether the allegations are founded, unfounded, or undetermined.

57.     For good cause shown, a 30-day extension of the investigation may be approved by DCFS.

58.     Defendant / Inness was assigned to Case # 2324824A as the investigator or "CPI".

59.     Defendant / Collins was assigned as the supervisor or "PSA".

60.     Defendants / Inness and Collins consulted with Defendant / Petrak on the investigation. Defendant / Petrak was responsible for determining whether there was medical child abuse or not. Defendants / Inness and Collins relied upon Defendant / Petrak for the determination of whether there was medical child abuse. Numerous contact and supervisor notes entered during the investigation show that Defendants / Inness or Collins were either unable or unwilling to conclude investigation #2324824A without Defendant / Petrak's input.

61.     Between October 2017 and March 7, 2019, Defendants (Inness, Collins, and Petrak) investigated the adult Plaintiffs for suspected abuse or neglect of AA and BB. DCFS investigations typically last 60 days. During the seventeen (17) month period when DCFS performed its initial investigation, there were no reported safety concerns regarding AA.

62.     Throughout the 17-month investigation, Defendants / Inness and Collins documented that they were unable to complete their investigation without an opinion from Defendant / Petrak on the suspected medical child abuse of BB.

63.     Repeatedly, the investigation was extended because Defendants / Inness and Collins were awaiting Defendant / Petrak's opinion regarding the suspected medical child abuse of BB. Throughout the investigation (October 2017 – March 2019), AA and BB were in the custody and control of the adult Plaintiffs, and Defendants / Inness and Collins assessed there were no risks of harm warranting the removal of AA or BB from the adult Plaintiffs. In other words,

Defendants (Innes, Collins, and Petrak) made no determinations that AA or BB were unsafe at home with their parents, Jacob and Patti, between October 2017 and March 2019.

64.    On March 5, 2019, Defendant / Inness told Defendant / Petrak that DCFS was closing its investigation. Defendant / Inness stated, "[BB] continues to be admitted and treated by doctors **which is not the mother's fault**." (Emphasis added).

65.    On March 7, 2019, Defendant / Inness told the adult Plaintiffs the "case will finally be closed out as unfounded." Defendant / Inness documented that same day, "the family has followed through with everything needed and [BB] is doing better." Defendant / Inness documented that Defendant / Petrak had not made any findings of medical child abuse and that Inness could not say it was abuse or neglect without Defendant / Petrak's opinion.

66.    Defendant / Inness told Defendant / Petrak to make a hotline call if something new occurs that suggests neglect. Defendant / Inness told the adult Plaintiffs something similar, "if Petrak feels there is something new to report, she will."

67.    Defendant / Collins was aware of this, that the investigation would be closed, and that the allegations of medical child abuse would be deemed unfounded. Defendant / Collins documented in her March 7, 2019, Supervisory Note that AA and BB were assessed as "safe" at the time of closing the investigation.  Defendants / Inness and Collins, as of March 7, 2019, both agreed AA and BB were not at risk of harm, the investigation would be closed, and the allegations of medical child abuse were unfounded.

68.    The adult Plaintiffs were overcome with joy that the 17-month-investigation was over, the allegations of medical child abuse were "unfounded", and their names were cleared of any wrongdoing.

69.    Defendant / Petrak concluded in a written report on March 8, 2019, that she was

unable to determine whether there was abuse or neglect. Defendant / Petrak's inconclusive determination was made based upon her review of virtually all of BB's medical records from birth (2017) through March 4, 2019.

**EVENTS OCCURRING <u>AFTER</u> DEFENDANTS DETERMINED AA AND BB WERE SAFE, THE INVESTIGATION WAS REPORTED AS CLOSED, AND THE ALLEGATIONS OF MEDICAL CHILD ABUSE WERE REPORTED AS UNFOUNDED**

70.     On March 11, 2019, BB developed a high fever, and he was pulling on his ear. BB was evaluated at Decatur Memorial Hospital and was found to have a bulging right ear drum. BB was given IV antibiotics and fluids and sent home. Later that same day, BB was seen by his primary care physician. There, BB was noted to have low oxygen saturation (around 80%) and signs of pneumonia. The primary care physician sent BB back to Decatur Hospital, where an x-ray showed perihilar pneumonia.

71.     During the month of March 2019, BB had repeated visits to the Emergency Department and to his primary care physician with respiratory illness, including pneumonia. BB was hospitalized at OSF several times. When BB was admitted for dehydration, prolonged intermittent fever, and refusal to eat, a physician at the hospital (Dr. Wylie) discussed placing a g-tube.

72.     On March 21, 2019, BB was admitted to OSF for treatment of dehydration, pneumonia, feeding intolerance, and viral illness. Defendant / Petrak was actively involved in this hospitalization.

73.     On or about March 25, 2019, BB was moved to a new hospital room at OSF. Unbeknownst to the adult Plaintiffs, the room was used to videotape patients and others in the room. The adult Plaintiffs were not told prior to the change in rooms that the move was being made so that OSF could monitor and videotape BB and others in the room, including Patti.

74.     On March 29, 2019, the Krueger family was actively planning and working with OSF on BB's discharge home. Jacob and his mom, AA and BB's grandmother, were at OSF. Patti was home with AA. The family met and spoke with the Home Transition Specialist at OSF and ordered oxygen for delivery upon BB's discharge home to his parents.

75.     On March 29, 2019, at approximately 5:00 p.m. Defendant / Petrak, Dr. Wylie, and another one of Petrak's colleagues, met with Jacob and his mother (AA and BB's grandmother) in BB's hospital room. At the time of the meeting, Defendant / Petrak was planning on approving BB's discharge home to his parents. That is documented in OSF hospital records. However, during that meeting, Defendant / Petrak was offended by statements made and questions asked by Jacob and his mother, so Petrak changed her mind about BB's discharge home and the Krueger family's fate.

76.     During the March 29, 2019, meeting, BB's grandmother insisted on learning and documenting who would be participating in the meeting and who would be involved in discussing BB's discharge home to his parents. BB's grandmother asked for the doctors' names in attendance. Defendant / Petrak introduced herself. This alarmed Jacob. The investigation was over. The allegations were deemed unfounded. Jacob questioned why Petrak was involved in BB's discharge planning.

77.     While Jacob had heard of Defendant / Petrak previously, this was the first time he remembered meeting her in person. Defendant / Petrak told Jacob and his mom that BB would be discharged home to his parents, but that she needed to examine BB first.  Jacob responded by stating he would not allow Defendant / Petrak to examine his son or to participate in any meeting where BB's discharge planning was being discussed unless the family's attorney was present. That statement and his mother's questions about who would be participating in the meeting, surprised

and offended Defendant / Petrak. She followed up by asking Jacob if he was refusing medical care or treatment for BB. Jacob clarified that he was not refusing medical care for his son, that he wanted BB's doctors and nurses to continue their care and treatment of him, and that Jacob wanted to discuss discharge planning with BB's doctors and nurses. Petrak was not BB's doctor. Jacob told Defendant / Petrak he did not want her involved in BB's care, treatment, or discharge planning. Defendant / Petrak was offended and embarrassed by Jacob's statements. She left the room, as requested, but Defendant / Petrak was not done with the Krueger family.

78.     After Defendant / Petrak left BB's hospital room, a resident returned. She told Jacob he should speak with Defendant / Petrak and let her examine BB. Eventually, Jacob agreed and Defendant / Petrak returned to BB's room. She examined BB and said "that is all I need". Jacob asked Defendant / Petrak if BB was still able to come home to his family. Defendant / Petrak responded that it would be "up to DCFS" now. That was a lie.

79.     After the meeting, Defendant / Petrak contacted Defendant / Collins. Defendant / Petrak communicated to Defendant / Collins that she was making an investigative finding of medical child abuse and that a video from OSF showed Patti taking BB's diaper and not allowing the hospital to check the diaper for feces and urine. That, Defendant / Petrak reported, was important because, she contended, it showed Patti was trying to disrupt or manipulate BB's medical care. The video Petrak referenced, if it really exists, would have been taken, available, and viewed prior to the March 29, 2019, meeting regarding BB's discharge home.

80.     Later, the adult Plaintiffs (through counsel) requested the video. When the adult Plaintiffs received a copy of BB's medical chart from OSF, the video was not included. The adult Plaintiffs (through counsel) followed up with Defendants multiple times about the video. To date, the video has not been produced. The only reference to it in the records provided by Defendants is

Defendant / Petrak's reliance on it to support her determination of medical child abuse **after** the March 29, 2019, meeting when she intended to announce and approve BB's discharge home to his parents and when Defendant / Petrak was offended and embarrassed by Jacob and his mom questioning and challenging her.

81.     Prior to the meeting with Jacob and his mother, Defendant / Petrak was planning on approving BB's discharge home to his parents. That is documented in BB's medical chart. What that means is **prior** to the meeting on March 29, 2019, Defendant / Petrak did not believe BB and AA were at risk of harm, nor that Jacob or Patti were abusive or neglectful parents.

82.     At approximately 11:30 p.m. on March 29, 2019, Defendant / Galassi came into BB's room. Jacob and his mom had never met Defendant / Galassi before. Defendant / Galassi demanded to see Patti. When Jacob explained Patti was not there, Defendant / Galassi asked who Jacob was. When he explained he was BB's father, Defendant / Galassi told him he needed to sign the paperwork in her hand and leave OSF immediately. There were 2-3 OSF security guards who accompanied Defendant / Galassi and who were waiting outside BB's hospital room. Jacob asked Defendant / Galassi what she was telling him he needed to sign and why he had to leave OSF. Defendant / Galassi said it did not matter, and that he needed to sign it and leave OSF immediately. When Jacob continued to challenge Defendant / Galassi, she told Jacob you can sign the paperwork and leave OSF on your own <u>or</u> you can refuse to sign it and law enforcement will escort you out of OSF. Defendant / Galassi refused to show Jacob the paperwork or tell him what he was signing. Under duress and based on coercion by Defendant / Galassi, Jacob signed the paperwork and left OSF without involving the OSF security guards in the presence of his son BB. Months later, Jacob discovered Defendant / Galassi had tricked him into signing a safety plan, related to the removal of BB from his parents, under duress.

83.     DCFS needs a court order, exigent circumstances, or consent to remove a child from his or her parents. Knowing DCFS would not be able to obtain a court order and that there were no exigent circumstances, Defendants / Petrak, Collins, and Galassi discussed and executed a plan to coerce the "consent" needed to remove BB from his parents.

84.     Prior to the meeting on March 29, 2019, Defendant / Petrak approved BB's discharge home to his parents. During the meeting, Defendant / Petrak changed her mind and then recommended *inter alia* that DCFS take protective custody of AA and BB based reportedly on a videotape, which Defendants have not produced to Plaintiffs, when in fact Defendant / Petrak's recommendation to remove BB from his parents was based on Defendant / Petrak being embarrassed and offended by Jacob and his mom questioning and challenging her during the March 29, 2019, discharge meeting.

85.     By approximately 10:00 p.m. on March 29, 2019, Defendant / Petrak had spoken with Defendant / Collins and told her about her determination of medical child abuse and the alleged video of Patti taking and hiding BB's diaper.

86.     DCFS investigator Black spoke with Defendant / Collins at approximately 10:00 p.m. on March 29, 2019. During that phone call, Defendant / Collins told investigator Black that Defendant / Petrak determined there was medical child abuse, that she was authorizing DCFS to take protective custody of AA, that DCFS would take protective custody of BB upon his discharge from OSF, and that Jacob's parents would not be appropriate foster parents for AA or BB.

87.     Based on the recommendation and direction of Defendant / Petrak and Defendant / Collins' directive, on March 29, 2019, Defendant / Galassi removed BB from the care and custody of his parents by coercing Jacob into signing a safety plan under duress and ordering Jacob and his mom to leave OSF and to not return to OSF under threat of physical removal by law enforcement.

88.     On April 1, 2019, Defendant / Petrak prepared another report for Defendants / Inness and Collins. In the April 1, 2019, report, Defendant / Petrak concluded that by providing either inaccurate or overstated histories (events previously investigated and determined to be unfounded), as well as keeping information from medical staff (events occurring prior to the March 29, 2019, discharge meeting), the adult Plaintiffs had caused BB to undergo procedures and medical therapies that placed BB at serious risk of harm. That, Defendant / Petrak concluded, constituted medical child abuse. Defendant / Petrak's reported conclusions were based on the same evidence Defendants / Inness, Collins, and Petrak had considered previously, and which Defendants / Inness and Collins determined not to be abuse or neglect.

89.     Defendant / Petrak did not interview the adult Plaintiffs about BB's medical history. Instead, after the March 29, 2019, meeting, Defendant / Petrak selectively reviewed BB's medical records between March 9, 2019 (when the allegations of abuse and neglect were determined to be unfounded), and April 1, 2019, when she wrote her supplemental report, and cherry-picked entries or falsified statements or evidence to support her trumped-up conclusion of medical child abuse. For example, in her April 1, 2019, report, Defendant / Petrak stated that Patti withheld food from BB and that BB did not have a feeding problem. However, in so reporting, Defendant / Petrak ignored the documentation of BB's nurse, (Jo Sue Stein), who had worked with BB since November 2017. During that time, the nurse documented repeatedly that BB choked and coughed when drinking liquids; that BB had difficulty eating and swallowing; that BB's oxygen saturation dropped with some feedings; that she observed plenty of food in the Krueger's home and that Patti made homemade muffins filled with vegetables for BB; and that Patti was always welcoming, cooperative, and put enormous effort into making foods that BB could eat.

90.     In addition, on March 29, 2019, Defendant / Petrak told Defendant / Collins that

she witnessed a videotape of Patti taking BB's diaper and not allowing the hospital staff at OSF to check the diaper for feces or urine. Based on that misstatement of fact, Defendant / Collins authorized DCFS to take protective custody of AA and BB, which Defendant / Galassi accomplished by illegally obtaining a safety plan under duress. Defendant / Collins also directed the removal of BB's grandmother from the hospital and determined BB's paternal grandparents would not be an appropriate foster placement for AA or BB based on misstatements of fact made by Defendant / Petrak.

91. AA is BB's older brother. AA was illegally seized and unlawfully detained by Defendants for no reason other than that he is BB's brother and the adult Plaintiffs' son. Defendants did not have a court order, consent, or the exigent circumstances necessary to seize him. On March 31, 2019, AA was taken from his parents at home and placed in foster care. The DCFS caseworker who took AA noted "[AA] was screaming his head off" while being taken from his parents and his home. The caseworker also observed, the "***child is healthy with no signs of abuse or neglect at this time***." (Emphasis added).

92. On April 2, 2019, BB was taken into protective custody by DCFS based on the recommendation and direction of Defendant / Petrak.

93. On April 2, 2019, a Petition was filed in Macon County, Illinois, Juvenile Court, alleging the adult Plaintiffs had abused and neglected AA and BB based on suspected medical child abuse of BB. The same day, DCFS Investigator Inness completed her safety assessment for Investigation No. 2324824A. In her safety assessment, Inness concluded *inter alia*, "***[AA and BB] are currently safe***. [BB] has made progress medically, and continues to be seen by the team at OSF as well as [the primary care physician]. [BB] is growing and on target developmentally. [BB] is very interactive and a happy little boy. [AA] is also doing well and will be starting

preschool in the fall. No concerns are noted at this time. Collateral contacts report no concerns with the parents and feel they are doing what is necessary to address [BB's] medical needs. **The family is doing well overall and no safety concerns noted**." (Emphasis added).

94.     Inness' assessment that AA and BB were safe, and that the family was doing what was necessary for BB's medical needs, was made on April 2, 2019, and certified on May 23, 2019. During that same time, AA and BB were taken from their family and placed in DCFS custody and control. Inness testified in juvenile court to the exact opposite. In court, she testified the children were not safe with their parents and that they needed to remain in foster care.

95.     Inness was not the only one who assessed that AA and BB were safe. On March 25, 2019, DCFS Investigator Haddock observed AA and BB playing together at OSF. Investigator Haddock noted, "*[AA] looked healthy, safe and free from any observable hazards*." (Emphasis added).

96.     On June 19, 2019, DCFS was awarded temporary custody of AA and BB, based on misstatements and omissions of fact made by Defendants / Inness and Petrak. Inness testified *inter alia* there were concerns of abuse or neglect from multiple doctors; and that she never told the Plaintiffs the case would be "unfounded" or the investigation closed.

### EXCULPATORY EVIDENCE DEFENDANTS IGNORED OR WITHHELD

97.     After AA and BB were taken, mold was discovered throughout the Krueger family home. The mold was discovered while the family was installing new flooring in the home. In subsequent air quality testing, the highest concentrations of molds were found in BB's bedroom.

98.     The air quality test results and evidence of the mold contamination in the Krueger home were provided to Defendants / Inness, Collins, Taylor, Wilson, Horcharik, and Petrak. Rather than investigate the mold as a possible cause of BB's symptoms, Defendants / Collins, Inness,

Taylor, Wilson, Horcharik, and Petrak summarily dismissed the mold problem as having any contribution to BB's illnesses, reporting falsely instead that BB had been tested for molds previously and that molds were not detected in BB's blood at that time. However, BB's treating Allergist/Immunologist confirmed that while BB had been tested for mold sensitivity previously, BB had not been tested for the same molds that were detected at high levels in BB's bedroom. Further, the physician stated that inhaling mold spores and hyphae (another part of the fungus) can cause airway problems especially in patients with sensitive airways, and that mold can cause respiratory illness without being detected in the blood. Defendants / Petrak, Inness, Collins, Wilson, Horcharik, and Taylor ignored this exculpatory evidence, causing the minor Plaintiffs continued detention and CC's seizure and subsequent detention.

99.    After Defendant / Petrak reported her conclusion of medial child abuse, Patti agreed to two different DCFS-recommended psychological assessments. The assessments were completed in October 2019 and March 2020. The results were provided to Defendants Taylor and Petrak. The testing was coordinated with DCFS and DCFS approved psychologists were used. Neither assessment reported any indicators that would associate Patti's behaviors with medical child abuse or Munchausen by Proxy. In fact, the DCFS recommended psychologist concluded, Patti did not have a delusional disorder or psychotic disorder, that she pursued for BB treatments and tests recommended by medical professionals, that she had no clinically significant pathologies, and that she had no cognitive or mental health limitations that might impact her ability to safely care for her children. Defendants, Horcharik, Taylor and Petrak, ignored and withheld this exculpatory evidence.

100.    In May 2019, Dr. Manaa, a pulmonologist, examined BB and made a finding that his previous surgeries (adenoidectomy and tonsillectomy), were successful in correcting

BB's sleeping issues and breathing obstructions. Dr. Manaa communicated those findings to Defendant / Petrak. Upon learning that Dr. Manna's findings contradicted her determination that BB never had any sleeping issues or breathing obstructions, Petrak simply dismissed this exculpatory evidence. The correction of BB's symptoms through surgery was never communicated to the Juvenile Court by Defendants / Petrak, Inness, Collins, Wilson, or Taylor.

101.     In December 2018, Patti learned she was pregnant, and that she and Jacob would be having their third child, CC, who was born in 2019 at St. Mary's in Decatur, Illinois.

102.     CC is AA and BB's younger brother. Like AA, CC was illegally seized and unlawfully detained for no reason other than his relation to the other Plaintiffs. Defendants did not have a court order, consent, or the exigent circumstances necessary to seize him.

103.     Parker told Patti and Jacob, while CC was a newborn at St. Mary's, that they would be allowed to see CC only if they signed a safety plan. Under duress and with the coercion of Parker, Patti and Jacob singed a safety plan for CC.

## CLEARLY ESTABLISHED PRECEDENT

104.     The Fourth Amendment, incorporated against the States by the Fourteenth Amendment, *Contreras v. City of Chicago,* 119 F.3d 1286, 1290 (7th Cir.1997), provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated     " U.S. Const. Amend. IV.

105.     Because the basic purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials," *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 528 (1967), the amendment's prohibition against unreasonable searches and seizures protects against warrantless intrusions during civil as well as criminal investigations by the government. *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312 (1978).

106.     The strictures of the Fourth Amendment apply to child welfare workers, as well as all other governmental employees. *Brokaw v. Mercer County,* 235 F.3d 1000, 1010 n. 4 (7th Cir. 2000); *Darryl H. v. Coler,* 801 F.2d 893, 900 (7th Cir.1986). *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003), as amended on denial of reh'g (May 15, 2003).

107.     A person has been "seized" within the meaning of the Fourth Amendment if, in view of all of the circumstances surrounding the incident, a reasonable person would not have believed that he was free to leave. *United States v. Mendenhall,* 446 U.S. 544, 554; *White v. City of Markham,* 310 F.3d 989, 993 (7th Cir. 2002); *Brokaw,* 235 F.3d at 1010 (holding that the defendants' action of taking a child into custody, without the consent of the parents, for the purpose of questioning him about allegations of child neglect was a seizure under the Fourth Amendment). *See also Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003), as amended on denial of reh'g (May 15, 2003).

108.     Removing a child from his home or family is an unreasonable seizure if it is not pursuant to a court order, supported by probable cause, or justified by exigent circumstances, meaning that state officers "have reason to believe that life or limb is in immediate jeopardy." *Tenenbaum*, 193 F.3d at 605 (quoting *Good v. Dauphin County Social Services for Children and Youth,* 891 F.2d 1087, 1094 (3d Cir. 1989)). *See, e.g., Tenenbaum,* 193 F.3d at 603–05 (analyzing child's removal as a seizure under the Fourth Amendment, and considering whether a court order, probable cause or exigent circumstances justified the child's removal); *Wooley v. City of Baton Rouge,* 211 F.3d 913, 925–26 (5th Cir. 2000) (noting that a warrant, probable cause, or a reasonable belief that a child is in imminent harm is necessary to justify a seizure of a child under the Fourth Amendment); *J.B. v. Washington County,* 127 F.3d 919, 929 (10th Cir. 1997) (applying probable cause standard to removal of child); *Wallis v. Spencer,* 202

F.3d 1126, 1138 (9th Cir.2000) ("state may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse"). *See also Tennessee v. Garner,* 471 U.S. 1, 8 (1985) ("reasonableness depends on not only when a seizure is made, but also how it is carried out"). *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1010–11 (7th Cir. 2000).

109.    Where an official makes a threat to take an action that she has no legal authority to take, that is duress; and it is improper to obtain consent to a safety plan through duress or other illegal means. *Hernandez v. Foster,* 657 F.3d 463, 482 (7th Cir. 2011).

110.    A threat that parents cannot see their child unless they agree to something is extremely coercive. *See, e.g., Siliven,* 635 F.3d at 926 (evidence that defendants coerced mother into taking her child to her grandmother's house by threatening to place him in foster care if she didn't cooperate with investigation); *Croft,* 103 F.3d at 1125 n. 1 ("The threat that unless Dr. Croft left his home, the state would take his four-year-old daughter and place her in foster care was blatantly coercive."). In the context of removing a child from his home and family, we have observed that " '[a] threat becomes more coercive as the cost of non-compliance increases relative to the cost of compliance.' " *Siliven,* 635 F.3d at 926 (quoting *Kernats v. O'Sullivan,* 35 F.3d 1171, 1179 (7th Cir.1994)). Indeed, "it is difficult to overstate the cost of non-compliance— losing custody of one's child, even temporarily." *Id. Hernandez v. Foster*, 657 F.3d 463, 482–83 (7th Cir. 2011).

111.    When a defendant knows the allegations of child neglect are false, or withheld material information, and nonetheless caused, or conspired to cause, a child's removal from his home, the defendant violates the Fourth Amendment. *Malik v. Arapahoe County Dept. of Social Services,* 191 F.3d 1306, 1315 (10th Cir. 1999) (government officials' procurement of a

court order to remove children based on information they knew was founded on distortion, misrepresentation and omission, violated the Fourth Amendment).

112. The Fourteenth Amendment to the United States Constitution provides that no State may "deprive any person of life, liberty, or property, without due process of law ...." U.S. Const. Amend. XIV, § 1. The Supreme Court has long recognized, as a component of "substantive" due process, that parents have a liberty interest in familial relations, which includes the right to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923); *see also Troxel v. Granville,* 530 U.S. 57, 65 (2000) (noting that the right to familial relations is "the oldest of the fundamental liberty interests recognized"); *Brokaw,* 235 F.3d at 1018 (same). "[T]he right of a man and woman to marry, and to bear and raise their children is the most fundamental of all rights—the foundation of not just this country, but of all civilization." 235 F.3d at 1018; *see also Smith v. Organization of Foster Families For Equality and Reform,* 431 U.S. 816, 845 (1977) (noting that "the liberty interest in family privacy has its source ... not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition' ") (citation omitted); *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972).

113. Equally fundamental is the right of a child to be raised and nurtured by his parents. *Santosky,* 455 U.S. at 760, 102 S. Ct. 1388 (noting that "until the state proves parental unfitness, the child and his parents *share* a vital interest in preventing erroneous termination of the natural relationship") (emphasis added); *Brokaw,* 235 F.3d at 1018 (same). *Doe v. Heck*, 327 F.3d 492, 517–18 (7th Cir. 2003), as amended on denial of reh'g (May 15, 2003).

114. A defendant's threat to remove a child from the custody of their parents violates the family's right to familial relations, which includes a liberty interest in the maintenance of the family unit. *Stanley,* 405 U.S. at 651; *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977).

This protection is especially important where, as here, "we are concerned with the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state." *Duchesne,* 566 F.2d at 825.

115. The interest being protected is not only that of the "parent in the 'companionship, care, custody, and management of his or her children,' [but also] of the children in not being dislocated from the 'emotional attachments that derive from the intimacy of daily association,' with the parent." *Id.* (citations omitted). *See, e.g., Miller v. City of Philadelphia,* 174 F.3d 368, 376 (3d Cir.1999) (holding that when a social worker "threaten[s] to remove a child from the home if the father himself d[oes] not leave ... the social worker effectively remove[s] the child from the parents' custody"); *Croft,* 103 F.3d at 1124–27 (holding that right to familial relations was violated when child welfare caseworker gave a father "an ultimatum ... [that] unless he left his home and separated himself from his daughter until the investigation was complete, she would take [his daughter] physically from the home ... and place her in foster care"). *See also Brokaw,* 235 F.3d at 1019 (holding that "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse").

116. Due process "requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw,* 235 F.3d at 1020. This conclusion applies equally in the context of obtaining parental consent to a restrictive safety plan. Under *Dupuy,* the state may not threaten to infringe parental custody rights when the state has no legal right to carry through on the threat. *See Dupuy,* 465 F.3d at 761–63. If a defendant misrepresents the facts in order to obtain the parents' consent to a safety plan, the agreement to the safety plan was not voluntary and the parents were illegally coerced into signing it, and that is a denial of due process. *Id.* at 761–62 *Hernandez ex rel. Hernandez v. Foster,* 657 F.3d 463, 486– 87 (7th Cir. 2011).

117.     Although child welfare caseworkers may investigate allegations of child abuse without violating parents' constitutional right to familial relations, they may not do so arbitrarily. *Tenenbaum,* 193 F.3d at 600; *Croft v. Westmoreland County Children and Youth Services,* 103 F.3d 1123, 1126 (3d Cir.1997).

118.     In contrast to substantive due process claims, "[i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Doe by Nelson v. Milwaukee County*, 903 F.2d 499, 502 (7th Cir.1990).

119.     Familial relations are protected liberty interests. *Santosky,* 455 U.S. at 753; *Stanley v. Illinois*, 405 U.S. 645, 651–52, 92 (1972). *See also, Doe,* 903 F.2d at 504 n. Parental rights cannot be denied without an "opportunity for them to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations omitted). Similarly, a child's right to be nurtured by his parents cannot be denied without an opportunity to be heard in a meaningful way. The amount of process due varies with the particular situation—it is a "flexible" concept. *Id.* at 334, 96 S.Ct. 893. However, no matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents. *Malik v. Arapahoe County Dept. of Social Serv.*, 191 F.3d 1306, 1315 (10th Cir.1999) ("An ex parte hearing based on misrepresentation and omission does not constitute notice and an opportunity to be heard."). Minimally, it also means that governmental officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances. *Hollingsworth v. Hill,* 110 F.3d 733, 739 (10th Cir.1997) ("Removal of children from the custody of their parents requires pre-deprivation notice and a hearing except for extraordinary situations

where some valid governmental interest is at stake that justified postponing the hearing until after the event."); *Malik,* 191 F.3d at 1315 (a parent has a liberty interest in familial association and privacy that—absent extraordinary circumstances—cannot be violated without adequate pre-deprivation procedures).

120.    Procedural due process rights are violated when:

- a child is removed based on knowingly false statements of child neglect. *Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000).
- a child is removed without a pre-deprivation hearing or exigent circumstances. *Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000).
- a defendant filed or conspired to file false statements with the court. *Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000).
- Reports provided to the state court contained false information that the court relied upon when ordering the continued withholding of a child from his parents. *Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000).

121.    Those acts are procedural due process violations based on the post-deprivation process afforded to children and their parents. *Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000). *See also Morrison v. Jones*, 607 F.2d 1269, 1276 (9th Cir.1979) (dismissal of procedural due process claim improper where mother alleged child was removed without adequate post-deprivation hearing). *Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 503 (7th Cir.1999) ("We agree that sham procedures do not satisfy due process …"). *Brokaw v. Mercer Cty.,* 235 F.3d 1000, 1021–22 (7th Cir. 2000).

122.    When a private citizen conspires with a state actor, then the private citizen is subject to Section 1983 liability. *Bowman v. City of Franklin*, 980 F.2d 1104, 1107 (7th Cir.1992).

123.    An official causes a constitutional violation if he sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights. *Morris v. Dearborne,* 181 F.3d 657, 672 (5th Cir.1999). Therefore, "[a]n official satisfies the personal responsibility required of § 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the

constitutional deprivation occurs at her direction or with her knowledge or consent." *Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir.1985) (internal quotation omitted). *Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000).

124.    A defendant who directs the removal of children is enough to affix liability. *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 859 (7th Cir.1999) (holding that allegations that a supervisor directed the unconstitutional search is enough to affix liability). *See also, Morris*, 181 F.3d at 672 (defendant who was moving force behind the removal of children was responsible for causing allegedly unconstitutional removal). *Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000).

## COUNT I
## SECTION 1983: FOURTH AMENDMENT UNLAWFUL SEIZURE OF BB

125.    BB was removed from his parents by Defendant Haddock without a court order, probable cause, or consent.

126.    Defendant Galassi did not obtain consent to remove BB. Defendant Galassi coerced Jacob to sign a safety plan for BB under duress.

127.    Defendant Collins directed the removal of BB.

128.    Defendant Petrak directed Defendant Collins to remove BB from his parents.

129.    Defendants Petrak and Collins conspired to coerce Jacob into signing a safety plan under duress and to remove BB without legal consent, probable cause, or a court order.

130.    BB seeks all compensatory damages, attorney's fees, statutory interest, and punitive damages allowed by law for the violation of his clearly established Fourth Amendment rights by Defendants Haddock, Galassi, Collins, and Petrak. Defendants acted under color of state law.

## COUNT II
## SECTION 1983: FOURTH AMENDMENT UNLAWFUL SEIZURE OF AA

131.     AA was removed from his parents by Defendant Tate without a court order, probable cause, or consent.

132.     Defendant Collins directed the removal of AA.

133.     Defendant Petrak directed Defendant Collins to remove AA from his parents.

134.     Defendant Petrak and Defendant Collins conspired to remove AA without legal consent, probable cause, or a court order.

135.     AA seeks all compensatory damages, attorney's fees, statutory interest, and punitive damages allowed by law for the violation of his clearly established Fourth Amendment rights by Defendants Tate, Collins, and Petrak. Defendants acted under color of state law.

## COUNT III
## SECTION 1983: FOURTH AMENDMENT UNLAWFUL SEIZURE OF CC

136.     CC was removed from his parents by Defendant Tate without a court order, probable cause, or consent.

137.     Defendant Parker did not obtain consent to remove CC. Defendant Parker coerced Jacob and Patti to sign a safety plan for CC under duress.

138.     Defendant Maxwell directed the removal of CC.

139.     Defendant Petrak set in motion a series of events that she knew or reasonably should have known would cause Defendant Maxwell to direct the removal of CC from his parents.

140.     Defendant Petrak's false reporting to DCFS, including reports relied upon by Defendant Maxwell, were a cause of Maxwell directing Parker to coerce Jacob and Patti into signing a safety plan under duress and to remove CC without legal consent, probable cause, or a

court order.

141.    CC seeks all compensatory damages, attorney's fees, statutory interest, and punitive damages allowed by law for the violation of his clearly established Fourth Amendment rights by Defendants Tate, Parker, Maxwell, and Petrak. Defendants acted under color of state law.

## COUNT IV
## SECTION 1983: FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS / FAMILIAL RELATIONS

142.    An arbitrary child welfare investigation violates the parents' and children's constitutional right to familial relations.

143.    The adult Plaintiffs were investigated for abuse and neglect between October 16, 2017, when an anonymous hotline call was made and July 8, 2020, when the children were returned home.

144.    DCFS investigations are supposed to take 60 days.

145.    The Adult Plaintiffs were continuously investigated for 996 days.

146.    Inness and Collins told the adult Plaintiffs the allegations were unfounded, and the investigation was over in March 2019.

147.    Then, when Defendant Petrak was planning on approving BB's discharge home on March 29, 2019, everything changed when Defendant Petrak was confronted by Jacob and his mother.

148.    After the March 29, 2019, discharge meeting at Defendant OSF, Defendant Petrak revived the reportedly closed child welfare investigation as a personal vendetta against the Krueger family.

149.    This was known by DCFS, and it was documented in the OSF chart that was made accessible to DCFS.

150.     As a result, all subsequent investigation of the adult Plaintiffs was arbitrary and performed for an improper and illegal purpose.

151.     Plaintiffs seek all compensatory damages, attorney's fees, statutory interest, and punitive damages allowed by law for the violation of their clearly established Fourteenth Amendment rights by Defendants Inness, Collins, Taylor, Wilson, and Petrak. Defendants acted under color of state law.

## COUNT V
## SECTION 1983: FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS

152.     AA, BB, and CC were detained and continuously withheld without a pre-deprivation hearing or exigent circumstances. AA, BB, and CC were detained and continuously withheld based on knowingly false statements of child neglect.

153.     Defendants Inness, Taylor, Collins, Wilson, Horcharik, and Petrak misstated facts and/or withheld exculpatory evidence from the Juvenile Court.

154.     Defendants' misstatements of facts and concealment of exculpatory evidence caused the illegal separation of AA, BB, and CC from their parents, Jacob and Patti.

155.     Plaintiffs seek all compensatory damages, attorney's fees, statutory interest, and punitive damages allowed by law for the violation of their clearly established Fourteenth Amendment rights by Defendants Inness, Collins, Taylor, Wilson, Horcharik, and Petrak. Defendants acted under color of state law.

## COUNT VI
## SECTION 1983: FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS / FAMILIAL RELATIONS

156.     It is well established that the right of a man and woman to marry, and to bear and raise their children is the most fundamental of all rights—the foundation of not just this country, but of all civilization. *Supra.*

157. Knowing, at least by March 29, 2019, that the child welfare investigation was a sham, Defendants Taylor and Horcharik impermissibly and in violation of the Fourteenth Amendment shifted to Jacob and Patti the burden of proving to DCFS that they were not guilty of abuse and neglect. (This Paragraph was dismissed pursuant to the Order of October 14, 2022 [ECF #22], and is included herein for purposes of preserving the record.)

158. Taylor and Horcharik told Jacob and Patti if they admitted they abused and neglected AA, BB, and CC, then their children would be returned home.

159. Horcharik told Jacob if he divorced Patti, then his children would be returned to him.

160. Plaintiffs seek all compensatory damages, attorney's fees, statutory interest, and punitive damages allowed by law for the violation of their clearly established Fourteenth Amendment rights by Taylor and Horcharik. Defendants acted under color of state law.

## COUNT VII DEFENDANT OSF
## DECLARATORY RELIEF

161. Knowing Patti and Jacob were exonerated of any wrongdoing and that AA, BB, and CC were not abused, OSF continues to record and report in EMR accessible to other authorized health care providers that Patti and Jacob are guilty of medical child abuse and that AA, BB, and CC were abused.

162. Defendant's false recording in Plaintiffs' EMR and false reporting to other health care providers interferes with Plaintiffs' ability to access health care from other providers.

163. This is an actual and ongoing controversy that impacts Plaintiffs' abilities to seek medical care for ailments.

164. Plaintiffs request that this Court declare the rights of the parties as follows. While OSF controls Plaintiffs' EMR, the EMR belongs to Plaintiffs. It is against the law and the public

policy of the State of Illinois for OSF to record and report abuse in Plaintiffs' EMR when Defendant knows the Macon County Juvenile Court has exonerated the adult Plaintiffs of any wrongdoing.

## COUNT VIII DEFENDANT OSF
## INJUNCTIVE RELIEF

165.     Plaintiffs seek preliminary and permanent injunctive relief against OSF.

166.     Defendant OSF has the ability to update Plaintiffs' EMR.

167.     Defendant OSF has the ability to update Plaintiffs' EMR to remove and correct any statements to the effect that Patti or Jacob abused AA, BB, and CC.

168.     Defendant OSF has the ability to update Plaintiffs' EMR to remove and correct any statements to the effect that AA, BB, and CC were the victims of abuse.

169.     There is no adequate remedy at law for Defendant's false recording and reporting of medical child abuse in Plaintiffs' EMR.

170.     Plaintiffs have a likelihood of success on the merits.

171.     Correcting the EMR would not be burdensome or costly.

172.     On balance, the equities favor Plaintiffs, as Defendant is knowingly recording and reporting incorrect information, which is impacting Plaintiffs' abilities to access health care for ailments.

173.     Plaintiffs request an Order of this Court instructing OSF to remove from Plaintiffs' EMR any references to medical child abuse, Munchausen by Proxy, Factitious Order by Proxy, or that AA, BB, and CC were abused.

## COUNT IX DEFENDANT PETRAK
## INFLICTION OF EMOTIONAL DISTRESS

174.     Defendant Petrak's conduct was extreme and outrageous.

175. Defendant Petrak intended to cause Plaintiffs severe emotional distress or knew that there was a high probability that her conduct would cause severe emotional distress.

176. Defendant Petrak's conduct caused Plaintiffs to suffer emotional distress.

177. Plaintiffs seek all damages allowed by law for Defendant Petrak's infliction of emotional distress.

## COUNT X DEFENDANT OSF
## INFLICTION OF EMOTIONAL DISTRESS – AGENCY

178. Defendant OSF employed Defendant Petrak at times relevant to her infliction of emotional distress.

179. Defendant OSF ratified Defendant Petrak's infliction of emotional distress as described herein.

180. At times relevant to the Complaint, Defendant Petrak was the agent of Defendant OSF and acted on behalf of OSF.

181. Plaintiffs seek all damages allowed by law for Defendant OSF's infliction of emotional distress.

## COUNT XI DEFENDANTS PETRAK, OSF
## NEGLIGENCE

182. Each paragraph of this complaint is incorporated as though restated fully herein.

183. At all times relevant, Defendant Petrak was a physician licensed to practice by the State of Illinois.

184. At times relevant, Defendant Petrak had a duty to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified and careful physician.

185. At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment.

186.     At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment, and as a result, Defendant OSF is vicariously liable for the conduct of Defendant Petrak.

187.     Defendant Petrak failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful physician, by one or more of the following negligent acts and/or omissions:

   a. Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;
   b. Failed to ensure a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;
   c. Continued to investigate Adult Plaintiffs for abuse and neglect of their minor children even after she determined the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;
   d. Continued to investigate Adult Plaintiffs for abuse and neglect of their minor children even after she knew or should have known the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;
   e. Wrongly directed the removal of AA and BB;
   f. Failed to stop the removal of AA and/or BB;
   g. Disregarded exculpatory evidence;
   h. Withheld exculpatory evidence;
   i. Misstated facts when she knew or should have known such misstated facts would be reported to the Macon County Juvenile Court;
   j. Omitted and/or allowed information to be omitted, inserted or allowed to be inserted false information, and/or otherwise created or allowed to be created inaccurate reports;
   k. Otherwise caused and/or contributed to cause the violations alleged herein.

188.     As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Petrak, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

**COUNT XII DEFENDANTS PETRAK, OSF**
**INFORMED CONSENT**

189.     Each paragraph of this complaint is incorporated as though restated fully herein.

190.     At all times relevant, Plaintiff BB was a patient at Defendant OSF.

191.     At all times relevant, Defendant Petrak was a physician licensed to practice by the State of Illinois.

192.     At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment.

193.     At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment, and as a result, Defendant OSF is vicariously liable for the conduct of Defendant Petrak.

194.     At all times relevant, Defendant Petrak had a duty to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified and careful physician.

195.     At all times relevant, it was the duty of Defendant Petrak to obtain consent from Adult Plaintiffs as the parents and agents duly authorized to make health care decisions for BB, for the touching, examination, surveillance, and investigation of their minor child BB.

196.     A reasonably well-qualified physician, under the same or similar circumstances, would have obtain consent from Adult Plaintiffs as the parents and agents duly authorized to make health care decisions for their minor child BB, for the touching, examination, surveillance, and investigation of their minor child.

197.     Defendant Petrak breached her duty to exercise reasonable care, which a reasonably well-qualified physician would have exercised under the same or similar circumstances, and was negligent by one or more of the following negligent acts or omissions:

     a.  Failed to obtain consent for the touching, examination, surveillance, and/or investigation concerning the minor BB;

b. Continued with touching, examination, surveillance, and/or investigation of the minor BB without consent;

c. Failed to disclose her touching, examination, surveillance, and/or investigation of the minor BB to Adult Plaintiffs;

d. Failed to disclose the true purpose of her touching, examination, surveillance, and/or investigation of the minor BB to Adult Plaintiffs;

e. Purposefully concealed her touching, examination, surveillance, and/or investigation of the minor BB from his parent;

f. Misstated facts regarding her touching, examination, surveillance, and/or investigation of the minor BB;

g. Otherwise caused and/or contributed to cause the violations alleged herein.

198. As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Petrak, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XIII DEFENDANTS PETRAK, OSF
## BATTERY

199. Each paragraph of this complaint is incorporated as though restated fully herein.

200. At all times relevant, Plaintiff BB was a patient at Defendant OSF.

201. At all times relevant, Defendant Petrak was a physician licensed to practice by the State of Illinois.

202. At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment.

203. At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment, and as a result, Defendant OSF is vicariously liable for the conduct of Defendant Petrak.

204. At all times relevant, it was the duty of Defendant Petrak, prior to touching, surveillance, and/or examination of the minor BB, to obtain consent from Adult Plaintiffs as the parents and agents duly authorized to make health care decisions for BB, for the touching,

examination, and/or surveillance of their minor child BB.

205.    Defendant Petrak purposefully made misstatements of facts and/or concealed facts in regard to her role and purpose in touching, surveillance, and/or examinationn of the minor BB.

206.    Informed consent to allow the touching, surveillance, and/or examination of the minor BB, was not obtained from the Adult Plaintiffs, as the agents duly authorized to make health care decisions for their minor child.

207.    Alternatively, consent to allow the touching, surveillance, and/or examination of the minor BB, was obtained under false pretenses from the Adult Plaintiffs, as the agents duly authorized to make health care decisions for their minor child.

208.    Had Adult Plaintiffs as agents duly authorized to make health care decisions for the minor BB been informed of the role and purpose of Defendant Petrak in regard to their minor child BB, and/or her touching, surveillance, and/or examination of the minor BB, Adult Plaintiff would not have provided consent.

209.    Without the consent of Adult Plaintiffs, Defendant Petrak, proceeded with purposeful touching, surveillance, and/or examination of the minor BB,

210.    As a direct and proximate result of said purposeful touching, surveillance, and/or examination of the minor BB, Plaintiffs, and each of them,  sustained injuries including, but not limited to, deterioration in their overall physical, mental, and psychosocial well-being, pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XIV DEFENDANT INNESS
## NEGLIGENCE

211.    Each paragraph of this complaint is incorporated as though restated fully herein.

212.    At all times relevant, Defendant Inness was licensed as a Child Welfare Employee by the Child Welfare Employee Licensing Board of the State of Illinois.

213.    At times relevant to, the Child Welfare Employee License (CWEL) is a license that is required for any child welfare employee independent of their state employment, and therefore required both for employment through the state and for a private child welfare agency.

214.    At all times relevant, it was the duty of Defendant Inness to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in regard to her role in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC.

215.    Defendant Inness failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC by one or more of the following negligent acts and/or omissions:

   a. Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;
   b. Continued to investigate Adult Plaintiffs for abuse and neglect of their minor children even after she determined the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;
   c. Continued to investigate Adult Plaintiffs for abuse and neglect of their minor children even after she knew or should have known the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;
   d. Purposefully misstated facts to the Macon County Juvenile Court;
   e. Withheld exculpatory evidence;
   f. Omitted information and/or inserted false information in her reports of investigation, and/or otherwise created or allowed to be created an inaccurate reports;
   g. Otherwise caused and/or contributed to cause the violations alleged herein.

216.    As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Inness, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XV DEFENDANT COLLINS
## NEGLIGENCE

217.     Each paragraph of this complaint is incorporated as though restated fully herein.

218.     At all times relevant, Defendant Collins was licensed as a Child Welfare Employee by the Child Welfare Employee Licensing Board of the State of Illinois.

219.     At times relevant to, the Child Welfare Employee License (CWEL) is a license that is required for any child welfare employee independent of their state employment, and therefore required both for employment through the state and for a private child welfare agency.

220.     At all times relevant, it was the duty of Defendant Collins to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in regard to her role in the supervision of Defendant Inness and the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC.

221.     Defendant Collins failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in the supervision of Defendant Inness and the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC by one or more of the following negligent acts and/or omissions:

   a.  Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;
   b.  Failed to appropriately supervise the investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;
   c.  Failed to appropriately supervise Defendant Collins in her investigation and reporting regarding claims concerning the health, safety, and welfare of AA, BB, and/or CC;
   d.  Failed to ensure a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;
   e.  Continued to investigate Adult Plaintiffs for abuse and neglect of their minor children even after she determined the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;
   f.  Continued to investigate Adult Plaintiffs for abuse and neglect of their

minor children even after she knew or should have known the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;

g. Wrongly directed the removal of AA and BB;

h. Failed to stop the removal of AA and/or BB;

i. Disregarded exculpatory evidence;

j. Omitted and/or allowed information to be omitted, inserted or allowed to be inserted false information, and/or otherwise created or allowed to be created inaccurate reports;

k. Otherwise caused and/or contributed to cause the violations alleged herein.

222. As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Collins, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XVI DEFENDANT TAYLOR
## NEGLIGENCE

223. Each paragraph of this complaint is incorporated as though restated fully herein.

224. At all times relevant, Defendant Taylor was licensed as a Child Welfare Employee by the Child Welfare Employee Licensing Board of the State of Illinois.

225. At times relevant to, the Child Welfare Employee License (CWEL) is a license that is required for any child welfare employee independent of their state employment, and therefore required both for employment through the state and for a private child welfare agency.

226. At all times relevant, it was the duty of Defendant Taylor to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in regard to her role in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC.

227. Defendant Taylor failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC by one or more of the following

negligent acts and/or omissions:

    a. Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;

    b. Failed to appropriately supervise the investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;

    c. Failed to appropriately supervise Defendant Horcharik in her investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;

    d. Failed to ensure a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;

    e. Continued to investigate Adult Plaintiffs for abuse and neglect of their minor children even after she knew or should have known the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;

    f. Purposely made misstatements to Adult Plaintiff(s) regarding facts and/or law;

    g. Purposely made misstatements of fact s to the Macon County Juvenile Court;

    h. Disregarded exculpatory evidence;

    i. Withheld exculpatory evidence;

    j. Omitted and/or allowed information to be omitted, inserted or allowed to be inserted false information, and/or otherwise created or allowed to be created inaccurate reports;

    l. Otherwise caused and/or contributed to cause the violations alleged herein.

228. As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Taylor, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XVII DEFENDANT TATE
## NEGLIGENCE

229. Each paragraph of this complaint is incorporated as though restated fully herein.

230. At all times relevant, Defendant Tate was licensed as a Child Welfare Employee by the Child Welfare Employee Licensing Board of the State of Illinois.

231. At times relevant to, the Child Welfare Employee License (CWEL) is a license that

is required for any child welfare employee independent of their state employment, and therefore required both for employment through the state and for a private child welfare agency.

232.     At all times relevant, it was the duty of Defendant Tate to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in regard to her role in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC.

233.     Defendant Tate failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC by one or more of the following negligent acts and/or omissions:

a. Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;
b. Took AA from his home without a court order;
c. Took AA from his home without probable cause;
d. Took AA from his home without consent;
e. Took CC from St. Mary's and his parents on August 16, 2019 without a court order;
f. Took CC from St. Mary's and his parents on August 16, 2019 without probable cause;
g. Took CC from St. Mary's and his parents on August 16, 2019 without consent;
h. Wrongly took AA despite knowledge and/or suspicion the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;
i. Wrongly took CC despite knowledge and/or suspicion the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;
j. Otherwise caused and/or contributed to cause the violations alleged herein.

234.     As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Tate, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XVIII DEFENDANT GALASSI
## NEGLIGENCE

235.    Each paragraph of this complaint is incorporated as though restated fully herein.

236.    At all times relevant, Defendant Galassi was licensed as a Child Welfare Employee by the Child Welfare Employee Licensing Board of the State of Illinois.

237.    At times relevant to, the Child Welfare Employee License (CWEL) is a license that is required for any child welfare employee independent of their state employment, and therefore required both for employment through the state and for a private child welfare agency.

238.    At all times relevant, it was the duty of Defendant Galassi to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in regard to her role in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC.

239.    Defendant Galessi failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC by one or more of the following negligent acts and/or omissions:

a. Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;
b. Coerced Plaintiff Jacob to sign a safety plan under false pretenses on March 29, 2019;
c. Purposefully misstated the law and/or facts to Plaintiff(s);
d. Took BB from his parents without a court order;
e. Took BB from his parents without probable cause;
f. Took BB from his parents without consent;
g. Wrongly took BB from his parents despite knowledge and/or suspicion the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;
h. Otherwise caused and/or contributed to cause the violations alleged herein.

240.     As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Galassi, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XIX DEFENDANT HADDOCK
## NEGLIGENCE

241.     Each paragraph of this complaint is incorporated as though restated fully herein.

242.     At all times relevant, Defendant Haddock was licensed as a Child Welfare Employee by the Child Welfare Employee Licensing Board of the State of Illinois.

243.     At times relevant to, the Child Welfare Employee License (CWEL) is a license that is required for any child welfare employee independent of their state employment, and therefore required both for employment through the state and for a private child welfare agency.

244.     At all times relevant, it was the duty of Defendant Haddock to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in regard to his role in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC.

245.     Defendant Haddock failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC by one or more of the following negligent acts and/or omissions:

    a.  Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;
    b.  Took BB from OSF and his parents on April 2, 2019 without a court order;
    c.  Took BB from OSF and his parents on April 2, 2019 without probable cause;
    d.  Took BB from OSF and his parents on April 2, 2019 without consent;
    e.  Wrongly took BB from OSF and his parents despite knowledge and/or

suspicion the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;

f. Otherwise caused and/or contributed to cause the violations alleged herein.

246. As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Haddock, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XX DEFENDANT PARKER
## NEGLIGENCE

247. Each paragraph of this complaint is incorporated as though restated fully herein.

248. At all times relevant, Defendant Parker was licensed as a Child Welfare Employee by the Child Welfare Employee Licensing Board of the State of Illinois.

249. At times relevant to, the Child Welfare Employee License (CWEL) is a license that is required for any child welfare employee independent of their state employment, and therefore required both for employment through the state and for a private child welfare agency.

250. At all times relevant, it was the duty of Defendant Parker to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in regard to her role in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC.

251. Defendant Parker failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC by one or more of the following negligent acts and/or omissions:

a. Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;

b. Coerced Plaintiff Jacob to sign a safety plan under false pretenses on

August 13, 2019;
c. Purposefully misstated the law and/or facts to Plaintiff(s);
d. Took CC form his parents without a court order;
e. Took CC from his parents without probable cause;
f. Took CC from his parents without consent;
g. Wrongly took CC from his parents despite knowledge and/or suspicion the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;
h. Otherwise caused and/or contributed to cause the violations alleged herein.

252. As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Parker, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XXI DEFENDANT MAXWELL
## NEGLIGENCE

253. Each paragraph of this complaint is incorporated as though restated fully herein.

254. At all times relevant, Defendant Maxwell was licensed as a Child Welfare Employee by the Child Welfare Employee Licensing Board of the State of Illinois.

255. At times relevant to, the Child Welfare Employee License (CWEL) is a license that is required for any child welfare employee independent of their state employment, and therefore required both for employment through the state and for a private child welfare agency.

256. At all times relevant, it was the duty of Defendant Maxwell to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in regard to her role in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC.

257. Defendant Maxwell failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC by one or more of the following

negligent acts and/or omissions:

    a. Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;

    b. Wrongly authorized and directed the taking of CC from St. Mary's and his parents on August 16, 2019, without a court order;

    c. Wrongly authorized and directed the taking of CC from St. Mary's and his parents on August 16, 2019, without a probable cause;

    d. Wrongly authorized and directed the taking of CC from St. Mary's and his parents on August 16, 2019, without consent;

    e. Wrongly authorized and directed the taking of CC from St. Mary's and his parents on August 16, 2019, despite knowledge and/or suspicion the allegations of abuse and neglect were unfounded and the minor Plaintiffs were safe;

    f. Otherwise caused and/or contributed to cause the violations alleged herein.

258.    As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Maxwell, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XXII DEFENDANT HORCHARIK
## NEGLIGENCE

259.    Each paragraph of this complaint is incorporated as though restated fully herein.

260.    At all times relevant, Defendant Horcharik was licensed as a Child Welfare Employee by the Child Welfare Employee Licensing Board of the State of Illinois.

261.    At times relevant to, the Child Welfare Employee License (CWEL) is a license that is required for any child welfare employee independent of their state employment, and therefore required both for employment through the state and for a private child welfare agency.

262.    At all times relevant, it was the duty of Defendant Horcharik to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in regard to her role in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC.

263. Defendant Horcharik failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC by one or more of the following negligent acts and/or omissions:

    a. Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;

    b. Purposefully misstated the law and/or facts to Plaintiff Patti and/or Jacob;

    c. Coerced Plaintiffs Patti and/or Jacob with misstatements;

    d. Wrongly and purposefully Plaintiffs Patti and/or Jacob that unless they admitted to abuse and neglect, their minor children would not be returned home;

    e. Wrongly and purposefully advised Plaintiff Jacob that if he divorced Plaintiff Patti the children would return home;

    f. Otherwise caused and/or contributed to cause the violations alleged herein.

264. As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Horcharik, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

## COUNT XXIII DEFENDANT WILSON
## NEGLIGENCE

265. Each paragraph of this complaint is incorporated as though restated fully herein.

266. At all times relevant, Defendant Wilson was licensed as a Child Welfare Employee by the Child Welfare Employee Licensing Board of the State of Illinois.

267. At times relevant to, the Child Welfare Employee License (CWEL) is a license that is required for any child welfare employee independent of their state employment, and therefore required both for employment through the state and for a private child welfare agency.

268. At all times relevant, it was the duty of Defendant Wilson to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare

Employee in regard to her role in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC.

269.     Defendant Wilson failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably careful Child Welfare Employee in the investigation of claims concerning the health, safety, and welfare of AA, BB, and/or CC by one or more of the following negligent acts and/or omissions:

    a. Failed to conduct a thorough and appropriate investigation into the claims concerning the health, safety, and welfare of AA, BB, and/or CC;

    b. Continued to investigate Adult Plaintiffs for abuse and neglect of their minor children even after she knew or should have known the allegations of abuse and neglect were determined unfounded and the minor Plaintiffs were safe;

    c. Purposefully misstated facts to the Macon County Juvenile Court;

    d. Withheld exculpatory evidence;

    e. Omitted and/or allowed information to be omitted, inserted or allowed to be inserted false information, and/or otherwise created or allowed to be created inaccurate reports;

    f. Otherwise caused and/or contributed to cause the violations alleged herein.

270.     As a direct and proximate result of one or more of the negligent acts or omissions of Defendant Wilson, Plaintiffs, and each of them, suffered injuries including but not limited to pain, suffering, mental anguish, grief, loss of normal life, loss of society, and loss of companionship.

### COUNT XXIV DEFENDANTS PETRAK, OSF
### FALSE IMPRISONMENT

271.     Each paragraph of this Complaint is incorporated as though restated fully herein.

272.     Between October 2017 and March 2019, AA and BB were in the custody and control of Plaintiffs throughout the investigation for suspected medical child abuse. On March 7, 2019, after discussing with Defendant Petrak, Defendant Inness told Plaintiffs Jacob and Patti that

the investigation was being closed out. On March 8, 2019, Defendant Petrak concluded her findings in a written report.

273. On March 29, 2019, without consent, a court order, or exigent circumstances, Defendant Petrak directed the detainment of BB and the removal of Plaintiffs Jacob and Patti from OSF.

274. BB was removed from his parents held without consent, probable cause or court order.

275. BB was removed and held against his and that of his parents from March 29, 2019 until July 8, 2020. BB was detained and kept from his parents for a total of 467 days.

276. BB suffered the loss of his parents' care, comfort, love, society, companionship, nurture, and support while he was wrongfully and intentionally imprisoned by OSF.

277. Plaintiffs Jacob and Patti suffered the loss of their child's comfort, love, society, and companionship, while he was wrongfully and intentionally imprisoned by OSF.

278. At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment.

279. At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment, and as a result, Defendant OSF is vicariously liable for the conduct of Defendant Petrak.

280. Plaintiffs seek all damages allowed by law for Defendants' false imprisonment.

## COUNT XXV DEFENDANT PETRAK, OSF
## MALICIOUS PROSECUTION

281. Each paragraph of this Complaint is incorporated as though restated fully herein.

282. On April 2, 2019, a petition was filed against Plaintiffs Jacob and Patti in Macon County, Illinois, Juvenile Court, alleging abuse and neglect of AA and BB based on suspected medical child abuse.

283. The Juvenile Court proceedings were terminated in favor of Plaintiffs Jacob and Patti, whereby the Court exonerated Plaintiffs Jacob and Patti of any alleged wrongdoing on July 8, 2020.

284. Defendant Petrak arbitrarily investigated Plaintiffs Jacob and Patti for the abuse and neglect of their children.

285. Defendant Petrak unlawfully directed the removal of AA, BB, and CC.

286. Defendant Petrak disregarded and withheld exculpatory evidence, and misstated facts she knew would be reported to the Macon County Juvenile Court.

287. Defendant Petrak acted with malice and without probable cause.

288. The actions of Defendant Petrak was the direct and proximate cause of the commencement of the Macon County judicial proceeding.

289. At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment.

290. At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment, and as a result, Defendant OSF is vicariously liable for the conduct of Defendant Petrak.

291. As a result, AA, BB, and CC, suffered the loss of their parents' care, comfort, and support while wrongfully and intentionally detained, and Plaintiffs Jacob and Patti suffered the loss of their three young children for a total of 467 days.

## COUNT XXVI DEFENDANT OSF
## INSTITUTIONAL MEDICAL MALPRACTICE

292.    Each paragraph of this Complaint is incorporated as though restated fully herein.

293.    At all times it was the duty of Defendant OSF to adhere to the professional standard of care of BB required of institutions of like kind and character.

294.    Defendant OSF deviated from and breached the standard of care in one or more of the following ways:

      a.    Failed to conform to and to observe one or more of the standards adhered to by accredited hospitals in the area involved at that time;
      b.    Failed to assume responsibility for the care of its patients including BB;
      c.    Failed to review and supervise the treatment of its patients including BB that is administrative or managerial in character;
      d.    Failed to ensure its patients including BB were protected from battery and other unwanted touching and harmful acts;
      e.    Failed to supervise the medical care provided to its patients including BB;
      f.    Failed to ensure adequate communication between its medical team.

295.    As a direct and proximate result of Defendant OSF's institutional negligence, BB has suffered long-lasting, severe, psychological trauma which has led to the loss of a normal life, as well loss of loss of the nurture, care, society and companionship of his family.

## COUNT XXVII DEFENDANTS PETRAK, OSF
## FRAUDULENT CONCEALMENT / MISREPRESENTATION

296.    Each paragraph of this Complaint is incorporated as though restated fully herein.

297.    At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment.

298.    At times relevant, Defendant Petrak was a duly authorized agent and/or employee of Defendant OSF, acting within the scope of her agency and/or employment, and as a result, Defendant OSF is vicariously liable for the conduct of Defendant Petrak.

299.    Defendants OSF and Petrak covertly conducted video surveillance of Plaintiffs on

March 25, 2019, when BB was moved to a different room within OSF, to surveil BB, Jacob, and Patti.

300. Plaintiffs were unaware that OSF were monitoring and videotaping their actions.

301. Defendant Petrak made an investigative finding based on the video surveillance from the room wrongly contending Plaintiff Patti had attempted to disrupt or manipulate BB's medical care. To date, Defendant OSF has failed to produce the video surveillance footage.

302. Furthermore, Defendant Petrak has continuously misstated and misrepresented facts that she knew would be reported to Macon County Juvenile Court for Plaintiff's judicial proceeding.

303. To date, Defendant OSF continues to falsely report that Jacob and Patti were guilty of medical child abuse and that the AA, BB, and CC were abused and neglected.

304. Plaintiffs seek all damages allowed by law for Defendants' fraudulent concealment and misrepresentation.

## COUNT XXVIII DEFENDANT GALASSI
## FRAUDULENT CONCEALMENT / MISREPRESENTATION

305. Each paragraph of this Complaint is incorporated as though restated fully herein.

306. On March 29, 2019, Defendant Galassi concealed the purpose of the paperwork upon which Plaintiff Jacob was required to sign with the intent to deceive or defraud Jacob into signing a safety plan related to the removal of BB from Jacob and Patti.

307. While under duress, Jacob signed the paperwork, which ultimately led to the removal of BB.

308. Plaintiffs seek all damages allowed by law for Defendant's fraudulent concealment and misrepresentation.

## PLAINTIFFS DEMAND TRIAL BY JURY

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants; that compensatory damages, punitive damages (as allowed by law), attorneys' fees (as allowed by law), costs of suit and prejudgment interest be awarded to Plaintiffs; that the Court declare the rights of the parties; and that the Court enter preliminary and permanent injunctive relief on behalf of the Plaintiffs.

Dated: February 7, 2024

Respectfully submitted,

By: */s/ Aaron W. Rapier*

Aaron W. Rapier
Rapier Law Firm
1770 Park Street, Suite 200
Naperville, IL 60563
(630) 853-9224
IL No. 6270472
arapier@rapierlawfirm.com

By: */s/ Julie A. Murphy*

Julie A. Murphy
Hart McLaughlin & Eldridge, LLC
One S. Dearborn, Suite 1400
Chicago, IL 60603
(312) 9712-9236
IL No. 6290303
jmurphy@hmelegal.com

**CERTIFICATE OF SERVICE**

I certify that on February 7, 2024, I electronically filed the foregoing **Amended Complaint** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants listed in the below service list:

**Attorneys for Defendant Channing Petrak**
John P Heil, Jr.
jheil@heylroyster.com
Ashley Elizabeth Broadstone
abroadstone@heylroyster.com
Emily Jane Galligan
egalligan@heylroyster.com
HEYL ROYSTER VOELKER & ALLEN
300 Hamilton Boulevard
PO Box 6199
Peoria, IL 61601-6199
309-676-0400

**Attorneys for Defendant OSF St. Francis Medical Center**
Ambrose V McCall
amccall@hinshawlaw.com
Jessica Johnson
jjohnson@hinshawlaw.com
HINSHAW & CULBERTSON LLP
Ste 600
416 Main Street
Peoria, IL 61602
309-674-1025
Fax: 309-674-9328

**Attorneys for Defendants Jennifer Inness, Alisa Collins, Kimberly Taylor, Leandra Tate, Raelyn Galassi, Austin Haddock, Anita Parker, Angelique Maxwell, Lindsay Horcharik, Kimberly Wilson**
Peter Quigley
peter.quigley@ilag.gov
Lisa A Cook
lisa.cook@ilag.gov
ILLINOIS ATTORNEY GENERAL
115 South Lasalle Street
Chicago, IL 60603
773-771-4500