E-FILED
Tuesday, 06 August, 2024  05:16:53 PM
Clerk, U.S. District Court, ILCD

# Deposition Transcript

Case Number: 22-CV-1016-JBM-JEH
Date: July 10, 2024

In the matter of:

# KRUEGER, et al. v PETRAK, et al.

# Channing Petrak, M.D.

**CERTIFIED
COPY**

Reported by:
Grace Baldino



**Steno**
**Official Reporters**

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

```
                              - - -
  1            IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF ILLINOIS
  2                      PEORIA DIVISION

  3                           - - -

  4   JACOB KRUEGER and PATRICIA :   CIVIL ACTION
      KRUEGER, individually and  :
  5   as the parents and next    :
      friends of AA, BB, and CC, :
  6           Plaintiffs,        :
                                 :
  7           vs.                :
                                 :
  8   CHANNING PETRAK, et al.,   :
              Defendants.        :   NO. 22-CV-1016-JBM-JEH
  9                           - - -

 10               Wednesday, July 10, 2024

 11                           - - -

 12

 13            Videotaped deposition of CHANNING PETRAK,

 14   MD, taken pursuant to Notice and remotely via Zoom,

 15   commencing at 9:11 a.m., and reported

 16   stenographically by Grace M. Baldino, Professional

 17   Shorthand Reporter and Notary Public in and for the

 18   Commonwealth of Pennsylvania.

 19                           - - -

 20

 21

 22

 23

 24
```

CHANNING PETRAK, M.D.                                                JOB NO. 1027581
JULY 10, 2024

---

Page 2

```
 1   APPEARANCES:
 2
             RAPIER LAW FIRM
 3           BY:  AARON W. RAPIER, ESQUIRE
             1770 Park Street
 4           Suite 200
             Naperville, IL 60563
 5           815-782-5478
             arapier@rapierlawfirm.com
 6           Representing the Plaintiffs
 7
 8   HEYL, ROYSTER, VOELKER & ALLEN, P.C.
             BY:  JOHN P. HEIL, JR., ESQUIRE
 9           300 Hamilton Boulevard
             PO Box 6199
10           Peoria, IL 61601
             309-676-0400
11           jheil@heylroyster.com
             Representing the Witness
12
13
             HINSHAW & CULBERTSON LLP
14           BY:  AMBROSE V. McCALL, ESQUIRE
             416 Main Street
15           6th Floor
             Peoria, IL 61602
16           309-674-1025
             amccall@hinshawlaw.com
17           Representing the Defendant, OSF Saint
             Francis Medical Center
18
19
             ASSISTANT ATTORNEY GENERAL
20           BY:  PETER QUIGLEY, ESQUIRE
             500 South Second Street
21           Springfield, IL 62701
             217-782-1090
22           peter.quigley@ilag.gov
             Representing the Individual Defendants
23
24
```

---

Page 3

```
 1   APPEARANCES: (cont'd)
 2
 3   ALSO PRESENT:
 4           BECKY TRIBE, ESQUIRE (RAPIER LAW FIRM)
 5           AMY WARD, PARALEGAL (RAPIER LAW FIRM)
 6           MADDIE INMAN (HEYL ROYSTER)
 7           JULIE MURPHY, ESQUIRE (HART McLAUGHLIN &
             ELDRIDGE)
 8
 9           JACOB KRUEGER, PLAINTIFF
10           PATRICIA KRUEGER, PLAINTIFF
11           COLLIER VICTORIAN, VIDEO TECHNICIAN
12                       - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1                       INDEX
                         - - -
 2
 3   Testimony of:  CHANNING PETRAK, MD
 4
 5                                          PAGE
 6   By Mr. Rapier   . . . . . . . . . . .  9, 282
 7   By Mr. McCall   . . . . . . . . . . .  269
 8   By Mr. Quigley  . . . . . . . . . . .  281
 9
10                       - - -
11                     EXHIBITS
12                       - - -
13   NUMBER    DESCRIPTION                  PAGE
14   1         Compensation Memorandum      92
15   2         Fixed Rate Agreement         106
16   3         Grant Agreement              117
17   4         9/6/18 Letter                143
18   5         Interrogatory Answers        160
19   6         PRC Medical Report           179
20   7         PRC Cross Reference Info     196
21   8         In Basket Messages           227
22   9         Case Notes                   234
23   10        Supervisory Note             245
24   11        Medical Order                250
```

---

Page 5

```
 1                 EXHIBITS (cont'd)
                         - - -
 2
 3   NUMBER    DESCRIPTION                  PAGE
 4   12        Progress Note                251
 5   13        Medical Order                251
 6   14        Medical Order                252
 7   15        Juvenile Court Documents     253
 8   16        Court Order                  261
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 6

1                    DEPOSITION SUPPORT INDEX
2                         - - -
3
4    INSTRUCTION NOT TO ANSWER:
5    Page      Line
6       (None)
7
8
9    REQUEST FOR PRODUCTION OF DOCUMENTS:
10   Page      Line              Description
11      (None)
12
13
14   STIPULATIONS:
15   Page      Line
16     7        1
17
18
19   QUESTIONS MARKED:
20   Page      Line
21      (None)
22
23
24

Page 7

1    (It is hereby stipulated and agreed by and
2    among counsel for the respective parties that
3    sealing, certification and filing are waived;
4    and that all objections, except as to the form
5    of the question, be reserved until the time of
6    trial.)
7                         - - -
8        THE TECHNICIAN:  Good morning.  We are on
9    the record.  The time is 9:11 a.m. Central Time
10   on July 10th, 2024 to begin the deposition of
11   Channing Petrak in the matter of Krueger, et
12   al. versus Petrak, et al.  The venue for this
13   case is in the United States District Court for
14   the Central District of Illinois, Peoria
15   Division.  The case number is
16   22-CV-1016-JBM-JEH.  This deposition is taking
17   place viz Zoom videoconference.  The legal
18   videographer is Collier Victorian, here on
19   behalf of Steno, and the court reporter is
20   Grace Baldino, also here on behalf of Steno.
21   Would counsel please identify yourselves and
22   state whom you represent.
23       MR. RAPIER:  Good morning.  Aaron Rapier
24   for the plaintiffs.

Page 8

1        MR. HEIL:  Good morning.  John Heil,
2    H-E-I-L, on behalf of Dr. Channing Petrak.
3        MR. McCALL:  Ambrose McCall for OSF
4    HealthCare System.
5        MR. QUIGLEY:  Assistant Attorney General
6    Peter Quigley for the DCFS defendants.
7        THE TECHNICIAN:  Thank you, Counsel.  Will
8    the court reporter please swear in our witness.
9        THE COURT REPORTER:  The attorneys
10   appearing in this deposition acknowledge that I
11   am not physically present in the deposition
12   room, that I will be reporting on this
13   deposition remotely, and that I will administer
14   the oath to the witness remotely.
15       The parties and their counsel further
16   agree that, while I am a licensed notary, the
17   witness may be in a state where I am not
18   licensed.  The parties stipulate that this
19   deposition may be taken before me.
20       If any party does have an objection to
21   this manner of reporting or anything stated
22   above, please state so now.  Hearing none, we
23   can proceed.
24                       - - -

Page 9

1        CHANNING PETRAK, MD, after having been
2        first remotely duly sworn, was examined and
3        testified as follows:
4                         - - -
5                      EXAMINATION
6                         - - -
7    BY MR. RAPIER:
8        Q.   Good morning, Doctor.
9        A.   Good morning.
10       Q.   My name is Aaron Rapier, and I represent
11   the Krueger family.  Would you please state your
12   name for the record?
13       A.   Channing Petrak.
14       Q.   Do you have any aliases, or have you gone
15   by any other names?
16       A.   I changed my name prior to becoming
17   married back in 1991.
18       Q.   What was your former name?
19       A.   Dawn was my first name.
20       Q.   And what was your maiden name?
21       A.   Petrak.
22       Q.   Did you attend college?
23       A.   I did.
24       Q.   And where did you go to undergrad?

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 10

- - -

1    A.  University of Illinois in Urbana.  I have
2  a bachelor's degree in economics.
3    Q.  When did you obtain your bachelor's degree
4  in economics from the University of Illinois?
5    A.  1986.
6    Q.  Did you attend medical school at some
7  point after that?
8    A.  I did.  I also have a Master's in Business
9  Administration that I obtained in 1989 from what is
10  University of Illinois in Springfield, and then I
11  went to medical school at Southern Illinois
12  University School of Medicine, and I graduated in
13  May of 2000.
14    Q.  Back in '89, was that Sangamon State where
15  you earned your MBA?
16    A.  It would have been, yes.
17    Q.  After -- between 1989 and -- let me go
18  back.  I think I misspoke there.  After getting your
19  MBA, did you attend medical school at SIU?
20    A.  Yes.
21    Q.  And when did you start medical school at
22  SIU?
23    A.  It would have been 1996.
24    Q.  In between earning your MBA in 1989 and

Page 11

1  starting medical school in 1996, what did you do for
2  work?
3    A.  I was a policy analyst for the Joint
4  Committee on Administrative Rules, and then I was a
5  economic and physical analyst for the Economic and
6  Fiscal Bipartisan Commission for the General
7  Assembly.
8    Q.  Who was your employer in that period of
9  time between 1989 and when you started school at SIU
10  in 1996?
11    A.  It would have been the state of Illinois.
12    Q.  Why did you decide to go to medical school
13  in or around 1996?
14    A.  I was not happy doing the work I was doing
15  and decided I wanted to do something more
16  meaningful.
17    Q.  Before you started medical school at SIU,
18  did you know what type of medicine you wanted to
19  practice?
20    A.  Yes.  I had already decided that I wanted
21  to do something in the pediatric field.
22    Q.  And what was it about pediatrics that you
23  were interested in pursuing professionally?
24    A.  Children are much more fun to work with

Page 12

- - -

1  than grown-ups are, and they are very -- they're
2  just more happy and joyful, and I enjoyed working
3  with them compared to working with adults.
4    Q.  Are you married?
5    A.  Yes.
6    Q.  How long have you been married?
7    A.  Since 1991, so over 30 years.
8    Q.  Congratulations, and do you have children?
9    A.  I do.
10    Q.  How many children do you have?
11    A.  Two.
12    Q.  After graduating from SIU's medical school
13  in May 2000, did you have a residency program that
14  you participated in?
15    A.  I did.  I did a pediatrics residency
16  program here in Peoria with the University of
17  Illinois College of Medicine and Saint Francis
18  Hospital.
19    Q.  Is Saint Francis Hospital sometimes
20  referred to as OSF?
21    A.  It's OSF Saint Francis.
22    Q.  During what period of time did you do your
23  residency at OSF Saint Francis?
24    A.  It would have been 2000 until 2003.

Page 13

- - -

1    Q.  And did you participate in a fellowship
2  program after that?
3    A.  I did not.
4    Q.  Did you go to work in the medical field
5  after completing your residency in 2003?
6    A.  I did.
7    Q.  And where did you first work?
8    A.  I worked for the Department of Pediatrics
9  in the University of Illinois College of Medicine in
10  primary care as well as the Pediatric Resource
11  Center and developmental pediatrics, including a
12  pediatric after-hours clinic and some hospital work.
13    Q.  And during what period of time did you
14  work in the Department of Pediatrics at the
15  University of Illinois and PRC?
16    A.  From 2003 until present day.
17    Q.  Do you have employment with the University
18  of Illinois that is separate from the employment
19  with PRC?
20    A.  No.
21    Q.  Would it be accurate to say that since
22  2003, you have worked for PRC?
23    A.  I have worked for the University of
24  Illinois College of Medicine, the Department of

Page 14

- - -

1  Pediatrics, and the PRC is a division of that.
2      Q.  Just to make sure that I have that, is it
3  accurate to say that since 2003, you continuously
4  worked for the University of Illinois College of
5  Medicine in its Department of Pediatrics, including
6  its division, or a division, referred to as PRC?
7      A.  In some capacity.  There have been years
8  where I did very few cases or hours with PRC and
9  years where it's been a significant amount to
10  becoming full-time.
11      Q.  Let's start in 2003.  In general, when you
12  started working at the University of Illinois
13  College of Medicine, what did you do for the
14  university?
15      A.  Primarily general pediatrics, so
16  outpatient and inpatient pediatrics, in addition to
17  a small amount of time with the Pediatric Resource
18  Center and developmental pediatrics and an
19  after-hours clinic as well as hospital medicine.
20      Q.  And is it the case that, over time, how
21  much of your professional life was devoted to PRC,
22  for example, has changed since 2003 [sic]?
23      A.  It has increased over time and has become
24  full-time at this point.

Page 15

- - -

1      Q.  Can you describe how it has changed over
2  time and increased to what is now a full-time
3  position?
4      A.  It was typically about one half day a week
5  in addition to other hours that I could give when I
6  had time to spare from the other duties I had, and,
7  over time, that -- the need became greater, and I
8  was giving more time to Pediatric Resource Center,
9  and general pediatrics was cut back.  At some point,
10  I was doing 80 percent Pediatric Resource Center,
11  20 percent pediatrics, and then I just devoted a
12  hundred percent to Pediatric Resource Center.
13      Q.  When did that change occur from when it
14  was 80 percent PRC, 20 percent general pediatrics to
15  100 percent PRC?
16      A.  I believe it was 2011.
17      Q.  In general, what's the difference between
18  the time spent at PRC and the time spent in general
19  pediatrics?
20      A.  In general pediatrics, it is doing well
21  visits and illness visits.  At that point in time,
22  the practice was still rounding on patients in the
23  hospital, and then Pediatric Resource Center's
24  subspecialty evaluations for children where there's

Page 16

- - -

1  a concern of abuse or neglect.
2      Q.  Do you have any board certifications?
3      A.  I do.  I am board-certified in both
4  general pediatrics and in child abuse pediatrics.
5      Q.  When were the first boards for child abuse
6  pediatrics?
7      A.  I believe the first boards were offered in
8  2009.
9      Q.  And when were you first board-certified in
10  child abuse pediatrics?
11      A.  2013.
12      Q.  Do you remember why it was you sought
13  board certification in child abuse pediatrics?
14      A.  I felt it was important to be
15  board-certified just to -- board certification, I
16  think, in general, is a very important thing.  I
17  feel it's important to maintain board certification
18  in general pediatrics.  I think all pediatricians
19  should be board-certified because it speaks to your
20  level of dedication to evidence-based medicine, to
21  increasing your knowledge over time, to
22  practice-based learning and systems-based practice,
23  so it speaks to your, basically, integrity and
24  knowledge as a pediatrician.  So I still maintain my

Page 17

- - -

1  general pediatrics certification, and I feel the
2  same way about child abuse pediatrics, that board
3  certification is important -- excuse me -- for
4  people who are doing the work.
5      Q.  In terms of where you would physically
6  work, has that changed over time since 2003?
7      A.  I mean, our office has physically
8  relocated, but other than that, no.
9      Q.  And where is your office?
10      A.  Currently, we are at 1800 North Knoxville,
11  Suite B.
12      Q.  What city is that?
13      A.  Peoria.
14      Q.  And do you practice medicine out of that
15  physical location?
16      A.  That is where our outpatient clinics are
17  located.  I do also have privileges at both the
18  Children's Hospital of Illinois, which is part of
19  Saint Francis, as well as Carle Methodist.
20      Q.  Where is Carle Methodist located?
21      A.  Peoria.  They're both in Peoria.
22      Q.  Where is the Children's Hospital of
23  Illinois located?
24      A.  It is within Saint Francis Hospital.

1    Q.   Is the Children's Hospital of Illinois
2  part of OSF Saint Francis?
3    A.   It is a hospital within a hospital, so it
4  is considered a separate children's hospital
5  within -- so it's co-located within Saint Francis.
6    Q.   Was ██ a patient at Children's
7  Hospital of Illinois or a patient at OSF Saint
8  Francis or both?
9    A.   Well, it would depend.  If he was in the
10 emergency department, that is considered OSF Saint
11 Francis.  If he is admitted inpatient, then he would
12 be at the Children's Hospital of Illinois.
13   Q.   Is the Children's Hospital of Illinois
14 physically located within the same hospital as the
15 emergency department of OSF Saint Francis?
16   A.   Yes.
17   Q.   In terms of your access to the facilities,
18 do you need any special clearance to access the
19 emergency department of OS [sic] Saint Francis that
20 is different than clearance needed to access
21 patients in the Children's Hospital of Illinois
22 within that same facility?
23   A.   I mean, my privileges and my credentialing
24 allows me to see patients in both the emergency

1  department and in the Children's Hospital of
2  Illinois.  There's badge access and security access
3  that is determined based on what your credentials
4  and privileges allow.  So I'm sure there are parts
5  of the hospital that my badge does not allow me to
6  get in.  It's probably on the adult floors that I
7  don't attempt to access.
8    Q.   In this period of time generally, between,
9  say, 2017 and 2020, did you need a badge to access
10 various parts of OSF Saint Francis or the Children's
11 Hospital of Illinois?
12   A.   Yes.
13   Q.   And did you have one badge or two badges
14 to access the emergency department and the
15 Children's Hospital of Illinois?
16   A.   It's one -- one badge.
17   Q.   Do you know what your badge said on it
18 during that period of time between 2017 and 2020?
19   A.   I -- it has my name on it, and I believe
20 the only logo on mine is Children's Hospital of
21 Illinois.  I have an older badge.
22   Q.   Does the badge identify what type of
23 doctor you are?
24   A.   The badge itself, no.

1    Q.   Do you have any professional licenses that
2  you have not already mentioned?
3    A.   I mean, I'm licensed to practice in the
4  state of Illinois.  I have a controlled substance
5  license.  I have a DEA number.
6    Q.   Are you a member of any professional
7  associations?
8    A.   I am.  I'm a member of the Helfer Society,
9  which is an honorary society for medical
10 professionals who are engaged in child maltreatment
11 work.  I am a member of the American Academy of
12 Pediatrics and the Illinois Chapter and active in
13 the Council -- Committee on Child Abuse and Neglect
14 in both of those.  I'm also a member of the Child
15 Fatality Committee in the American Academy of
16 Pediatrics.  I am a member of the American
17 Professional Society on the Abuse of Children and
18 the International Professional Society on Child
19 Abuse and Neglect.  I'm the current president of the
20 board for the National Children's Alliance, which is
21 the accrediting agency for children's advocacy
22 centers.  I'm a member of the Children's Justice
23 Task Force in Illinois.  I sit on the Peoria
24 Regional Child Death Review Team.  I think that's

1  probably it.
2    Q.   Okay.  I want to follow up on those just
3  to make sure that I have them.  What was the first
4  society you mentioned?  It started with an H.
5    A.   Helfer.
6    Q.   How do you spell that?
7    A.   H-E-L-F-E-R.
8    Q.   What is your position with the Helfer
9  Society?
10   A.   I'm just a member.  I am on several
11 committees.  I'm on the Sexual Assault Nurse
12 Examiner and Child Abuse Pediatrician Committee, and
13 then I'm also on the Child Fatality Committee within
14 that society.
15   Q.   Where is the Helfer Society located?
16   A.   I honestly can't tell you where the
17 headquarters is.  I believe it's currently out of
18 Florida, but I don't know off the top of my head.  I
19 think it's relocated recently.
20   Q.   Does the Helfer Society meet regularly?
21   A.   Annually.
22   Q.   Have you ever spoken at any of the annual
23 Helfer Society meetings?
24   A.   I did.  I spoke at not this most recent

Page 22

- - -

1  year, but the year before, so 2023.
2      Q.   Do you remember what subject matters you
3  addressed in your talk at the Helfer Society in
4  2023?
5      A.   I did.  I spoke on the changes to the
6  standard for the National Children's Alliance,
7  accrediting standards.
8      Q.   And, in general, what were the changes to
9  the accrediting standards for the NAC?
10     A.   NCA?  The changes to those standards
11 related to changes in how many abnormal exams needed
12 to be reviewed, so it was basically the changes that
13 were pertained to medical providers who are doing
14 work in the area of child sexual abuse.
15     Q.   In this context, when you're referring to
16 abnormal exams, is that specific to child sexual
17 abuse?
18     A.   Yes.
19     Q.   I believe the next professional
20 association you mentioned was the American Academy
21 of Pediatrics, including its Illinois Chapter?
22     A.   Yes.
23     Q.   And what is your position with that
24 organization?

Page 23

- - -

1      A.   I am a member of several committees, but,
2  otherwise, I hold no specific positions within those
3  organizations other than being members of specific
4  committees.
5      Q.   Does the American Academy of Pediatrics
6  Illinois Chapter meet regularly?
7      A.   Yes, it does.
8      Q.   And how often does it meet?
9      A.   Bimonthly.
10     Q.   Where is the Illinois Chapter of the
11 American Academy of Pediatrics?
12     A.   It's up by Chicago.  Elk Grove, I believe.
13     Q.   Do you attend the bimonthly meetings?
14     A.   I do.
15     Q.   Are those meetings in person or virtual?
16     A.   They're virtual.
17     Q.   Have you ever spoken at an Illinois
18 Chapter of the American Academy of Pediatrics
19 bimonthly meeting?
20     A.   Not the -- so I have not spoken at the
21 chapter meetings.  I have spoken at the Committee
22 for Child Abuse and Neglect meeting.  That's the
23 bimonthly meetings.  I don't know how often the
24 actual chapter meets.

Page 24

- - -

1      Q.   And in those meetings, have you ever, as a
2  part of your talk, addressed subjects of factitious
3  disorder imposed on another, Munchausen syndrome by
4  proxy, medical neglect, or medical child abuse?
5      A.   Other than discussions that the group has
6  had about education or just the topic, no, I have
7  not spoken on those topics.
8      Q.   The next association you mentioned, all I
9  wrote down was "Council," so I didn't even catch
10 what council it was, but it was before the Child
11 Fatality Committee.  Was there another association
12 that you belong to that is a council?
13     A.   It's the American Academy of Pediatrics.
14 There's the Council on Child Abuse and Neglect, and
15 then there's the child fatality section.
16     Q.   And is each one of those a committee
17 within the American Academy of Pediatrics?
18     A.   Yes.
19     Q.   I believe then that the next professional
20 association you mentioned was American Professional
21 Society on Abuse of Children?
22     A.   Yes.
23     Q.   And what is your position with that
24 professional association?

Page 25

- - -

1      A.   I am simply a member.  I'm not a member of
2  any particular committees within that organization.
3      Q.   Where is the American Professional Society
4  on Abuse of Children?
5      A.   I do not know.
6      Q.   Does that organization meet regularly?
7      A.   They have committees that meet regularly.
8  I don't know that they have regular meetings.  There
9  is an annual conference or symposium that happens.
10     Q.   And have you spoken at that annual
11 conference or symposium?
12     A.   I have not.
13     Q.   You also mentioned that you are currently
14 the president of the board of the NCA; is that
15 correct?
16     A.   Correct.
17     Q.   What does the NCA do?
18     A.   The National Children's Alliance is the
19 accrediting organization for all of the children's
20 advocacy centers within the country.
21     Q.   Is the PRC, for example, one of those
22 children advocacy centers?
23     A.   No.
24     Q.   Does OSF Saint Francis have a children

Page 26

- - -

1  advocacy center that is accredited by the NCA?
2      A.    No.
3      Q.    Are there any accredited children advocacy
4  centers in the state of Illinois?
5      A.    Yes.  There are multiple.
6      Q.    Are there any in Peoria?
7      A.    There is one in Peoria.
8      Q.    Which one is that?
9      A.    The Peoria County Children's Advocacy
10  Center.
11     Q.    Where is that located?
12     A.    It's in Peoria.  I believe it's on Gift
13  Street -- Gift Avenue.
14     Q.    Is it affiliated with any medical
15  facilities?
16     A.    There's not an affiliation.  As a
17  children's advocacy center, there are -- there's a
18  protocol and a memorandum of understanding with all
19  of the multidisciplinary team members.  So the Saint
20  Francis Emergency Department is one of the entities
21  that would be affiliated in such a manner.  They're
22  part of the memorandum -- memorandum -- I can't
23  talk -- memorandum of understanding as is the
24  Pediatric Resource Center.

Page 27

- - -

1      Q.    What does the Peoria County Advocacy
2  Center do?
3      A.    Children's advocacy centers are -- were
4  created in an effort to really coordinate the
5  multidisciplinary response for children when there
6  has been -- child sexual abuse is what they were
7  really initiated for, but also for serious harms so
8  that children can have a coordinated response to
9  their trauma and not have to experience repeated
10  trauma from multiple people asking questions
11  repeatedly or multiple exams that could be
12  traumatic.  So it's an effort to coordinate all of
13  that multidisciplinary response to provide the best
14  care for the children.
15     Q.    Are there published or publicly available
16  standards that are used for accrediting children
17  advocacy centers?
18     A.    There are.  They are on the National
19  Children's Alliance web page.  There are standards
20  for child sexual abuse, and there are newer
21  standards if -- that are optional for child physical
22  abuse or trafficking and prevention.
23     Q.    As the president of the board, in general,
24  what are your responsibilities?

Page 28

- - -

1      A.    I am the president of the board, which is
2  a governing board.  We are tasked with ensuring that
3  the NCA -- the group, the workers -- are functioning
4  appropriately, that accreditation occurs, that the
5  people who are doing the accreditation are actually
6  going out and doing it.  The standards are revised
7  every five years, but the people working on that are
8  not necessarily on the board.  I did participate in
9  the revision of the standards, but there are many
10  other physicians, nurse practitioners, other people,
11  social workers who also participate in those
12  revisions.
13     Q.    What is your understanding of the general
14  terms of that memorandum of understanding between
15  Peoria County Advocacy Center and the OSF Emergency
16  Department?
17     A.    There's basically a protocol that is set
18  forth, and it talks about every multidisciplinary
19  group; so what the police response and
20  responsibility would be, what the DCFS response and
21  responsibility would be, what the children's
22  advocacy center staff response would be, the
23  forensic interviewers, the state's attorney, which
24  is part of the team, the medical response, and what

Page 29

- - -

1  referrals for medical would look like.  So it
2  basically is a very long protocol setting forth how
3  do we best provide care to children, and what does
4  that response look from any of the possible
5  partners.
6      Q.    The next professional association I have
7  written down is the Children's Justice Task Force.
8  Do you have a position with that task force?
9      A.    I don't currently hold any positions.
10  Specifically, I am on the medical and mental health
11  committee -- subcommittee of that group.  That group
12  is basically to -- basically look at a way to
13  improve the response to child maltreatment within
14  the state.
15     Q.    In general, what do you mean by "the
16  response to child maltreatment in the state"?
17     A.    Looking at systemic issues and approaches,
18  so making recommendations back to the governor and
19  to the Department of Children and Family -- DCFS,
20  basically, about any systemic issues that could be
21  improved that would improve the response to child
22  welfare in the state.
23     Q.    What's a systemic issue that could be
24  addressed to improve child welfare in the state?

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 30

- - -

1    A.   There was a report to the general
2 assembly -- I'm not gonna remember the year, but I
3 want to say 2016 -- from the Children's Justice Task
4 Force that laid out many recommendations that were
5 made from the Children's Justice Task Force.  Some
6 of them talk about, you know, improving the
7 multidisciplinary response for child maltreatment or
8 improving the access to mental health resources.
9 It's multifactorial.
10    Q.   Were those recommendations accepted?
11    A.   The report was accepted.  I don't know
12 that many of the changes were implemented, but they
13 were accepted.
14    Q.   Were those recommendations made by the
15 task force to DCFS?
16    A.   Yes.
17    Q.   Can you identify any recommendations that
18 were made to DCFS that were not accepted or put into
19 place?
20    A.   I don't remember all of the
21 recommendations that were made.  It was a very
22 lengthy report, so I wouldn't be able to tell you
23 which ones were or were not implemented.
24    Q.   Have you seen any negative impacts as a

Page 31

1 result of the recommendations made to DCFS not being
2 put into place?
3    A.   I don't know that I would have enough
4 information to be able to answer that.
5    Q.   To your knowledge, has anyone on the task
6 force studied that issue?
7    A.   On the task force itself, no, I don't
8 believe they have.
9    Q.   To your knowledge, has anyone studied that
10 issue?
11    A.   Potentially.  I don't know off the top of
12 my head.
13    Q.   Does that mean that you're aware that
14 someone is doing it, but you just can't recall who
15 it is?
16    A.   I don't know that there's been any
17 particular person that I'm aware of that has looked
18 specifically at the recommendations that were made
19 by the task force and what the outcome of
20 implementing or not implementing those
21 recommendations had on children.  I don't know that
22 that has happened.  It might have, but I can't -- I
23 can't determine whether it did or did not.
24    Q.   To your knowledge, in the approximately

Page 32

- - -

1 eight years since those recommendations have been
2 made, has the task force made any additional
3 recommendations to DCFS?
4    A.   There are recommendations made on a
5 regular basis.
6    Q.   Are those recommendations, when made to
7 DCFS, made in writing?
8    A.   Yes.
9    Q.   To your knowledge, have any of those
10 recommendations to DCFS involved the issues of
11 factitious disorder imposed on another, Munchausen
12 syndrome by proxy, medical neglect, or medical child
13 abuse?
14    A.   Not that I recall, no.
15    Q.   The last association I have is the Death
16 Review Team; is that correct?
17    A.   Child Death Review, yes.
18    Q.   And what is your position on the Child
19 Death Review Team?
20    A.   I am just a member of the team for the
21 Peoria region.
22    Q.   As a member of that team, what are your
23 responsibilities?
24    A.   It's a multidisciplinary team, and we are

Page 33

- - -

1 tasked with reviewing child deaths that have
2 occurred that DCFS has either been involved with or
3 has investigated to determine if there are any
4 recommendations that can be made to improve, again,
5 the response to the death investigation or to
6 prevent further deaths that may have resulted from
7 that situation.
8    Q.   Other than ones we've addressed already,
9 are you a member of any other professional
10 associations or organizations?
11    A.   No, not that I can recall.
12    Q.   In general, what are your responsibilities
13 at PRC?
14    A.   I'm the current medical director.
15    Q.   How long have you been the medical
16 director?
17    A.   Since 2011.
18    Q.   What are your responsibilities as the
19 medical director?
20    A.   I am in charge of determining the medical
21 programming, so that is where we can provide
22 services, what services we have the capability to
23 provide based on the staff we have, and also in
24 charge of supervising any other medical staff that

Page 34

- - -

1  we have, so any other physicians or nurse
2  practitioners, nurses, as well as doing medical
3  evaluations myself.
4      Q.   In that answer you mentioned, among other
5  things, an issue related to where you can provide
6  medical services.  Where does PRC provide its
7  medical services?
8      A.   Our region is large.  It is most of
9  central Illinois, and so it's a very large region.
10     Q.   Within central Illinois, in what facility
11 specifically does PRC provide services?
12     A.   At our outpatient clinic, and then at
13 Carle Methodist and Children's Hospital of Illinois.
14     Q.   Does the amount of work that PRC provides
15 at those various facilities -- the facilities being
16 the outpatient clinic, Carle Methodist, and
17 Children's Hospital of Illinois -- change, or is the
18 amount of work done at each one been constant so
19 long as you've been the medical director?
20     A.   It can vary just based on the year, but it
21 also would vary based on the availability of medical
22 providers.  So in the years where I was the sole
23 medical provider, the ability of myself to see a
24 large amount of children is limited, so that

Page 35

- - -

1  decision has to be made.  If there's two medical
2  providers, we can see a few more children.  The
3  numbers can increase, but we still have to limit the
4  capability to see a large increase in children
5  because of the number of staff available.
6      Q.   Does Carle Methodist have a child abuse
7  pediatrician?
8      A.   No.
9      Q.   Does Children's Hospital of Illinois have
10 a child abuse pediatrician?
11     A.   There is myself, and there is another
12 child abuse pediatrician who has joined the
13 Pediatric Resource Center, so, yes.  There is also
14 Dr. Saving, who is a child abuse pediatrician but
15 doesn't do child abuse work anymore, but she is
16 board-certified.
17     Q.   And what was that doctor's name?
18     A.   Saving, S-A-V-I-N-G.
19     Q.   And your colleague at PRC is?
20     A.   Dr. Hari, H-A-R-I.
21     Q.   Does OSF Saint Francis have a child abuse
22 pediatrician?
23     A.   No.
24     Q.   Is the work you do as a child abuse

Page 36

- - -

1  pediatrician at Children's Hospital of Illinois
2  substantially the same as the work you do at Carle
3  Methodist?
4      A.   Yes.
5      Q.   In general, what do you do as a child
6  abuse pediatrician at Children's Hospital of
7  Illinois?
8      A.   Perform consultations when requested on
9  cases where someone has a suspicion of child abuse
10 or neglect.
11     Q.   Do you see any patients at Children's
12 Hospital of Illinois where there has not been a
13 reported suspicion of abuse or neglect?
14     A.   I'm not sure what you mean by "reported".
15     Q.   Let me remove that then.  Do you see
16 patients at Children's Hospital of Illinois where
17 abuse or neglect is not suspected?
18     A.   No.  No one calls us unless they have some
19 concern, at least, for abuse or neglect or
20 maltreatment of some sort.
21     Q.   Just gonna ask you now based on your
22 understanding:  If a doctor at the Children's
23 Hospital of Illinois has a concern about abuse or
24 neglect, what is the procedure for that physician to

Page 37

- - -

1  get a consultation from you or from PRC?
2      A.   They should put in a consult order like
3  they would for any specialist, and then they are to
4  call us as well and describe what the concern or
5  question is.
6      Q.   Does that physician, as a part of the
7  protocol or procedure, also report the suspicion to
8  DCFS?
9      A.   They have a mandate by law, so they are
10 mandated reporters, and if they have reached the
11 degree of reasonable suspicion, then, yes, they
12 should report it.  They don't always if they haven't
13 reached that level, but they should, and we do
14 remind them of their mandate, but they don't always
15 report it.
16     Q.   Is the threshold for seeking a
17 consultation from you or PRC the same as the
18 threshold for reporting abuse or neglect?
19     A.   No.
20     Q.   What are the differences?
21     A.   The differences may be that a physician or
22 a medical provider has a concern for abuse or
23 neglect, but they're not sure.  They're not -- they
24 themselves have not reached that suspicion level or

Page 38

- - -

1  that reasonable suspicion, but they're also not sure
2  that it's just accidental if it's an injury, and so
3  they request a consultation from us.
4      Q.   How do you compare that to the threshold
5  for reporting to Illinois DCFS?
6      A.   It's written in the law.  You have to have
7  a suspicion of abuse.  So that is an individual
8  mandate.  I can't make that decision for them.  They
9  have to make that decision.
10     Q.   Is it your understanding that the
11 suspicion that would trigger a call to Illinois DCFS
12 is a subjective suspicion of that report?
13     A.   It is.  It is a -- it is subjective.
14     Q.   Is it fair to say that a difference
15 between the suspicion of abuse that would trigger a
16 report to Illinois DCFS is different than a consult
17 from either you or PRC because the consult can be
18 done if the physician simply has a concern that
19 there may be some abuse or neglect?
20     A.   Yes.
21     Q.   So after you get consulted based on a
22 physician's concern, what do you do next?
23     A.   It depends on what the question they're
24 asking is.  If it's a case where we obviously have

Page 39

- - -

1  to see the patient, we will go do that, and we will
2  gather history and perform a physical, review all
3  medical records, review laboratory studies, imaging
4  studies, and then make recommendations for further
5  evaluation that needs to be performed to rule out
6  any underlying medical conditions, and then we give
7  them a medical opinion.
8      Q.   With respect to your last answer, how is
9  it that you're able to review records as a part of
10 your consultation?
11     A.   Because it's continuity of care.  They
12 have requested a consultation.  They have requested
13 my assistance and medical opinion for the specific
14 question or concern they had, and in order to be
15 able to do that, you have to review the medical
16 records that are available.  So you have to be able
17 to do that, and that is part of the exception in
18 HIPAA for treatment.  So you can review records when
19 there is a treatment option for providers.
20     Q.   Did you say that there is an exception in
21 HIPAA to review treatment for providers?
22     A.   I mean, it's not even really an exception
23 as just that, yes, you can review records if you are
24 being -- if you have a relationship or going to

Page 40

- - -

1  have, have had a relationship with a patient, if you
2  are a health care provider who is being requested to
3  see the patient or being asked a question about the
4  patient, you have a relationship with that patient
5  now because you're performing a consultation, so you
6  are able to review the records.  That is beneficial
7  to the patient because it prevents excess of
8  testing.  It prevents wrong medications being given.
9  It is safer for the patient when you are able to do
10 that.  That is why it is written into HIPAA.
11     Q.   Does that type of review, as you
12 understand it, require the consent of the patient?
13     A.   It does not.
14     Q.   How do you actually access the records,
15 say, if it's a patient at Children's Hospital of
16 Illinois?
17     A.   It's in the electronic medical record.
18     Q.   At Children's Hospital of Illinois, what
19 platform, if you know, or software is used to store
20 and manage the electronic health record?
21     A.   Epic.
22     Q.   What is Epic?
23     A.   It's a electronic health record platform.
24     Q.   If you wanted to access records about a

Page 41

- - -

1  patient at Children's Hospital of Illinois through
2  Epic, would you have to physically be at the
3  Children's Hospital of Illinois?
4      A.   No.
5      Q.   How are you able to access records of a
6  patient at Children's Hospital of Illinois through
7  Epic remotely?
8      A.   You can log in from any computer that can
9  access the interwebs.  You just access the internet,
10 and you can log into Epic if you've been given
11 permission, obviously.
12     Q.   With respect to a patient and where you've
13 been consulted by a physician, are you able to
14 access that patient's records from any health care
15 facility that participates in Epic?
16     A.   I don't know that it's any facility that
17 participates in Epic.  I don't know that that's a
18 fact, no.  I wouldn't say necessarily that's true.
19     Q.   What does the, sort of, interface look
20 like when you're logging into a patient's electronic
21 health record at Children's Hospital of Illinois
22 through Epic?
23     A.   I'm not exactly sure what you're asking
24 because it can look varied depending on where you

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 42

- - -

1  are in the record.
2      Q.   What types of information can you access
3  through Epic?
4      A.   Again, it would depend on where you are in
5  the record.  So you can see their name, their date
6  of birth, male or female.  You can see allergies to
7  medications, current medications, vaccinations,
8  demographic information like their address, and
9  then, depending on where you go into the record, you
10  could see other medications that they're on,
11  laboratory studies.  It really depends on where you
12  are in the medical record.
13      Q.   When you access a patient's electronic
14  health record through Epic -- and this is for a
15  patient at Children's Hospital of Illinois -- are
16  you able to review the entire electronic health
17  record for that patient at that facility?
18      A.   So if they are admitted to Children's
19  Hospital of Illinois, are you asking if I can see
20  all of that hospitalization?
21      Q.   Sure.
22      A.   Yes.
23      Q.   What about prior hospitalizations?  Can
24  you see that, too?

Page 43

- - -

1      A.   Yes.
2      Q.   Are you able to enter your own consult
3  notes through Epic?
4      A.   Yes.
5      Q.   Can you edit your own consult notes
6  through Epic?
7      A.   Yes.
8      Q.   Can you edit any other health care
9  provider's entries in Epic?
10      A.   No.
11      Q.   Are you able to edit anyone else's entries
12  in Epic?
13      MR. HEIL:  Objection as to form.  Are you
14  talking about at a particular location?  "Any"
15  is such a broad word, so I object to form.
16      MR. RAPIER:  Yes, for sure.
17  BY MR. RAPIER:
18      Q.   So let's stick with you got a patient at
19  Children's Hospital of Illinois; you're in the
20  electronic health record; you've accessed it
21  remotely through Epic.  Are you able to edit any
22  entries other than ones that you made?
23      A.   No.
24      Q.   Are you able to communicate with other

Page 44

- - -

1  authorized users of the Epic system through Epic?
2      A.   Yes.
3      Q.   How do you do that?
4      A.   You can send an In Basket message to them.
5      Q.   What is an In Basket message?
6      A.   It's sort of like an email within Epic.
7      Q.   Other than through In Basket messaging,
8  can you communicate with other authorized users of
9  Epic through Epic?
10      A.   There is a Secure Chat function.
11      Q.   What is that?
12      A.   It's more like a -- maybe I would call it
13  an instant messaging function.
14      Q.   How is that used?
15      A.   I can't speak for how other people use it.
16  I tend to use it for reminders of my notice in;
17  here's what I recommended, or are you available to
18  talk so that I'm not interrupting people.  It only
19  stays for so many days, so it's not going to, you
20  know, be a permanent reminder or stay with the chart
21  or anything.  So I only use it for really immediate
22  things.
23      Q.   And what do you mean, it only stays for so
24  many days?

Page 45

- - -

1      A.   The messages drop off after a certain
2  number of days.
3      Q.   To your knowledge, is that the same
4  wherever you use Epic, or is that something that's
5  specific to Children's Hospital of Illinois?
6      A.   Most -- I can't speak for all Epic
7  systems.  Not all of them have Secure Chat, but I
8  think many do or have a similar function.
9      Q.   Are you able to edit In Basket messages
10  after they're sent in Epic?
11      A.   No, I don't believe so.
12      Q.   Do you ever print or, you know, download
13  the instant messaging that you use through the
14  Secure Chat function in Epic?
15      A.   No, I don't.
16      Q.   Did you use In Basket messaging related to
17  the Krueger case?
18      A.   I don't believe I did.
19      Q.   Did you use the Secure Chat function
20  related to the Krueger case?
21      A.   I don't believe -- I don't recall us
22  having Secure Chat at that point in time.  It's a
23  relatively newer function.
24      MR. HEIL:  Aaron?

Page 46

- - -

1       MR. RAPIER:  Yeah?
2       MR. HEIL:  We're about an hour in.  I
3   drank a lot of coffee, so I could certainly use
4   a break.
5       MR. RAPIER:  Yeah, let's do that.
6       MR. HEIL:  Okay.  You want to take -- I
7   don't know -- five, seven minutes, something
8   like that?
9       MR. RAPIER:  Yeah.  Does that work for
10  everybody else?
11      MR. QUIGLEY:  That works.
12      MR. RAPIER:  Okay.  Let's do it.
13      THE TECHNICIAN:  We are now off the
14  record.  The time is 10:12 a.m. Central Time.
15          - - -
16      (Whereupon there was a recess in the
17  proceeding from 10:12 a.m. to 10:25 a.m.)
18          - - -
19      THE TECHNICIAN:  We are now on the record.
20  The time is 10:25 a.m. Central Time.
21  BY MR. RAPIER:
22      Q.  Dr. Petrak, when we broke, we were talking
23  a little bit about Epic and some of its features.
24  Is one of the features in Epic, Care Everywhere?

Page 47

- - -

1       A.  Yes.
2       Q.  What is Care Everywhere?
3       A.  It is a feature that allows for medical
4   records outside of the -- for example, the OSF
5   system to be pulled in so that they can be seen in
6   the medical record.
7       Q.  Are you able to access information in Care
8   Everywhere through Epic?
9       A.  Yes.
10      Q.  Are you able to change diagnoses in Care
11  Everywhere, you know, for a patient that you are
12  seeing?
13      MR. HEIL:  Objection as to form.  You can
14  answer if you understand.
15      THE WITNESS:  I'm not sure I know what
16  you're asking.
17  BY MR. RAPIER:
18      Q.  Sure.  If a patient -- does a patient's
19  diagnosis -- is that something that you would see in
20  Care Everywhere?
21      A.  So Care -- I'll give you an example.  If a
22  child is hospitalized at Children's Hospital of
23  Illinois, the current diagnoses are in the
24  Children's Hospital of Illinois record.  The problem

Page 48

- - -

1   list is a Children's -- CHOI -- I'm gonna say CHOI;
2   it's shorter -- CHOI problem list.  The Care
3   Everywhere records come in, and you may see a record
4   from, for example, Saint John's in Springfield, and
5   there was a reason for a visit.  That is not
6   automatically populated onto the CHOI record unless
7   someone adds it there, and you cannot change the
8   record from another institution.
9       Q.  If it was a diagnosis at CHOI, would you
10  be able to change it through Care Everywhere?
11      A.  No, because Care Everywhere is for outside
12  records.  So it's not for CHOI records; it's for
13  outside records.
14      Q.  Within Epic, would you be able to change a
15  diagnosis made at CHOI for a patient you are seeing?
16      A.  I don't know.  I don't change people's
17  diagnoses.
18      Q.  Is there a function within Epic that
19  you've seen that will flag whether or not it's a
20  case involving either a concern or suspicion of
21  child abuse or neglect?
22      A.  There is a pop-up or alert if a -- if DCFS
23  has been notified by the emergency department, there
24  will be a little alert that lets the providers know

Page 49

- - -

1   that has happened.  Other than that, no, not that
2   I'm aware of.
3       Q.  Do you know who or how that pop-up is
4   activated?
5       A.  By emergency department staff when they've
6   notified DCFS.
7       Q.  Are the ER staff at CHOI like CHOI ER
8   staff, or is that OSF Saint Francis staff?
9       MR. HEIL:  Objection as to form.  Go ahead
10  and answer if you can.
11      THE WITNESS:  The emergency department
12  staff are OSF Saint Francis Medical Center
13  staff, not -- they are not under the Children's
14  Hospital of Illinois umbrella; the pediatric
15  ED, but they are under a separate umbrella.
16  BY MR. RAPIER:
17      Q.  All right.  I want to ask you some more
18  background questions, kind of jumping around here.
19  Have you -- before today's deposition, have you
20  given a deposition before?
21      A.  Yes.
22      Q.  How many other depositions have you given?
23      A.  I don't recall.  Maybe 10 or 15.
24      Q.  Have you given a prior deposition

Page 50

- - -

1  involving a case where there was a diagnosis or
2  possible diagnosis of Xia-Gibbs syndrome?
3      A.   No.
4      Q.   Have you given a deposition on a case
5  involving factitious disorder?
6      A.   No.
7      Q.   Have you given a deposition in a case
8  involving Munchausen syndrome by proxy?
9      A.   No.
10     Q.   Have you given a deposition in a case
11 involving medical [audio distortion]?
12     A.   I'm sorry.  What did you say?
13     Q.   Medical neglect.
14     A.   Possibly.
15     Q.   Have you given a deposition in a case
16 involving medical child abuse?
17     A.   I don't believe so, no.
18     Q.   Have you ever testified at trial?
19     A.   Yes.
20     Q.   How many times?
21     A.   Probably about 170 or so.
22     Q.   Have you ever testified at trial outside
23 the state of Illinois?
24     A.   I have testified in federal court, but,

Page 51

- - -

1  other than that, no.
2      Q.   Have you given a deposition in a case
3  outside of Illinois?
4      A.   I don't believe so.
5      Q.   Have you ever testified at trial in a case
6  involving a diagnosis of Xia-Gibbs syndrome?
7      A.   No.
8      Q.   Have you ever testified at trial in a case
9  involving factitious disorder?
10     A.   No.
11     Q.   Have you ever testified at trial in a case
12 involving Munchausen syndrome by proxy?
13     A.   I would say no because that's not a term I
14 would use.
15     Q.   Have you testified at trial in a case
16 involving medical neglect?
17     A.   Yes.
18     Q.   And have you testified at trial in a case
19 involving medical child abuse?
20     A.   I believe so, yes.
21     Q.   When you -- you mentioned in a prior
22 answer that you wouldn't use the term "Munchausen
23 syndrome by proxy".  What term would you use
24 instead?

Page 52

- - -

1      A.   Medical child abuse.
2      Q.   How many times have you testified at trial
3  in cases involving [inaudible]?
4      A.   I'm sorry.  Could you repeat that?
5      Q.   Sure.  How many times have you testified
6  at trial in cases involving medical [inaudible]?
7           THE COURT REPORTER:  You said --
8           THE WITNESS:  Are you saying "medical
9      neglect"?
10          MR. RAPIER:  Yes.
11          MR. HEIL:  Yes.  Aaron, your last
12     sentence -- your last word tailed off both
13     times.  You might be turning your head.  I'm
14     not sure.
15          MR. RAPIER:  Yeah.
16          THE WITNESS:  I don't have an exact
17     number, but it would be many.
18 BY MR. RAPIER:
19     Q.   How many times have you testified at trial
20 involving medical child abuse?
21     A.   It would be few, but I don't have an exact
22 number for you.  I'm sorry.
23     Q.   Do you remember the names of any cases
24 where you testified at trial, and it involved

Page 53

- - -

1  medical child abuse?
2           MR. HEIL:  Objection as to the names of
3      any other cases involving medical neglect,
4      medical child abuse.  The doctor certainly
5      can't testify as to any of that information.
6           MR. RAPIER:  Is that because these all
7      involve minors?
8           MR. HEIL:  Yes.
9  BY MR. RAPIER:
10     Q.   All right.  Without identifying the names,
11 do you keep a list of the cases where you have
12 testified at trial?
13     A.   I personally don't.  My office keeps
14 track.
15     Q.   What does that list of cases look like?
16     A.   I'm not sure what you're asking.
17     Q.   So if we were looking at it, what would we
18 see on the page?
19     A.   As I said, I don't keep the list; they do.
20 I'm not sure if they have it by name or if they have
21 it by an identifying number.  It would probably
22 include the county, the date, outcomes.  I don't
23 honestly know because I don't keep the list.
24     Q.   In cases where you've testified and the

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 54

- - -

1  case involved medical neglect or medical child
2  abuse, for which side were you providing testimony?
3  **A.   I have primarily testified for the**
4  **prosecution.**
5  Q.   Have you, in a case involving medical
6  neglect or medical child abuse, ever testified on
7  behalf of the defense?
8  **A.   I mean, I testify for whoever subpoenas**
9  **me, but I do believe there have been maybe a couple**
10  **of medical neglect cases where I was subpoenaed by**
11  **the defense.**
12  Q.   Were those criminal cases?
13  **A.   I don't believe so.  I believe they were**
14  **juvenile.**
15  Q.   Have you testified in any criminal cases
16  involving allegations of medical neglect or medical
17  child abuse?
18  **A.   Yes.**
19  Q.   And what are the names of those criminal
20  cases?
21     MR. HEIL:  Objection.  The witness already
22     testified she doesn't have the list.  She
23     doesn't have that information in front of her,
24     and I would also object on the basis of

Page 55

- - -

1  relevance and the privacy that that entails.
2     MR. RAPIER:  In a criminal case?  Are
3  those -- aren't those public proceedings?
4     MR. HEIL:  They are public proceedings,
5  but you're asking a general question about any
6  she has testified in.  I don't know the
7  outcomes of those.  I don't know if those
8  contained in the caption names of juveniles.
9  I -- as a general matter, as a general
10  question, I think it's improper.
11     MR. RAPIER:  Are you instructing her not
12  to answer it?
13     MR. HEIL: Yes.
14  BY MR. RAPIER:
15  Q.   Have you ever testified in a case that a
16  parent did not have medical child abuse?
17  **A.   Not that I recall.**
18  Q.   Have you testified in cases where your
19  conclusion was there was medical child abuse?
20  **A.   I believe so, yes.**
21  Q.   Do you know where any of those cases were
22  venued?
23  **A.   I'm sorry.  Can you repeat that?**
24  Q.   Sure.  Do you know where any of those

Page 56

- - -

1  cases were venued?
2  **A.   Are you asking if they were juvenile**
3  **versus criminal or administrative hearings?**
4  Q.   I mean, if that's how you want to answer.
5  What I asked where they were venued, but you can
6  answer it however you want.
7  **A.   I don't recall.**
8  Q.   You don't recall anywhere you've testified
9  in a case involving medical child abuse?  Is that
10  what you're saying?
11  **A.   I don't.  I've testified in numerous**
12  **counties and in multiple courts and DCFS**
13  **administrative hearings, and I don't recall.**
14  Q.   Did you testify in the Krueger case?
15  **A.   No.**
16  Q.   Other than speaking with your attorney,
17  did you do anything to prepare for today's
18  deposition?
19  **A.   I read through my prior reports I had done**
20  **and read through some of the other information that**
21  **I had available to me.**
22  Q.   What was that other information that was
23  available to you?
24  **A.   I mean, I reread the HIPAA information,**

Page 57

- - -

1  and I looked at the physician service agreement with
2  Children's Hospital of Illinois and OSF -- sorry --
3  University of Illinois College of Medicine.
4  Q.   And what is the HIPAA information that you
5  reviewed?
6  **A.   Just the section talking about continuity**
7  **of care.**
8  Q.   And what does that section say, as best as
9  you can describe it?
10  **A.   It's as I described earlier, that if there**
11  **is a patient who is going from one provider to**
12  **another, providers can share information, or medical**
13  **records can be shared so that there is a continuum**
14  **of care for that patient to provide better care for**
15  **that patient.**
16  Q.   Did you discuss this deposition with
17  anyone from DCFS?
18  **A.   No.**
19  Q.   And did you discuss the deposition with
20  anyone from OSF?
21  **A.   No.**
22  Q.   Did you discuss the deposition with anyone
23  from PRC?
24  **A.   I mean, my staff knew that it was**

CHANNING PETRAK, M.D.                                    JOB NO. 1027581
JULY 10, 2024

Page 58

- - -

1  happening.
2      Q.  Have you ever been a plaintiff in a civil
3  action?
4      A.  Not that I recall, no.
5      Q.  Have you ever been a defendant in a civil
6  action?
7          MR. HEIL:  Objection as to form.  You mean
8      other than this one, Aaron?
9          MR. RAPIER:  Sure.
10         THE WITNESS:  I don't believe so.
11  BY MR. RAPIER:
12     Q.  Does PRC have a contract with OSF?
13     A.  PRC is part of the Department of
14  Pediatrics, and there is a physician service
15  agreement with OSF and the children's hospital, so
16  we are part of that.
17     Q.  And what's your understanding generally of
18  what that contract covers?
19     A.  The physician service agreement basically
20  allowed the Children's Hospital of -- sorry -- CHOI
21  and OSF to have one contract with the University of
22  Illinois pediatricians as opposed to numerous
23  different contracts with each of us, and so it
24  consolidated things into one agreement, and so it is

Page 59

- - -

1  an agreement between the Department of Pediatrics
2  and the College of Medicine and OSF or CHOI to set
3  forth the terms of how the Department of Pediatrics
4  physicians will provide services, and then what
5  services OSF and CHOI will provide to us in return
6  for the clinical services we are providing to them.
7      Q.  What are the clinical services that you
8  provide to them?
9      A.  As a child abuse pediatrician, we
10  provide -- I provide medical evaluations for
11  children when there's concerns of abuse or neglect.
12  I also provide education to medical students and
13  residents.  I provide education to other staff in
14  the hospital.  I -- I'm on a quality improvement
15  committee that I chair, so we do quality improvement
16  related to systemic issues around child abuse and
17  neglect, and work on prevention issues within the
18  hospital related to child abuse and neglect.
19     Q.  How many days a week are you at CHOI or
20  OSF?
21     A.  It's variable.
22     Q.  Are you there every week?
23     A.  I don't know that I'm there physically
24  every week.

Page 60

- - -

1      Q.  Are you there physically most weeks?
2      A.  Probably, yes.
3      Q.  Does PRC have a contract with Illinois
4  DCFS?
5      A.  Yes.
6      Q.  What is your understanding, again, just in
7  general, of what that contract covers?
8      A.  It covers -- it allows, basically, DCFS
9  investigators to make referrals to PRC and that we
10  will provide them with medical coordination.  So we
11  will coordinate medical care information back to
12  them.  We will sometimes obtain medical records that
13  they are not able to.  We will synthesize that
14  information and give a report back to them when
15  they've made a referral.
16     Q.  To your knowledge, does PRC have any
17  contracts with any Illinois counties or state's
18  attorneys offices?
19     A.  We don't.
20     Q.  Does the University of Illinois Department
21  of Pediatrics, to your knowledge, have any contracts
22  with Illinois counties or state's attorneys offices?
23     A.  I don't believe so, but I wouldn't -- I
24  wouldn't necessarily be aware of it.

Page 61

- - -

1      Q.  Do you do any consulting for law
2  enforcement?
3      A.  No.  I mean --
4      Q.  Do you do any --
5      A.  Not personally.
6      Q.  And what do you mean by that?
7      A.  You asked if I did any consulting.  I
8  personally do not do any consultations for law
9  enforcement.
10     Q.  Does PRC do consulting for law
11  enforcement?
12     A.  So the PRC accepts referrals from multiple
13  sources.  Medical providers are our biggest referral
14  source, but we also accept referrals from DCFS or
15  law enforcement, and we also accept referrals from
16  parents.  So multiple sources can refer to us, law
17  enforcement being one of them, so they can refer a
18  patient to us for evaluation.
19     Q.  Are the referral sources for PRC
20  providers, law enforcement, DCFS, and parents?
21     A.  That is where most of our referrals come
22  from.  We sometimes get contacted by other people
23  who have questions or concerns but are not one of
24  those sources.

Page 62

- - -

1     Q.   And do you have a sense, of the total
2  referrals PRC receives, approximately what
3  percentage comes from health care providers?
4     A.   That is the biggest group.  I want to say
5  it's close to half, if not over half.
6     Q.   How about from law enforcement?
7     A.   When it comes down to law enforcement and
8  DCFS, I don't recall the percentages.
9     Q.   How about from parents?
10    A.   Again, I don't recall.  That's probably
11 the smaller number, but it's not minuscule.
12    Q.   And then that other, you know,
13 miscellaneous or other third parties category?
14    A.   That's a very small number.  That's
15 usually someone who just is looking for information
16 or needs some guidance for resources.
17    Q.   To recap that, would it be fair to say
18 that approximately half of the referrals PRC
19 receives is from health care providers, and
20 approximately the other half comes from law
21 enforcement, DCFS, parents, or other third parties?
22    A.   Yes.
23    Q.   Do you do any consulting for prosecutors?
24    A.   If you're asking if the PRC accepts

Page 63

- - -

1  consultations or referrals from state's attorneys
2  offices, the answer would be yes.
3     Q.   And do you personally?
4     A.   No.
5     Q.   So do you personally do any consulting for
6  defense counsel in civil cases?
7     A.   I personally do no consultation work
8  outside of the PRC, but the PRC does accept
9  consultations or referrals from defense attorneys,
10 yes.
11    Q.   Have you ever worked with Mr. Heil before?
12    A.   Before this case, no.
13    Q.   Have you ever worked with his firm before?
14    A.   Not that I recall.
15    Q.   Have you ever worked with Ambrose before?
16    A.   No, I don't believe so.
17    Q.   Have you worked with his law firm?
18    A.   Not that I'm aware of, no.
19    Q.   Have you ever worked with Mr. Quigley
20 before?
21    A.   I'm pretty sure I haven't.
22    Q.   Have you ever been retained as an expert
23 witness in a civil case?
24    A.   I believe so, yes.

Page 64

- - -

1     Q.   How many times have you done that kind of
2  work?
3     A.   It's a much smaller number, but there have
4  been a few times when I have been requested through
5  the PRC to do a report and then testify.  I don't
6  always end up testifying for things that would be
7  civil matters.
8     Q.   Would those civil matters also be on that
9  list that PRC maintains for you involving your prior
10 involvement in cases or testimony?
11    A.   Yes.
12    Q.   Have you ever been retained as an expert
13 witness in a federal case?
14    A.   Yes.
15    Q.   Have you ever prepared an expert report in
16 a federal case?
17    A.   Yes.
18    Q.   Have you ever testified in a federal case?
19    A.   Yes.
20    Q.   Have you ever testified in a federal case
21 in the Central District of Illinois?
22    A.   Yes.
23    Q.   And have you ever testified in a federal
24 case in the Central District of Illinois, Peoria

Page 65

- - -

1  Division?
2     A.   Yes, I believe it was.  Yes.
3     Q.   And how many times have you done that?
4     A.   I think I've only testified once in a
5  child sexual abuse material case that I recall.
6  There could have been others, but that's the main
7  one I recall.
8     Q.   Gonna ask you some questions now about
9  some diagnoses generally.  First, I want to ask you
10 about factitious disorder.  Is there a difference
11 between factitious disorder and factitious disorder
12 imposed on another?
13    A.   Yes.
14    Q.   Let's start with factitious disorder.
15 What is that?
16    A.   That would be when a person is fabricating
17 illnesses for themselves that don't exist and
18 seeking medical attention.
19    Q.   And what is factitious disorder imposed on
20 another?
21    A.   That would be when there is fabrication of
22 illnesses, but it's not to self.  It is imposed on
23 another person, and medical care is sought.
24    Q.   What is Munchausen syndrome by proxy?

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 66

- - -

1    A.    It would be when there is fabrication or
2    induction of illness to another person, and medical
3    attention is sought for that illness that is being
4    induced to another person.
5    Q.    What's the difference between factitious
6    disorder imposed on another and Munchausen syndrome
7    by proxy?
8    A.    They're terms that I don't diagnose
9    because they are diagnosing an adult, and I don't
10   diagnose adults; I diagnose children.  So there are
11   subtle differences between whether you're seeking
12   just attention or whether you're seeking financial
13   gain or not, or is there malingering or not, but,
14   again, I don't treat adults.  I don't diagnose
15   adults, and, therefore, I am not looking at the
16   subtle differences there.  I am diagnosing children.
17   Q.    What is medical neglect?
18   A.    Medical neglect is when a child has a
19   medical condition, and the parent does not seek
20   medical care for the condition, and, by not doing
21   so, there is either risk to the child or a serious
22   risk of harm that could happen to that child.
23   Q.    What is medical child abuse?
24   A.    Medical child abuse is when a parent or

Page 67

- - -

1    caregiver is either fabricating or inducing illness
2    in a child or exaggerating symptoms of a child and
3    seeking medical attention for those things that then
4    results in excessive care to be given to the child
5    or potential, even, procedures, things that then
6    could result in risk of harm to the child because of
7    the exaggeration, induction, fabrication of illness
8    or symptoms.
9    Q.    Is medical neglect a diagnosis?
10   A.    Yes.
11   Q.    Is it a diagnosis of the child or the
12   parent?
13   A.    It is the child.  A child has experienced
14   neglect that is of a medical nature.
15   Q.    How do you diagnose medical neglect?
16   A.    It depends on what the child has, so what
17   condition they have, and looking at medical care
18   that has or has not been provided to the child.
19   Q.    In 2017 to 2020, were there generally
20   accepted criteria for diagnosing medical neglect?
21   A.    Yes.
22   Q.    Were those criteria published?
23   A.    There's -- yeah.  There's multiple
24   publications about medical neglect.

Page 68

- - -

1    Q.    And what are the, sort of, authoritative
2    texts or publication on the criteria for diagnosing
3    medical neglect during that period of time, 2017 to
4    2020?
5    A.    There are -- there are American Academy of
6    Pediatric publications based on medical -- talking
7    about medical neglect.
8    Q.    During that same time period, were there
9    generally accepted criteria for treating a child
10   with a diagnosis of medical neglect?
11   A.    Yes.
12   Q.    And were those criteria published?
13   A.    Well, the treatment would be to provide
14   the treatment, but it has been withheld.
15   Q.    What type of physician may diagnose
16   medical neglect?
17   A.    Any physician could diagnose medical
18   neglect.
19   Q.    Is medical child abuse a diagnosis?
20   A.    Yes.
21   Q.    How do you diagnose medical child abuse?
22   A.    It's a much more complicated diagnosis.
23   There are guidelines published from both the
24   American Academy of Pediatrics as well as the

Page 69

- - -

1    American Professional Society on the Abuse of
2    Children on how to approach the evaluation for
3    medical child abuse.  It's a very intensive process.
4    It requires review of all medical records.  It
5    requires a very granular look at the medical care
6    that has been provided or sought.  It requires a
7    look at the history that's been provided, any
8    discrepant history, care that has been provided
9    solely based on history as opposed to objective
10   findings, care sought for the same condition by
11   multiple providers or with multiple providers, care
12   sought for the same condition on the same day in
13   multiple settings.  So there are criteria set forth.
14   Q.    Does a diagnosis of medical child abuse
15   require that you see the patient?
16   A.    No, not necessarily.
17   Q.    Does a diagnosis of medical child abuse
18   require that you speak with the parents or
19   caregiver?
20   A.    No.  A lot of it can just be record
21   review.  There are times when it might be helpful to
22   speak to the parent.
23   Q.    What type of doctor may diagnose medical
24   child abuse?

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

---

Page 70

- - -

1    A.   Technically, anyone could diagnose it.  It
2 is a very complicated diagnosis, and so it really is
3 more reserved for child abuse pediatricians or
4 people within their team who are skilled at doing
5 the work.
6    Q.   Does it take any sort of special training
7 to diagnose medical child abuse?
8    A.   As I said, it should be a child abuse
9 pediatrician, so that is special training.
10    Q.   Is there a standard of care for diagnosing
11 medical child abuse?
12    A.   Yes.  There are published guidelines.
13    Q.   Does the standard of care require that it
14 be any certain type of doctor that makes the
15 diagnosis?
16    A.   The guidelines do point toward child abuse
17 pediatricians and their team.
18    Q.   Does the -- for this period of time, 2017
19 to 2020, did the standard of care require that a
20 diagnosis of medical child abuse be made by a
21 board-certified child abuse pediatrician?
22    A.   I don't recall it specifying it had to be
23 a board-certified child abuse pediatrician.  They
24 weren't distinguishing between board-certified or

---

Page 71

- - -

1 board-eligible, but if you're not a child abuse --
2 if you're not board-certified or board-eligible, you
3 would not call yourself a child abuse pediatrician.
4    Q.   Do you diagnose medical child abuse?
5    A.   Yes.
6    Q.   How do you treat medical child abuse?
7    A.   It depends on the severity.  So there is,
8 you know, a spectrum of severity.  There are some
9 cases that are more mild and can have interventions
10 that will help, you know, with the child that are
11 not very intensive, and then there -- depending on
12 where the child is on that spectrum, it might
13 require far more intensive interventions.  I
14 personally am making recommendations about what
15 should happen moving forward and providing a care
16 plan.  I am not personally treating because a lot of
17 the treatment would be directed toward the adults.
18    Q.   Does a diagnosis of medical child abuse
19 require any sort of diagnosis of the parent or
20 caregiver perpetrator?
21    A.   Medical child abuse diagnosis does not
22 require a diagnosis of the parent.
23    Q.   Is the intent of the parent a factor that
24 is considered when making a diagnosis of medical

---

Page 72

- - -

1 child abuse?
2    A.   No.  Just like every other form of abuse,
3 it is a diagnosis for the child, not for the parent.
4    Q.   Can a child of any age be diagnosed with
5 medical child abuse?
6    A.   Yes, they could be.
7    Q.   In order to make a diagnosis of medical
8 child abuse, is it required that the physician do a
9 differential diagnosis?
10    A.   Every diagnosis has a differential
11 diagnosis.
12    Q.   Is a part of the differential diagnosis,
13 in considering a medical child abuse diagnosis, that
14 other medical causes for the patient's symptoms be
15 considered?
16    A.   Certainly, but children who have
17 underlying medical conditions can also experience
18 medical child abuse.
19    Q.   Is an example of that where there's an
20 accepted diagnosis of a child, you know, say, for
21 heart disease, but there can still be medical child
22 abuse if, for example, the parent is exaggerating
23 the symptoms of that child's heart disease?
24    MR. HEIL:  Objection as to form.  I

---

Page 73

- - -

1 believe it's an incomplete hypothetical.  You
2 can answer if you understand it.
3    THE WITNESS:  Yeah.  I don't know that I
4 could answer that.  It's very nebulous.
5 BY MR. RAPIER:
6    Q.   Sure.  What's an example of a case where
7 the underlying diagnosis of the child is not
8 questioned, and yet a diagnosis of medical child
9 abuse is made?
10    A.   There are numerous examples, but, for
11 example, if a child has a diagnosis of asthma, which
12 is something that can be tested for -- you can show
13 that there's asthma; they actually have asthma --
14 but then they also have ten other diagnoses that are
15 unrelated that cannot be tested for, no testing has
16 shown that they have those diagnoses, and yet
17 there's constant care sought for them and multiple
18 interventions done for other conditions.  So they do
19 have one medical condition, but the others are not
20 in existence.
21    Q.   If there is a medical diagnosis that would
22 explain each one of the patient's symptoms, can a
23 diagnosis of medical child abuse be made?
24    MR. HEIL:  Objection as to form.  You can

---

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 74

- - -

1    answer if you --
2         THE WITNESS:  There's no way to answer
3    that.  It's too vague.
4  BY MR. RAPIER:
5    Q.  Can you make a diagnosis of medical child
6  abuse if you cannot rule out prior diagnoses that
7  would explain the child's symptoms?
8         MR. HEIL:  Same objection.
9         THE WITNESS:  Again, it's very vague.  I
10    don't know that I can answer that because
11    there's a lot of detail that goes into the
12    diagnosis of medical child abuse.
13  BY MR. RAPIER:
14    Q.  If a child's diagnosed conditions -- and
15  those diagnoses are not being challenged -- explains
16  each one of the symptoms that the physician is
17  observing, in that event, can the physician make a
18  diagnosis of medical child abuse?
19    A.  You're speaking more about conditions, not
20  symptoms.  So symptoms are a runny nose; a runny
21  nose could be 15, 20 things.  So conditions -- if a
22  condition actually exists and the treatment is
23  appropriate for it, then you would not be looking at
24  medical child abuse for that component condition.

Page 75

- - -

1  So if all of the conditions that are present for a
2  child -- so if a child had medically complex care --
3  then, no, you would not be looking at medical child
4  abuse because they are all explained.  Some children
5  are medically complex.
6    Q.  Is a part of the differential in a case
7  where a child just has a complex medical
8  presentation speaking with specialists who have made
9  diagnoses related to that child?
10    A.  Yes.
11    Q.  And if those specialists can explain the
12  child's presentation, does that mean that you're
13  unable to rule out those specialist diagnoses as a
14  cause of the child's condition?
15         MR. HEIL:  Objection as to form.  Go ahead
16    and answer.
17         THE WITNESS:  It's not -- the diagnosis of
18    medical child abuse is not necessarily trying
19    to rule out other people's diagnoses.  So it is
20    more of looking at discrepant diagnoses or
21    discrepant histories, information that has been
22    misrepresented or exaggerated, fabricated.  So
23    it's not that you're disagreeing with
24    physicians and challenging all of their

Page 76

- - -

1    diagnoses.  It's -- that is not what it is.  So
2    if a diagnosis has been given, it's a
3    discussion about that diagnosis and the
4    information at hand.
5  BY MR. RAPIER:
6    Q.  When you speak to a specialist about his
7  or her patient and you're considering a diagnosis of
8  medical child abuse, do you defer to specialists who
9  have certifications in subspecialties that you do
10  not hold certifications in?
11    A.  Certainly.
12    Q.  As a part of your -- as a part of record
13  review and this process of determining whether or
14  not a diagnosis of medical child abuse is proper or
15  not, do you have to make any assumptions about the
16  completeness or accuracy of the medical records you
17  reviewed?
18    A.  I assume that what is documented is the
19  record, so medical record is as it stands.
20    Q.  Do you need a certification from the
21  custodian of records that what you're looking at is
22  complete and accurate in order to rely on those
23  records?
24    A.  No.

Page 77

- - -

1    Q.  I just wanna make sure I understand your
2  testimony.  Is it your testimony that as a part of
3  the record review, when considering a diagnosis of
4  medical child abuse, you assume that the medical
5  documentation that is provided to you is accurate
6  and complete?
7    A.  If I am reviewing a record and it appears
8  that things are missing -- so if I've gotten it on
9  paper and it appears that there are things missing,
10  then I will seek the things that are missing.  So I
11  don't presume that the stack of paper I've gotten is
12  accurate and complete.  I review it to make sure
13  it's complete.
14    Q.  And how do you know, if the records
15  involve some other subspecialty, whether or not they
16  are accurate and complete?
17    A.  Typically, when you receive a stack of
18  paper from another institution, there is a sheet at
19  the front which will have a list of all of the
20  visits.  It has all of the dates, and if there are
21  visits that are not included because they're on that
22  front sheet, then I'm going to ask for them, so --
23  or if I'm reviewing it and the page seems to just
24  stop mid-visit and I can't find the rest of the

1   visit, I understand that it's not complete, so then
2   I'm going to seek it.  If there are pages missing in
3   the fax numbers, I'm going to ask for them.  When
4   you're reviewing an EMR, that is not a problem
5   because you can see what's there.
6       Q.   Let me word it a little differently.  I
7   understand what you're saying.  It is not that
8   you're making an assumption about the accuracy or
9   completeness; one step that you take in this process
10  is your own review of those records for completeness
11  and accuracy?
12      A.   Correct.
13      Q.   If you assess that the records are
14  incomplete and you make a request for those
15  additional records and simply are unable to obtain
16  them, are you able to sort of fill in that gap by
17  getting the information any other way?
18      A.   If I have made a request and have not been
19  able to obtain something, I would note that in my
20  report.  Occasionally, if I see that a person has
21  said the patient sought care at another facility or
22  was referred to another facility, that record from
23  the other facility is sometimes scanned into the
24  first set of records, so I may have part of the

1   information.  So there are other ways to get the
2   information, but I will make a note if I don't have
3   something in my hands to review.
4       Q.   Can a child abuse pediatrician properly
5   make a diagnosis of abuse or neglect if the medical
6   records are incomplete?
7            MR. HEIL:  Objection as to form.  Go head
8   and answer.
9            THE WITNESS:  Yes, because it depends on
10  what is missing.  If it's a follow-up from an
11  upper respiratory infection or an ear
12  infection, or if it was just something that was
13  not really pertinent to the reason you're
14  evaluating the child, yes, you can still make
15  your diagnosis.
16  BY MR. RAPIER:
17      Q.   When you're performing a consultation for
18  Illinois DCFS, is there any urgency or deadline that
19  you're supposed to meet?
20      A.   Well, certainly depending on the type of
21  referral they have made, yes.  So physical abuse is
22  very timely.  Sexual abuse is very timely.  In a
23  case of medical child abuse, it's much more
24  complicated, and all of the records have to be

1   obtained, and that is very complicated, and so if
2   there are multiple medical records and you're
3   waiting on them, rather than making a preliminary,
4   incomplete assessment, it's better to get the
5   records.  That kind of evaluation is just going to
6   take time, and so -- and if you're reliant on DCFS
7   to give you the records, then that will take time.
8       Q.   When you're doing a review of a potential
9   medical child abuse case, do you get the records
10  yourself, or does someone at PRC do that, or do you
11  rely on DCFS for that purpose?
12      A.   If it's -- if it's something that's
13  accessible to me in the medical record for CHOI, we
14  can do that.  If it's something I can't see, then I
15  rely on DCFS to get it for me.
16      Q.   How would you describe Patti Krueger?
17      A.   I don't know what you're asking.
18      Q.   Have you ever met Patti Krueger?
19      A.   I don't believe I have met her, no.
20      Q.   Have you ever spoken with her?
21      A.   I don't believe so.
22      Q.   How would you describe Jacob Krueger?
23           MR. HEIL:  Objection as to form.  Vague
24  question.  Answer if you can.

1            THE WITNESS:  I mean, I think I spoke with
2   him once.  I didn't have any major observations
3   at that time.
4   BY MR. RAPIER:
5       Q.   Have you met with Jacob Krueger?
6       A.   Yes.
7       Q.   And, as you recall, did you speak with him
8   just once?
9       A.   Yes.
10      Q.   How would you describe BB?
11      A.   Typical two-year-old.
12      Q.   Have you ever met BB?
13      A.   Yes.
14      Q.   Have you ever spoken to him?
15      A.   Yes.
16      Q.   How would you describe AA?
17      A.   I have never seen AA.
18      Q.   Have you ever met or spoken with AA?
19      A.   No.
20      Q.   How would you describe CC [phonetic]
21  Krueger?
22      A.   I don't know who that is.
23      Q.   Just so we're clear, have you ever met or
24  spoken with CC?

Page 82

- - -

1    **A.    No.**
2        Q.    What is Xia-Gibbs syndrome?
3    **A.    It's an autosomal dominant genetic**
4    **syndrome.**
5        Q.    What are the symptoms of that syndrome?
6    **A.    They're fairly broad.  The main one is**
7    **moderate to severe cognitive disability.**
8        Q.    And what's the prognosis for a child
9    diagnosed with Xia-Gibbs syndrome?
10    **A.    Largely unknown at this point.  There has**
11    **been adults who have survived into their fifties,**
12    **but life span is unknown at this time.  It requires**
13    **intensive therapies because of the cognitive**
14    **disability, but a lot is still unknown as to**
15    **long-term prognosis.**
16        Q.    How is it treated?
17    **A.    You treat the symptoms or the presentation**
18    **that you have.  So if you have a moderate to severe**
19    **cognitive disability, then you would provide**
20    **services for that disability.**
21        Q.    Is there a cure for it?
22    **A.    Not at this point, no.**
23        Q.    How is it diagnosed?
24    **A.    Genetic testing.**

Page 83

- - -

1        Q.    And what type of doctor would diagnose
2    Xia-Gibbs syndrome?
3    **A.    Well, a genetic test will diagnose it, so**
4    **if a primary care physician ordered the test, they**
5    **would get the results.  Typically, then, there would**
6    **be a referral to a genetic counselor or geneticist.**
7        Q.    Does BB        have Xia-Gibbs
8    syndrome?
9    **A.    Not based on his test and not based on the**
10    **geneticist at Vanderbilt.**
11        Q.    Was BB        diagnosed with Xia-Gibbs
12    syndrome?
13    **A.    I can't say that someone didn't diagnose**
14    **him with it.**
15        Q.    Are you saying someone diagnosed him with
16    it?
17    **A.    I don't know if someone did.**
18        Q.    Are you an expert in the diagnosis or
19    treatment of Xia-Gibbs?
20    **A.    No.**
21        Q.    What types of diseases do child abuse
22    pediatricians diagnose and treat?
23    **A.    Child maltreatment, so child abuse and**
24    **neglect, as well as general pediatric conditions --**

Page 84

- - -

1    **bleeding disorders, accidental injuries, genetic**
2    **disorders.  We diagnose everything.**
3        Q.    As a child abuse pediatrician, do you
4    treat patients for Xia-Gibbs?
5    **A.    No.**
6        Q.    When you're contacted as a consultation
7    about a patient, say, at Children's Hospital of
8    Illinois, does that child then become your patient?
9    **A.    I am part of the care team at that point**
10    **or the treatment team, yes.**
11        Q.    Do you have an understanding of what
12    duties you are owed to that patient?
13        MR. HEIL:  Objection to the extent it
14        calls for a legal conclusion.  Go ahead.  You
15        can answer.
16        **THE WITNESS:  So as part of the care team**
17        **or treatment team, I am providing information**
18        **back to the primary team, depending on who that**
19        **is, about child maltreatment concerns.**
20    BY MR. RAPIER:
21        Q.    Is it your understanding that you have a
22    duty of loyalty to that patient?
23        MR. HEIL:  Objection to the extent it
24        calls for a legal conclusion.  Also objection

Page 85

- - -

1    to form, if you can answer.
2        **THE WITNESS:  I mean, I treat every**
3        **patient the same, so the patient's health and**
4        **safety is foremost in anything -- any work I**
5        **do.**
6    BY MR. RAPIER:
7        Q.    And does that -- again, this is just your
8    understanding; not asking for a legal conclusion.
9    Is a part of that, as you understand it, a duty of
10    loyalty to the child?
11        MR. HEIL:  Objection -- same objection.
12        **THE WITNESS:  It's not a word I would use.**
13        **Again, the child's health and safety is my**
14        **primary concern.**
15    BY MR. RAPIER:
16        Q.    Do you owe any duties -- again, as you
17    understand it -- to the child's parents?
18        MR. HEIL:  Same objection.
19        **THE WITNESS:  If they are the guardians of**
20        **the child, then they are entitled to medical**
21        **information.  I would treat them no differently**
22        **than I treated any other parents.**
23    BY MR. RAPIER:
24        Q.    As a child abuse pediatrician, do you

Page 86

- - -

1  serve a forensic purpose?
2      MR. HEIL:  Objection as to form.  If you
3  understand, you can answer.
4      THE WITNESS:  I don't know what you mean
5  by "forensic".
6  BY MR. RAPIER:
7      Q.  Sure.  What's your definition of
8  "forensic"?
9      A.  It has multiple uses.  So it can be used
10  in the collection of forensic evidence in sexual
11  abuse or assault.  It can be used in the terms of
12  forensic interviewing, which I do not do, but is
13  done in the course of sexual abuse or physical
14  abuse.  There are people trained for that.  I do not
15  do that.  I am doing a medical evaluation.  I get a
16  medical history.  I perform a medical exam, and I
17  provide a medical opinion.  I do not consider myself
18  an investigator, so I do not use the word "forensic"
19  for things that I do.
20      Q.  When you see clients at CHOI, do you tell
21  them that you work with law enforcement?
22      MR. HEIL:  Objection.  Vague, but you can
23  answer.
24      THE WITNESS:  When I see a patient at the

Page 87

- - -

1  Children's Hospital of Illinois, I introduce
2  myself, I say who I work with, I describe my
3  role.  Law enforcement may not be involved in
4  every case, so I don't discuss law enforcement
5  up front, and DCFS may not be involved in every
6  case I see.  At the end of a visit, I discuss
7  the plan and the recommendations I'm going to
8  make.  I may mention if DCFS is involved or if
9  law enforcement is involved, but it depends.
10  They are not always involved, so I'm not going
11  to discuss their involvement in a case where
12  they're not involved, so I don't discuss it
13  every time.
14  BY MR. RAPIER:
15      Q.  If DCFS is involved, when you see clients
16  at CHOI, do you tell them that you work with DCFS?
17      A.  That is not the wording I use because I
18  don't work with them, so -- and I don't work for
19  them.  I am -- I talk about -- I will be talking
20  with them and acting as a -- almost a liaison
21  because I am describing medical things to them; they
22  are not medical.  But I do not work with them, and I
23  do not work for them.
24      Q.  And what is your standard introduction

Page 88

- - -

1  when you meet a client at CHOI?
2      A.  I give them my name.  I tell them I'm with
3  the Pediatric Resource Center.  I first ask if
4  they've already been told I'm going to come, because
5  sometimes they've already been told, and ask if they
6  understand what that means.  So if they tell me they
7  understand everything about it, I'm not gonna repeat
8  it all.  If they don't or haven't been, then I
9  describe that I am called in cases -- so I'm
10  basically describing what a child abuse pediatrician
11  is because those are big words, and not everybody
12  understands it -- I am called in cases where there
13  are concerns for a child's injuries or a child's
14  situation because the child is nonverbal, and their
15  injuries may not be explainable yet, or the
16  situation doesn't make sense to the other physicians
17  and they've asked for my help, and so I'm here to
18  see if I can get more information and make
19  recommendations so that we can figure out if there
20  are any medical conditions or if we can figure out
21  what's going on.  So I explain the role of a child
22  abuse pediatrician.  I sometimes use those words
23  depending on the understanding or cognitive level of
24  parents, and then I just describe how the visit's

Page 89

- - -

1  gonna go.
2      Q.  Do you ever tell a client or the client's
3  parents or caregiver that the information they
4  provide you will be used or could be used against
5  them in court?
6      A.  No, because I don't know that that will
7  happen.  The entire medical record could be used in
8  court.
9      Q.  Do you ever tell clients at CHOI or their
10  parents or caregiver that your employer has a
11  contract with Illinois DCFS?
12      MR. HEIL:  I'll interpose an objection
13  here.  You continually use the word "client,"
14  Aaron, as if this is some sort of an
15  attorney-client relationship.  I would object
16  to use of that term in this context, in a
17  medical context.  I also object to the form of
18  this question generally.  If you can -- if you
19  understand it, you can answer.
20      MR. McCALL:  Join that objections.
21      THE WITNESS:  I don't because I -- if I'm
22  going to say that, I feel like I would have to
23  list every -- every contract we have for
24  everything, and that's not relevant to patient

Page 90

\- - -

1    care.
2  BY MR. RAPIER:
3      Q.   Ambrose and John objected to the use of
4  the word "client".  What would you refer to ██
   ████████  as with respect to your relationship to him?
6      A.   He's a patient.
7      Q.   Does the PRC contract with Illinois DCFS
8  refer to kids like ███ as clients or patients?
9      A.   I don't know what the contract term use
10  is.  They may say "client"; that's their
11  terminology.  But, in my role, he's a patient.
12     Q.   What do you do at OSF?
13     A.   I am a child abuse pediatrician and
14  physician.
15     Q.   And where is OSF located?
16     A.   In --
17          MR. McCALL:  Gonna object to the vagueness
18     and broadness and unspecified boundaries of
19     this line of inquiry, but go ahead, Doctor.
20     Sorry to interrupt.
21          MR. HEIL:  I join.
22          MR. QUIGLEY:  Join as well.
23          THE WITNESS:  I'll have to agree because
24     OSF is very large, and the mission encompasses

Page 91

\- - -

1    numerous facilities, including in Michigan.  I
2  do not go to Michigan.  So OSF Saint Francis is
3  in Peoria, so I go to OSF Saint Francis
4  Children's Hospital of Illinois.  I do not go
5  to other OSF facilities.
6  BY MR. RAPIER:
7      Q.   Do you have an office at OSF Saint
8  Francis?
9      A.   No.
10     Q.   Do you have an office at CHOI?
11     A.   No.
12     Q.   Do you have a supervisor at OSF Saint
13  Francis?
14     A.   No.
15     Q.   Do you have a supervisor at CHOI?
16     A.   No.  I'm part of the medical staff, but
17  there's no supervisor that is a CHOI person.
18     Q.   Do you receive any compensation from OSF
19  Saint Francis?
20     A.   I personally do not.
21     Q.   Do you receive any compensation from CHOI?
22     A.   No.
23     Q.   Does PRC receive any compensation from OSF
24  Saint Francis?

Page 92

\- - -

1      A.   Through the physician service agreement,
2  yes.
3      Q.   Does PRC receive any compensation from
4  CHOI?
5      A.   Through the physician service agreement,
6  yes.
7      Q.   Do you represent OSF at statewide and
8  national child abuse committees and associations?
9      A.   No.
10     Q.   All right.  I'm gonna share my screen with
11  you.  Hold, please.  Doctor, are you able to see my
12  screen?
13     A.   Fairly well.
14     Q.   So throughout the deposition I'll refer to
15  some exhibits.  Anytime you need me to increase the
16  font or move up and down in the exhibit, please just
17  let me know.  Take as much time as you need to read
18  part or all of the document.  Just tell me if you're
19  reading something and need more time.  I'll identify
20  as Exhibit 1 a two-page PDF.  Bates stamps are
21  OSF4927 and 4928.  Doctor, are you familiar with
22  this exhibit?
23     A.   I have seen it before, yes.
24     Q.   What is it?

Page 93

\- - -

1      A.   It is part of the compensation through the
2  agreement between OSF and the University of Illinois
3  College of Medicine.
4          MR. HEIL:  Aaron, I gave her a physical
5      copy of that two pages, so she also has that in
6      front of her for clarity.
7          MR. RAPIER:  Thank you.  I appreciate
8      that.
9  BY MR. RAPIER:
10     Q.   So let's look at page two of Exhibit 1.
11  And, you know, this first sentence, I will not ask
12  you to read it into the record, but when you're
13  ready, does the first sentence of this paragraph,
14  you know, sort of accurately describe in general
15  terms what services the University of Illinois
16  College of Medicine is providing to OSF HealthCare
17  Systems?
18     A.   Yes.
19     Q.   In that second sentence in the
20  paragraph -- let me read that.  Let me know if I've
21  read it accurately.  "Dr. Petrak will represent
22  UICOMP and Children's Hospital of Illinois" --
23  that's abbreviated as CHOI -- "in local, statewide
24  and national child abuse committees and

- - -

1  associations."  Did I read that correctly?

2  　　A.  Yes.

3  　　Q.  And so what types of statewide and

4  national child abuse committees and associations are

5  those where you represent UICOMP and CHOI?

6  　　A.  That would be the American Academy of

7  Pediatrics, the Illinois Chapter, the Committee on

8  Child Abuse and Neglect.  So all of those committees

9  and the associations.

10  　　Q.  So does OSF HealthCare Systems compensate

11  you for participating in those committees and

12  associations?

13  　　A.  So that is part of my compensation

14  overall.

15  　　Q.  And at least part of that compensation is

16  paid by OSF HealthCare Systems, correct?

17  　　A.  Yes.

18  　　Q.  The next sentence, "Dr. Petrak will be

19  responsible for enhancing the incorporation of child

20  abuse expertise into the Children's Hospital/OSF

21  Emergency Department."  Did I read that correctly?

22  　　A.  Yes.

23  　　Q.  Can you describe how you fulfill that

24  responsibility?

- - -

1  　　A.  That would be working on systemic issues

2  related to child abuse and neglect through -- mostly

3  through our quality improvement committee or patient

4  safety committee, and working on ensuring that

5  orders are done correctly, or we can improve --

6  for example, the medication orders for HIV

7  prophylaxis for sexual abuse so that it's done

8  effectively and efficiently for patients.  So that

9  is part of that work.

10  　　Q.  And does OSF HealthCare Systems compensate

11  you at least a part of your compensation for doing

12  that?

13  　　A.  That is part of my overall comp -- my

14  overall salary.

15  　　Q.  And part of that salary is paid by OSF

16  HealthCare System, correct?

17  　　A.  Yes.

18  　　Q.  The next sentence, "Dr. Petrak will

19  continue to build collaborative relationships with

20  CHOI" -- C-H-O-I -- "around child abuse treatment

21  and prevention through such vehicles as the Advocacy

22  Committee of the CHOI Community Advisory Board

23  and/or the Peoria chapter of the Injury Free

24  Coalition for Kids."  Did I read that correctly?

- - -

1  　　A.  Yes.

2  　　Q.  And how do you build those collaborative

3  relationships with those entities?

4  　　A.  Well, and there are other entities because

5  it's just community work.  So, for example, the

6  Peoria County created a recent task force to look at

7  co-sleeping deaths because there was a sudden

8  increase, so I participated in that and recommended

9  other people within the hospital that needed to be

10  involved and looking at ways that the community can

11  come together and decrease the number of infants

12  dying.

13  　　Q.  Does OSF HealthCare Systems compensate you

14  for building those collaborative relationships

15  through vehicles such as the Advocacy Committee of

16  the CHOI Community Advisory Board and/or the Peoria

17  chapter of the Injury Free Coalition for Kids?

18  　　A.  That is part of this addition to my

19  comp -- to my annual salary, so the portion of my

20  annual salary that OSF is contributing.

21  　　Q.  Below that paragraph, there's a reference

22  to what's done four hours a week or approximately

23  four hours a week, and is that to serve as liaison

24  to the Children's Hospital of Illinois at OSF Saint

- - -

1  Francis Medical Center staff and other community

2  entities that participate in child protection

3  issues?

4  　　A.  Yes.

5  　　Q.  Does OSF HealthCare Systems pay a portion

6  of your compensation for that purpose?

7  　　A.  Yes.  As listed below, there is a certain

8  number of my base compensation that encompasses all

9  of the things that are above it.

10  　　Q.  Doctor, I think you addressed this

11  already.  I just want to clarify.  Did you ever make

12  any diagnosis of Patti Krueger?

13  　　A.  No.

14  　　Q.  Did you ever make any diagnosis of Jacob

15  Krueger?

16  　　A.  No.

17  　　Q.  Did you make any diagnoses of AA

█████?

19  　　A.  No.

20  　　Q.  Did you make any diagnosis of CC

█████?

22  　　A.  No.

23  　　Q.  Is the only diagnosis that you made of

24  anyone in the immediate Krueger family a diagnosis

Page 98

- - -

1  of medical child abuse for ██████?
2  **A.   Yes.**
3  Q.   Have you read the complaint in this case?
4  **A.   At one time, yes.**
5  Q.   And do you have an understanding of the
6  allegations against you?
7  **A.   Generally.**
8  Q.   What's your understanding of the
9  allegations that have been made against you?
10 **A.   There's multiple listed.**
11 Q.   And what's your understanding of what the
12 Krueger family is saying you did or didn't do?
13 MR. HEIL:  Objection as to form.  Vague
14 question.  You can answer if you understand it.
15 **THE WITNESS:  I'm truly not sure what**
16 **you're asking.**
17 BY MR. RAPIER:
18 Q.   Do you know why you're being sued?
19 **A.   That, in general, I, in providing the care**
20 **I did, was a -- somehow colluded with DCFS to not**
21 **allow the Kruegers to have access to their children**
22 **in general.**
23 Q.   Did you investigate whether there was
24 abuse or neglect in this case?

Page 99

- - -

1  **A.   I did.**
2  Q.   Did you conclude there was abuse or
3  neglect in this case?
4  **A.   I did.**
5  Q.   Who did Jacob Krueger abuse or neglect?
6  **A.   ██**
7  Q.   How did Jacob abuse or neglect ██?
8  **A.   There was discrepant history.  There was**
9  **fabrication of symptoms.  There was interference**
10 **with medical care, all of which led to medical care**
11 **being provided that was risky and placed Jacob --**
12 **sorry -- ██ at risk of harm, which is medical**
13 **child abuse.**
14 Q.   Who did Patti abuse or neglect?
15 **A.   ██**
16 Q.   How did Patti abuse or neglect ██?
17 **A.   Again, providing discrepant histories,**
18 **seeking medical care that was unnecessary, providing**
19 **fabricated or exaggerated history, requesting**
20 **medical care that was not necessary or interventions**
21 **that were risky and put ██ at serious risk of**
22 **harm, which is medical child abuse.**
23 Q.   I'm gonna share my screen again.
24 MR. HEIL:  Can we take a five-minute break

Page 100

- - -

1  first, Aaron?
2  MR. RAPIER:  Oh, yeah, sure.
3  MR. HEIL:  It's been a while.
4  MR. RAPIER:  And, John, Ambrose, Peter,
5  the next exhibit, just so you know, will be
6  this contract between DCFS and the University
7  of Illinois.
8  MR. HEIL:  Thank you.
9  MR. RAPIER:  Okay.  Five minutes, guys?
10 THE TECHNICIAN:  We are now off the
11 record.  The time is 11:44 a.m. Central Time.
12 - - -
13 (Whereupon there was a recess in the
14 proceeding from 11:44 a.m. to 11:55 a.m.)
15 - - -
16 THE TECHNICIAN:  We are now on the record.
17 The time is 11:55 a.m. Central Time.
18 MR. QUIGLEY:  Just before we get into
19 further questioning of the deponent, this is
20 Attorney General -- Assistant Attorney General
21 Peter Quigley; moving forward, just to adopt
22 any objections brought up by cocounsel --
23 codefendant counsel John Heil or Ambrose
24 Donnelly [phonetic].  Previous objections made

Page 101

- - -

1  and objections going forward will be adopted by
2  the defendant's counsel DCFS -- to the DCFS
3  defendants.  You can go ahead.
4  BY MR. RAPIER:
5  Q.   Doctor, I want to follow up on some
6  questions I asked before the break, and then I'll
7  put the contract back on the screen, and that'll be
8  our Exhibit 2.  And what I want to follow up on
9  is -- so if you are consulted by another physician
10 with a patient at the Children's Hospital of
11 Illinois, and you come in, and you see the patient,
12 and the family is there -- and I'm only gonna ask
13 about your understanding, not for a legal
14 conclusion -- do you have an understanding whether
15 or not in that instance the family can ask that you
16 not be involved or that some other physician serve
17 the role that you were consulted on?
18 **A.   A family can always decline to have me see**
19 **their child.  That has happened before.  There is at**
20 **that time many years -- not many years ago --**
21 **several years ago; it wasn't even that long ago -- I**
22 **was the only person serving that role, so I was the**
23 **only child abuse pediatrician, and I had nobody else**
24 **working in my office.  So for many years, I was the**

Page 102

1  sole provider.  There was no one else who could
2  serve that role.  But they can certainly decline to
3  have me come in the room and evaluate their child or
4  talk to them.  That is their right, and they could
5  have refused, yes.
6      Q.   In that event, is there a policy or
7  procedure at PRC on how you are to handle that
8  situation?
9      A.   So I would put a note in the chart saying
10 that this is the information I was given, parent
11 declined to talk to me, refused to have me examine
12 their child, and then, you know, depending on what
13 information I had, I would give, you know, maybe a
14 medical opinion, depending on what it was, and make
15 any recommendations because I did have a consult.
16     Q.   Now, in an instance where DCFS asks you to
17 do a medical evaluation, in that instance, may the
18 parents -- again, your understanding; not asking for
19 a legal conclusion -- do you have an understanding
20 of whether, in that instance, the parents are able
21 to decline your involvement?
22     A.   Yes, whether it's outpatient or inpatient.
23 So if it's an outpatient referral, the parents do
24 not have to bring the child to our clinic.  They can

Page 103

1  absolutely refuse.  We do not force people to come
2  to our clinic.  If it's an inpatient consultation --
3  so the patient is in the hospital, and DCFS requests
4  us to see the child -- we would still have to have a
5  consultation request from a physician to do that,
6  but the parents can still refuse.
7      Q.   Are there any instances where DCFS asks
8  for a medical evaluation, you do not have a
9  consultation order from Children's Hospital of
10 Illinois, and you actually need the patient to be
11 admitted to OSF Saint Francis for purposes of the
12 medical evaluation?
13     A.   Yes.
14         MR. HEIL:  Objection as to form, and I'm
15 sorry.  Go ahead if you understand it.
16         THE WITNESS:  Yes.
17 BY MR. RAPIER:
18     Q.   And can you describe that for us, please?
19     A.   There are multiple instances where that
20 would happen.  So if there is a young infant who has
21 injury that they should not have and they need
22 thorough evaluation to ensure that they don't
23 progress to serious neurological devastation or
24 death, I absolutely need them to be admitted, and we

Page 104

1  would tell the DCFS person calling us that that was
2  the case, and we would work on a plan to get them to
3  the hospital for their health and safety.
4      Q.   In that instance, are there any particular
5  hospitals where you want that child admitted or
6  where the child, you know, must be admitted under
7  the contracts that are in place?
8      A.   It depends on where they live.  If they're
9  in my region, I want them admitted at the children's
10 hospital because we have the subspecialists to be
11 able to care for them if they have serious injuries.
12 We have neurosurgeons.  We have neurology.  We have
13 all of the subspecialists that are needed closest to
14 where that child would be, so I would prefer them
15 strongly -- we have pediatric radiologists.  We have
16 the services, so I want them at the Children's
17 Hospital of Illinois.
18     Q.   I asked you some questions earlier about
19 medical child abuse, and you clarified that it's
20 a -- it is not a diagnosis of the parent; it is a
21 diagnosis of the child.  But in an instance where
22 you make a diagnosis of medical child abuse on the
23 child, do you discuss the diagnosis with the
24 parents?

Page 105

1      A.   If possible.  It depends on, again, where
2  we fall on that spectrum and if the discussion is
3  going to be meaningful.  Yes, I try to.
4      Q.   In -- strike that.  Whether you discuss it
5  with the parents or not, in that instance where you
6  make a diagnosis of medical child abuse of the
7  child, do you make any referral for services for the
8  parents?
9      A.   I may suggest that counseling would be
10 recommended for a parent, but I -- I don't diagnose
11 parents, and so -- but I also make recommendations
12 for counseling for parents when they've lost a
13 child, so it's just a recommendation.  I have no
14 control over that.
15     Q.   Okay.  Let me go back to the screen share.
16 Doctor, are you able to see my screen?
17     A.   Fairly.  It's a little bit small.
18         MR. HEIL:  Aaron --
19         MR. RAPIER:  And --
20         MR. HEIL:  -- copy of this.  If you can
21 blow it up just a little bit, that would be
22 helpful.
23         MR. RAPIER:  Yeah, I will.  The font's
24 really small, so, yeah, I'll have to like --

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 106

- - -

1  BY MR. RAPIER:
2      Q.   It'll be one of those things, Doctor,
3  where I think, in order to see the font, it's gonna
4  have to cut off some of the page, so just let me
5  know if you, you know, want to see the entire page
6  when I ask you about a particular part of it, okay?
7      A.   Okay.
8      Q.   So for now what I'll do is, believe it or
9  not, I'll -- oops -- I'll actually make it a little
10  smaller just so you can see the whole page.  I
11  wouldn't expect that anybody could actually read
12  that.  And, John, before I ask any questions, I'll
13  increase the font, but I want to just kind of --
14  it's 96 pages, so I won't go page by page, but,
15  again, same is true with this.  If there's any part
16  of it where you want to read it before answering any
17  questions, please just let me know that, and I'll
18  make that available to you.  So as I scroll through
19  this, do you recognize this generally as a contract
20  between University of Illinois and Illinois DCFS?
21      A.   It appears that that's what it is.  I
22  haven't looked at our contract with DCFS for some
23  time, but it appears that that is what it is.
24      Q.   For the record, it's a 96-page PDF.  Bates

Page 107

- - -

1  stamp is Krueger, and, actually, in the name, it's
2  P-E-N-T-A-K -- a typo, I presume -- and then it's
3  numbered one through 96.  And, Doctor, if I
4  understood it, this is not a contract that you have
5  reviewed; is that fair to say?
6      A.   Not recently.  This looks like it's from
7  fiscal year '23, which I would not have looked at
8  recently, no.
9      Q.   Do you have an understanding of whether or
10  not -- not in terms of the contract language, but in
11  terms of what the PRC was doing through the contract
12  with Illinois DCFS, whether that has changed in any
13  important way as you've seen it between 2017 and
14  present day?
15      A.   It has not substantially changed, no.
16      Q.   So I'll go through some particular pages,
17  and then I'll increase the font so that it's legible
18  on the screen.  I'm gonna jump to page 20 of Exhibit
19  2, and the top of this page says, "Exhibit B,
20  Deliverables or Milestones," and I want to ask you
21  some questions about this part of the exhibit where
22  it says, "Where services are to be performed".  But
23  before I do, is the size of the font large enough,
24  or should I increase it a little bit more?

Page 108

- - -

1      A.   I can read it.  If it was a little larger,
2  it'd be better.
3      Q.   Yeah, I agree.  Is that okay?
4      A.   Yes.
5      Q.   Okay.  All right.  And so there's a -- let
6  me get closer to the microphone.  There's a
7  statement here about where services are to be
8  performed, and then you'll see it says here,
9  "Complete address of location where services will be
10  performed," and the first address is 1800 North
11  Knoxville Avenue.  Is that the PRC headquarters that
12  you mentioned previously?
13      A.   That is where our outpatient clinic is,
14  yes.
15      Q.   And then this 74 percent that goes with
16  the value of services performed at this location, do
17  you have any idea what that percentage means in this
18  context?
19      A.   That is presuming that the majority of our
20  patients would have been seen outpatient.  That
21  fluctuates just based on the severity of injuries.
22  It has not been 74 percent, but that is an assumed
23  number that most of our patients would be
24  outpatient.

Page 109

- - -

1      Q.   The next address that is listed on this
2  page of the exhibit is 530 Northeast Glen Oak
3  Avenue.  Do you recognize what physical plant or
4  facility that is?
5      A.   Yes.  That is the address that is used for
6  OSF Saint Francis and Children's Hospital.
7      Q.   And in this context, do you know what the
8  25 percent means where it says, "Value of services
9  performed at this location"?
10      A.   That is an estimation that about
11  25 percent of our patient evaluations would have
12  been done on inpatients at the hospital --
13  Children's Hospital of Illinois.
14      Q.   And I understand that 25 percent is not
15  precise; it varies from year to year, maybe an
16  estimation.  Is about a quarter of your work at OSF
17  Saint Francis?
18      A.   No.  It's more than that.  It's probably
19  well over 30 percent, maybe 35, 36 percent.
20      Q.   If we scroll down in the same exhibit,
21  there's another address, 221 Northeast Glen Oak
22  Avenue.  Do you know what physical location or
23  facility that is?
24      A.   That's Carle Methodist currently.

Page 110

- - -

1   Q.   And, again, I know these are just
2   estimations.  Is it generally the case that a small
3   percentage of your work is performed at Carle
4   Methodist?
5        A.   Yes.
6        Q.   Gonna scroll down in the exhibit now to
7   page 44, and there's a title here under Section 1.5,
8   "Geographical Service Areas".  Is the font okay for
9   you to see that?
10       A.   Yes.
11       Q.   And then under "County of Service" it says
12  "Central Region".  Is that generally your region?
13       A.   Yes.
14       Q.   And then where it lists the main program
15  locations, are those the same three buildings that
16  we saw on the prior page?
17       A.   Yes.
18       Q.   And then under a description of the
19  services, "Medical evaluation and case coordination
20  services for physical abuse, sexual abuse and
21  neglect occur at 530 Glen Oak Avenue" [as read].  Is
22  that the OSF Saint Francis address?
23       A.   Yes.
24       Q.   Gonna scroll down now to page 45; came up

Page 111

- - -

1   a little bit earlier.  And, look, Doctor, I
2   understand when you said you -- you haven't read
3   this, you know, word for word, but I just wanted to
4   point out under "Definitions" 1.9.1, does the
5   definition of "client" there include BB?
6        A.   Yes, it would.
7        Q.   So BB -- under this contract, anyway,
8   BB was a client; is that correct?
9        A.   For D --
10            MR. HEIL:  Objection to the extent it
11       calls for a legal conclusion.  You may answer.
12            THE WITNESS:  For DCFS purposes, yes.
13  BY MR. RAPIER:
14       Q.   Was -- for that same purpose, was AA
15  a client under this contract?
16            MR. HEIL:  Objection, basis of knowledge.
17       The witness has already testified she's had no
18       contact, never met [inaudible].  You can answer
19       if --
20            THE WITNESS:  I don't know.  I have no
21       knowledge of any child in the family other than
22       BB.
23  BY MR. RAPIER:
24       Q.   So if I asked you the same question about

Page 112

- - -

1   CC, your answer would be the same?
2        A.   Correct.
3        Q.   I want to scroll down in the same exhibit
4   to page 52, and I'll scroll up just so you can see
5   the prior heading, 5.1, "Provider Physical Plant,"
6   begins on page 51, and then carries over onto the
7   top of page 52, and there's a statement in this
8   paragraph -- I'll read the whole paragraph for the
9   context:  "The Pediatric Resource Center staff also
10  serves children who have inpatient status at
11  Children's Hospital of Illinois at OSF Saint Francis
12  Medical Center and Unity Point Methodist Medical
13  Center.  These children are seen in their rooms at
14  these institutions.  If it would be necessary for a
15  child who has been referred for an examination for
16  evaluation of their injuries, PRC staff would
17  utilize these hospitals for the admission and
18  subsequent exam and testing."  Did I read that
19  correctly?
20       A.   Yes.
21       Q.   Is that describing what you addressed
22  earlier, that there are some instances where kids
23  within the central region need to be brought into
24  the hospital in order for you to complete your

Page 113

- - -

1   medical evaluation?
2        A.   Yes.
3        Q.   In that instance, is it your preference to
4   use the OSF Saint Francis Medical Center?
5        A.   Yes.  Currently, what is here called Unity
6   Point Methodist, but Carle Methodist, has very few
7   pediatric beds, and they just don't have the
8   specialists or pediatric services to accommodate the
9   evaluation that is needed for child abuse and
10  neglect.
11       Q.   You know, the title of this section, if we
12  go up, was "Provider Physical Plant".  I mean, is it
13  fair to say that you need that physical space at OSF
14  Saint Francis in order to perform the medical
15  evaluations that are addressed in this agreement?
16       A.   It is preferred.  There are still some
17  children who do get admitted over to what is now
18  Carle Methodist, and we will go over there and
19  evaluate them if it's necessary, but it's not the
20  preferred hospital.
21       Q.   Scroll down now to page 54 of the same
22  exhibit, and this will be under the subcategory
23  5.2.1, "Specialized Services".  Do you understand in
24  this context that the medical provider is either you

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 114

- - -

1  or other medical staff at PRC?
2      A.   Yes.
3      Q.   And with respect to this number five on
4  this page of the exhibit, "Supervise forensic
5  photo-documentation of injuries," in this context,
6  what's your understanding of what "forensic" means?
7      A.   So we photo-document injuries if there are
8  any, or we use photo-documentation for child sexual
9  abuse examinations.  People would refer to that as
10  forensic photo-documentation.  It's using a
11  measuring device to assess the injuries, and it has
12  to be a quality photo.  So people would refer to
13  that as forensic photo-documentation.  In my
14  opinion, it's just quality photo-documentation of an
15  injury with a measuring device, if it's physical
16  abuse, so that you can accurately assess an injury.
17  But there are some people who would refer to it as
18  forensic photo-documentation.
19      Q.   In number six -- I'll read the first
20  sentence; let me know if I read it accurately -- is
21  another one of the specialized services that PRC
22  provides under this agreement to "Formulate an
23  extended plan of medical investigation for children
24  whose evaluation is not completed with the exam"?

Page 115

- - -

1      A.   Yes.
2      Q.   And are some examples of that type of
3  medical investigation radiological testing, skeletal
4  surveys, blood works, and other tests as indicated
5  by the medical history and the child's presenting
6  status?
7      A.   Yes.
8      Q.   Number eight is another specialized
9  service that PRC provides, that a complete
10  court-worthy medical documentation for the child,
11  including a medical impression and recommendations?
12      A.   Correct.
13      Q.   And, in this context, what is meant by
14  "court-worthy"?
15      A.   All medical documentation should be
16  court-worthy.  We teach that in medical school.  So
17  absolutely every piece of medical documentation
18  should be court-worthy.  It should be legible if
19  it's handwritten.  It should be understandable.  It
20  should make sense.  It should be thorough and
21  accurate.  So all medical documentation should be
22  court-worthy.
23      Q.   Is another service that PRC provides under
24  this agreement that PRC recommend further action

Page 116

- - -

1  that will advance the investigation and/or meet the
2  child's health care needs?
3      A.   Yes.
4      Q.   And I have one more along the same line.
5  Is an additional specialized service that PRC
6  provides under this agreement to provide medical
7  consultation and case coordination without an
8  examination of the child, i.e. death cases and cases
9  in which the child has received adequate medical
10  physical examinations, but the case requires an
11  expert opinion based on existing medical records and
12  surrounding DCFS investigation?
13      A.   Yes.
14      Q.   Is that expert opinion something that is
15  provided in a written report, or is that more expert
16  testimony?
17      A.   It's in a written report.
18      Q.   The last thing I want to ask you about in
19  this agreement is down on page 63, and it's under
20  Section 10.4, "Additional Requirements for Fixed
21  Rate Agreements".  Does it say there, "The Provider
22  shall submit to DCFS: quarterly outcome measures
23  report, quarterly client listing with name and DCFS
24  ID (as required), quarterly personnel matrix, and a

Page 117

- - -

1  quarterly progress report describing the services
2  provider" -- "provided" -- excuse me -- "and number
3  of clients served"?
4      A.   Yes.
5      Q.   Now, is that -- is that referring to one
6  report, or is that sort of multiple types of reports
7  that PRC provides to DCFS?
8      A.   It's a report of the activities over the
9  last quarter.  So for each quarter, there is a
10  report given back to DCFS, which would include --
11  excuse me -- it would include the -- my goodness --
12  it would include the cases that have been evaluated.
13  It would include any progress if there's still ones
14  pending.  It includes a report back to DCFS of late
15  referrals that we got.  So it's basically just a
16  summary of the last quarter's work.
17      Q.   Is that a written report that is submitted
18  to DCFS?
19      A.   Yes.
20      Q.   Gonna put another contract here on the
21  screen.  This will be Exhibit 3.  It is a 128-page
22  PDF that purports to be a grant agreement between
23  DCFS and the University of Illinois.  Are you
24  generally familiar with this grant agreement?

Page 118

- - -

1    A.   Yes.
2    Q.   Like the other agreement we looked at,
3 while you haven't read each year's contract,
4 maybe -- I don't -- has the grant agreement between
5 University of Illinois and DCFS changed, as you
6 understand it, any material way since 2017?
7    A.   It hasn't changed significantly, no.
8    Q.   So the first page I want to look at, at
9 least by its Bates number page, will be on 152.  See
10 if I did the math right.  Yeah, okay.  All right.
11 And so we're under a section, 5.2, titled
12 "Description of Services," and in that top
13 paragraph, before we get to those subparts with the
14 lowercase letters, does it say, "Services delivered
15 by the Provider shall comply with all Department of
16 Children and Family Services laws, rules,
17 regulations, procedures, protocols, and policy
18 guides" -- parenthetically, it says, "Available for
19 viewing on the DCFS website," and it provides the
20 website address -- "all of which are hereby
21 incorporated by reference and made a part of this
22 Agreement"?
23    A.   Yes.
24    Q.   In general, do you know what those DCFS

Page 119

- - -

1 laws, rules, and regulations are?
2         MR. HEIL:  Objection as to vagueness.  You
3    can answer if you can.
4         THE WITNESS:  They're fairly
5    comprehensive, but I am familiar with the ones
6    that pertain to child abuse and neglect
7    maltreatment codes or allegation numbers or
8    their procedures and references that, you know,
9    are relevant to the work we are doing.
10 BY MR. RAPIER:
11    Q.   In this context, is the capitalized term
12 "Provider" referring to PRC?
13    A.   Yes.
14    Q.   And are the services that are being
15 delivered the services that are provided to the
16 clients like ██?
17    A.   This grant is different.  It's not a
18 service specifically to a patient.  There are
19 75-ish -- it's a small number of patients that are
20 actually served under this grant, but this is more
21 dealing with education and outreach and creation of
22 systems that can serve children as opposed to actual
23 service to patients.
24    Q.   If we look at the subpart B on the same

Page 120

- - -

1 page of the exhibit, is one of the services that PRC
2 provides assistance to DCFS legal staff in preparing
3 the medical pieces of cases for administrative
4 review hearings?
5    A.   Yes.
6    Q.   And, if I understand your prior answer,
7 would that be assistance to DCFS legal staff on
8 cases where perhaps you were not involved in an
9 underlying medical evaluation?
10    A.   No.  These are typically cases where we
11 have been involved, and we are going to be providing
12 testimony, and so it's helping that attorney prepare
13 and understand the medical pieces of the case
14 because attorneys are not typically medical folks,
15 and they don't understand terminology or medical
16 findings.
17    Q.   In the next subpart C, education and
18 training for health care providers, is OSF Saint
19 Francis one of those health care providers?
20    A.   We do frequent education and training to
21 health care providers at Saint Francis and the
22 Children's Hospital of Illinois on an ongoing basis,
23 yes.  There are many others though.
24    Q.   And so does this mean that PRC receives

Page 121

- - -

1 grant money, including federal money, in order to
2 educate and train health care providers at places
3 including, among others, OSF Saint Francis?
4    A.   Yes.  That is what this grant is partially
5 covering.
6    Q.   And if we go down to the next page,
7 subpart D, here it's talking about education and
8 training of non-health care providers.  Generally,
9 who are the folks within that category?
10    A.   It would include DCFS investigators,
11 caseworkers from DCFS or private agencies.  It would
12 include children's advocacy center staff.  It
13 includes attorneys.  It includes really anybody who
14 wants to learn about child maltreatment.  So we
15 provide at least three per year, but we often end up
16 providing many, many more educational sessions to
17 people who need or feel like they need to learn
18 about child maltreatment.
19    Q.   What types of attorneys receive that
20 education and training?
21    A.   Anybody who wants to -- prosecutors,
22 guardian ad litems, we've had defense attorneys --
23 anybody who feels like they need an understanding of
24 child maltreatment.

Page 122

- - -

1    Q.    How are those attorneys made aware that
2 this type of education and training is available to
3 them?
4    A.    The information is published in multiple
5 sources.  It's provided through the DCFS office of
6 training.  The children's advocacy centers are
7 notified.  It is sent to -- it's sent to multiple
8 different forums, so -- it's on our website.  I
9 mean, it's in multiple different places.
10    Q.    Is that -- is that federal and state
11 money, part of this grant, include education and
12 training for attorneys who represent families who
13 have been accused of abuse and neglect?
14    A.    We don't prohibit anyone from attending
15 the trainings.
16    Q.    How do you --
17    A.    Any attorney could attend, and we
18 typically offer CLE.
19    Q.    And how do you notify attorneys who defend
20 families that this state and federally funded
21 training is available to them?
22    A.    I'm not in charge of notifying people, but
23 I can tell you we have had defense attorneys attend
24 in the past.  I -- clearly, they were able to find

Page 123

the information.  I'm not sure how that was
2 particularly disseminated, but it is available.
3 Guardian ad litems attend, and they were able to get
4 the information, so -- I don't know where it was
5 disseminated though.  I'm sorry.
6    Q.    In the next subpart, which is E, it says,
7 "Consultative services for other types of
8 professionals" [as read], and does that include
9 judges, among other folks?
10    A.    That Section E is not specific to judges.
11 We have, under Section D, provided education and
12 trainings to judges when a chief judge has requested
13 us to do so.  Section E is more that, for example, a
14 physician has a question and just needs either
15 resources or education about a topic, and so we can
16 point them to the appropriate journal articles or
17 the appropriate literature or protocol or just give
18 them some information.  But, I mean, it could be to
19 an attorney or judge or someone if they sought it
20 out.  It's not -- that's not as common as it is for
21 a medical provider or someone who just needs some
22 information about medical information, medical
23 literature, medical words, but it can be.
24    MR. HEIL:  Aaron, would you mind making it

Page 124

- - -

1 a little bigger?  I'm having trouble seeing it
2 on my screen.  Thank you.
3    MR. RAPIER:  Yeah, sure.
4 BY MR. RAPIER:
5    Q.    Okay.  And so while the education and
6 training is utilized, it sounds like, more and more
7 often, is there federal and state grant money being
8 paid to PRC in order to consult with judges about
9 child maltreatment cases?
10    A.    If a judge reached out to us and had
11 questions, we would do that.  That rarely happens,
12 but it could, and so that would be covered under
13 this grant.
14    Q.    And in F, at the bottom here, does it say,
15 "PRC medical staff will continue to work on a
16 statewide standard of medical practice"?
17    A.    Yes.
18    Q.    What does that mean?
19    A.    So it's basically that we will assist
20 other institutions who are trying to do work in this
21 area on what the standard of care is and that we
22 will attempt to have everybody working at the
23 standard of care in the field and -- because there
24 are places that don't have child abuse

Page 125

1 pediatricians, so we want everybody to be aware of
2 what the standard is, and that will be a resource
3 for them.  Other places in the state that have a
4 child abuse pediatrician are certainly aware of what
5 that standard of care is and are practicing at that
6 level, but outside of Chicago there are very few
7 child abuse pediatricians, and so that is an attempt
8 to make sure that the response to child maltreatment
9 across the state is at the level it should be using
10 evidence-based medicine and at the standard of care
11 for children.
12    Q.    Does this mean that PRC is receiving state
13 and federal grants in order to continue to work on a
14 statewide standard of care for child abuse
15 pediatrics?
16    A.    It's not that we are dictating what
17 medical people should do; it's that we are
18 attempting to educate people on what the standard of
19 care and the best practices are in the field, which
20 we do on a daily basis because not every area in the
21 state has the resources that we do or a child abuse
22 pediatrician.
23    Q.    Is PRC receiving state and federal funds
24 for that purpose?

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 126

- - -

1    A.    Yes.
2    Q.    In the next subpart, there's a reference
3 to a Directory of Illinois Health Care Providers for
4 Child Abuse and Neglect Investigations.  What is
5 that directory?
6    A.    It is literally what it says.  It is a
7 directory of all of the health care providers in the
8 state who provide care for child abuse and neglect.
9 So it is child abuse pediatricians and who they are,
10 where they work, what type of maltreatment they
11 serve.  It also includes some other people who are
12 not child abuse pediatricians but do work in the
13 field, where they are, what types of cases they're
14 willing to see, how -- it talks about their years of
15 experience, how many cases they've seen.  So if you
16 were a parent, if you were somebody who's looking to
17 find someone to help you, whether you're an
18 investigator, law enforcement, attorney, parent --
19 it doesn't matter -- another physician, you could
20 look at this directory, find someone relatively near
21 you, and get a feel for their level of expertise, or
22 find someone maybe a little bit farther who has far
23 more expertise.  It also has a listing of all of the
24 sexual assault nurse examiners who are qualified to

Page 127

- - -

1 do pediatric cases in the state.  So it's basically
2 a resource for anybody who has a need for a child
3 maltreatment specialist in any field throughout the
4 state.  It also lists all the children's advocacy
5 centers, where they are, so it's a resource for
6 medical professionals or for parents or anybody
7 else, and it's on our website, and then we also send
8 it out to children's advocacy centers and DCFS
9 offices on a disc so they have a physical copy.
10    Q.    In subpart I of this section of the
11 exhibit, first sentence reads -- let me scroll down;
12 I beg your pardon -- "Direct services to children
13 ages 0 to 17, when there is a suspicion for abuse or
14 neglect, would benefit from PRC services, and court
15 jurisdiction is found within Illinois."  In this
16 context, what does that mean to direct services to
17 children?
18    A.    That is when we actually provide a medical
19 evaluation for the child, so we're actually
20 providing a direct service to that child.
21    Q.    In this same paragraph, the next sentence
22 refers to there being approximately 300 cases that
23 PRC services each year.  Has that been pretty
24 consistent since 2017?

Page 128

- - -

1    A.    Absolutely not.
2    Q.    Oh.  About how many cases does PRC service
3 each year?
4    A.    It has been well into the 400, 450 range
5 for many years, and this last year was probably
6 about 620 of actual direct service care that we
7 provided.
8    Q.    So the 300 is not accurate for each year.
9 I understand that, but then it breaks down that
10 approximately 225 will be served under an agreement
11 with the DCFS Central Regional Office.  Is that the
12 last contract that we looked at, Exhibit 2?
13    A.    Yes.
14    Q.    Then it mentions an additional 75 that
15 will be billed under this grant agreement, and you
16 mentioned that there was 75 serviced under this
17 agreement before.  Are we referring to the same
18 thing here?
19    A.    Yes.  That would be the 75 children that
20 are getting direct services under this particular
21 agreement.
22    Q.    And do you have an understanding of how it
23 is a determination is made whether the child
24 receives services under this grant or under that

Page 129

- - -

1 contract that we saw as Exhibit 2?
2    A.    Yes.  There are some children who are not
3 going to be under the purview of DCFS because there
4 is no eligible perpetrator based on DCFS criteria.
5 So if your person who sexually assaulted you is a
6 neighbor who was not in a caregiving role, that is
7 not a DCFS-eligible perpetrator.  Law enforcement
8 would be involved, but DCFS would not, so that might
9 be one of the 75 children.  So there are cases where
10 DCFS simply is not going to be one of the
11 multidisciplinary partners involved, but those
12 children still require services, and so 75 children
13 who fit that criteria would receive direct services
14 under this grant.
15    Q.    In general, if DCFS is involved, are the
16 services that PRC provides pursuant to that Exhibit
17 2 or that other contract we looked at?
18    A.    Yes.  If DCFS is involved, then they would
19 fall under the contract that you previously
20 mentioned.
21    Q.    When DCFS is not involved, services PRC
22 would provide would fall under this Exhibit 3 or
23 grant agreement; is that accurate?
24    A.    For 75 children, not for all of them.

Page 130

- - -

1  Q.  And for those children in excess of 75,
2  are they treated under some other agreement, or do
3  they then fall under that Exhibit 2 contract?
4  **A.  They would not fall under the other**
5  **contract.  They are seen, and if we don't get**
6  **payment, we just simply write off the amount.**
7  Q.  Do you write it off in the same amounts
8  that you would have been compensated under Exhibits
9  2 and 3?
10  MR. HEIL:  Objection as to form.  I know
11  relevance isn't an objection here, but I'll
12  object on that basis anyway.
13  **THE WITNESS:  We write off whatever the**
14  **parent is not paying.  We don't charge people**
15  **for child maltreatment evaluations, so if**
16  **there's no compensation either under a grant**
17  **contract or an insurance payment, then we**
18  **simply write it off.**
19  BY MR. RAPIER:
20  Q.  My question -- and, you know, maybe I'm
21  not understanding the nuances to this -- is, is the
22  amount that is written off the amount that you would
23  have been able to charge under either Exhibit 2 or
24  Exhibit 3?

Page 131

- - -

1  **A.  No.  The amount will vary depending on**
2  **what service was provided to the child.  Sexual**
3  **abuse evaluations are very different than physical**
4  **abuse.  So the amount will vary dependent on the**
5  **service provided, and then, of course, if the family**
6  **is self-insured or has no insurance, which is very**
7  **unusual in children, but if we are -- we are not**
8  **going to bill the family and there's nothing else**
9  **that will pay in any way for what we have done in**
10  **provided services for that child, then we write it**
11  **off.**
12  Q.  Go down to the next page under J, and this
13  deals with medical evaluations and diagnoses.  So
14  does this essentially show that PRC is receiving
15  state and federal grant money for, among other
16  things, forensic documentation of findings and court
17  testimony?
18  **A.  I don't know that I can speak to that**
19  **without knowing what was directly above this**
20  **section.**
21  Q.  Sure.  So -- okay.  So I'll scroll up
22  maybe to the heading, and then just tell me if you
23  need to see more information.  So the "J" is under
24  5.2, "Description of Services," or service delivered

Page 132

- - -

1  by the provider.
2  **A.  Okay.**
3  Q.  So does that give you the context you
4  needed?
5  **A.  Can you show me what's directly above J?**
6  Q.  Oh, sure.
7  **A.  Okay.**
8  Q.  So in subpart J, is what this is saying
9  that PRC receives federal and state grant money for,
10  among other things, forensic documentation of
11  findings and court testimony?
12  **A.  So part of what is covered by this grant**
13  **would be, for example, travel, if it's needed.  Now,**
14  **typically, for court, we would bill the county that**
15  **is subpoenaing us, but there are eight**
16  **administrative hearings that are covered under this**
17  **agreement, and so county, testimony, federal court**
18  **is not covered under this, so there are certain**
19  **things that would just not be falling under this**
20  **grant.  It will cover eight DCFS administrative**
21  **hearings.**
22  Q.  All right.  Let me take this off the
23  screen.  I'm gonna ask you about another sort of
24  subject matter now.  Did you discuss BB████'s

Page 133

- - -

1  case with other health care providers?
2  **A.  Yes.**
3  Q.  Did you discuss BB████r's case with
4  any health care providers located outside the state
5  of Illinois?
6  **A.  Yes.**
7  Q.  Do you remember which health care
8  providers you consulted with about BB████
9  that were located outside of Illinois?
10  **A.  I specifically remember talking to**
11  **Dr. Makoroff, who is in Ohio, and the geneticist at**
12  **Vanderbilt, which I believe is Dr. Morgan.  I recall**
13  **speaking to those two people in particular.**
14  Q.  What type of doctor is Dr. Makoroff?
15  **A.  She is a child abuse pediatrician.**
16  Q.  Is Dr. Makoroff a child abuse pediatrician
17  at the Mayerson Clinic?
18  **A.  Yes.**
19  Q.  Is the Mayerson Clinic part of Cincinnati
20  Children's Hospital?
21  **A.  Yes.**
22  Q.  And in terms of the communication with
23  Dr. Makoroff, were you able to speak with
24  Dr. Makoroff under that part of the HIPAA law that

- - -

1  you referenced earlier?
2      A.  Yes.  There were also -- because DCFS had
3  referred, there were consents through DCFS for
4  medical records and outside facilities that allowed
5  us to discuss with other providers, but also
6  continuity of care, yes.
7      Q.  Is it your understanding that even if you
8  did not have those consents, you could speak with
9  Dr. Makoroff under that continuity of care provision
10 in HIPAA?
11     A.  Yes.
12     Q.  In terms of consents, do you have an
13 understanding of when DCFS is the appropriate party
14 to sign the authorization as opposed to when it is
15 the parents' responsibility to sign authorizations?
16         MR. HEIL:  Objection as to form.  If you
17     understand --
18         THE WITNESS:  Author -- you'd have to
19     clarify what you mean by "authorization".
20 BY MR. RAPIER:
21     Q.  For you to speak with a third-party
22 provider either about a patient or to review that
23 patient's records.
24     A.  So it depends.  There's multiple factors

- - -

1  here.  DCFS can request records from another
2  facility, and if they are wanting me to review them,
3  they can send them to me.  They also can get consent
4  from a parent -- DCFS can -- and send that to us so
5  that we can access the records, if possible, or to
6  have a discussion.  So there's multiple ways it can
7  go.  Until they have taken protective custody,
8  though, they typically are not going to -- should
9  not consent for, for example, medical care or
10 anything like that.  So that would then be the
11 parents consenting.
12     Q.  I asked you some questions earlier about
13 circumstances where parents could decline your
14 involvement or request that another child abuse
15 pediatrician be involved.  Is it your understanding
16 that once DCFS has taken protective custody, that
17 the parent would lose that right?
18     A.  At that point they're not making medical
19 decisions, but they can always ask for second
20 opinions, which would not be in my control.
21     Q.  If DCFS has taken protective custody of a
22 child and DCFS wants you to do a medical evaluation
23 on the case, in that instance, do the parents have a
24 right to refuse?

- - -

1      A.  If DCFS is the guardian, then they would
2  be the one consenting to the medical care.
3      Q.  So is it your understanding that, in that
4  instance, the parents would not have a right to
5  refuse your involvement?
6      A.  I don't know that I can speak to that.
7      Q.  Do you remember anything either that you
8  said to Dr. Makoroff or Dr. Makoroff said to you
9  about ██?
10     A.  I do.  There had been a written document
11 by Dr. Makoroff detailing some of the concerns that
12 had occurred at her institution with ██ that
13 raised, certainly, concerns for overutilization of
14 medical care and concerns that were pointing toward
15 medical child abuse.
16     Q.  Do you remember anything else you
17 communicated to Dr. Makoroff or Dr. Makoroff
18 communicated to you about ██r?
19     A.  There would have been -- there were some
20 specifics about multiple providers for the same
21 medical condition, seeking care out of state, that
22 there were times that what was reported by parents
23 was not observed by the medical staff at all and
24 that it was discrepant -- discrepant histories being

- - -

1  provided for ██
2      Q.  Do you remember if you reached out to
3  Dr. Makoroff or if Dr. Makoroff reached out to you
4  about ██?
5      A.  I believe I called her.  There was some
6  phone tag, but I can't remember who actually got
7  ahold of who, but I think I called her.
8      Q.  And at that time were you seeking a
9  consultation from her about ██ and
10 possible medical child abuse?
11     A.  At that point, I was seeking information
12 because DCFS had relayed that they had information
13 from her, and so, for me, getting medical
14 information from a DCFS investigator is very
15 difficult because they don't understand medical
16 words, and I would much rather speak to the
17 physician, and so I tried to reach out to the
18 physician.
19     Q.  Independent of the communications with
20 Dr. Makoroff in this case, did you know Dr. Makoroff
21 as a fellow child abuse pediatrician?
22     A.  There's only about 300 of us in the
23 country, so we do tend to know each other, at least
24 in passing.  It's not like I know her exceedingly

- - -

1  well, but I know her in passing.
2      Q.  Prior to communicating with her about
3  BB██████, had you served with Dr. Makoroff on
4  any of those professional associations that you
5  testified to earlier?
6      A.  She is a member of the Helfer Society.  I
7  honestly couldn't tell you if she sits on any of the
8  committees with me.  Again, as I said, I know her in
9  passing, but not well.
10     Q.  You also mentioned a geneticist at
11  Vanderbilt.  Do you remember that physician's name?
12     A.  I believe it was Dr. Morgan.  Thomas
13  Morgan, maybe.
14     Q.  And do you remember what you said to the
15  geneticist at Vanderbilt and what that geneticist
16  said to you about BB██████?
17     A.  Yes, and there was actually a release of
18  information signed by BB██'s mother for the PRC to
19  the Vanderbilt's Undiagnosed Diseases Network, which
20  is Dr. Morgan, and so I reached out and asked about
21  what the process was for that specific clinic and
22  asked about BB██, and he advised that, based on the
23  information he had and the variant of unknown
24  significance on BB██'s testing, that BB██ did not

- - -

1  have Xia-Gibbs.
2      Q.  Do you remember if that is something that
3  the geneticist at Vanderbilt communicated to you
4  over the phone, or was that in a written record?
5      A.  Over the phone.
6      Q.  And what's your understanding of what the
7  Undiagnosed Diseases Network is?
8      A.  My understanding is that it's at several
9  large hospitals and that it is a program where if a
10  child has something that's just very unusual, they
11  will review some basic information and decide
12  whether to accept or not accept the child into that
13  network, and then further evaluation and testing
14  will be done trying to get at the very rare
15  diseases.
16     Q.  Is it specific to Vanderbilt, or is
17  Vanderbilt just one of other hospitals that
18  participate in the Undiagnosed Diseases Network?
19     A.  It's one of -- I believe there's one at
20  Boston Children's as well.  I don't recall if
21  there's one at CHOP, so Children's Hospital of
22  Philadelphia, but I know there's one at Boston
23  Children's.
24     Q.  Did you have an understanding that the

- - -

1  geneticist at Vanderbilt or Dr. Morgan was
2  considering whether or not BB██ would qualify for
3  the Undiagnosed Diseases Network?
4      A.  He had been contacted.  I believe at that
5  point he'd already seen BB██, and at the time I
6  spoke with him he said that he was not going to be
7  accepting him into the network.
8      Q.  Did Dr. Morgan tell you that BB██ would
9  not be accepted because he didn't have the diagnosis
10  of Xia-Gibbs, or was there some other reason that
11  was articulated to you?
12     A.  He didn't believe he had Xia-Gibbs, and he
13  also had concerns that there was overutilization of
14  medical care and possibly medical child abuse.
15     Q.  To your knowledge, had Dr. Morgan or the
16  geneticist at Vanderbilt sought consultation from a
17  child abuse pediatrician or reported those concerns
18  to the appropriate Child Protective Services Agency?
19     A.  I don't believe they had talked to their
20  child abuse pediatrician at Vanderbilt, and, no, I
21  don't -- well, I don't know if he would have called
22  in a report or not.
23     Q.  Do you know who the child abuse
24  pediatrician was at Vanderbilt at that time?

- - -

1      A.  They went through some transitional
2  phases.  I don't know for sure.  It might have been
3  Deborah Lowen, but I'm not quite sure at that point
4  in time.
5      Q.  And do you know Dr. Deborah Lowen?
6      A.  Again, I know her in passing, but not
7  well.
8      Q.  When you spoke with Dr. Makoroff, was that
9  something you were doing as a part of your
10  responsibilities under the agreement between PRC and
11  OSF, or was that something you were doing as part of
12  your responsibilities under the agreement between
13  PRC and DCFS?
14     A.  At that point, the referral had come from
15  DCFS, but BB██'s primary care physician was also an
16  OSF physician, so I had also spoken with him at some
17  point.  So in order to do -- complete the referral,
18  I had to review the medical records, and so it would
19  have been basically both.  But the child abuse
20  pediatrician often has the most comprehensive view
21  of the medical record, so that's the easiest first
22  place to reach out to.
23     Q.  And whether you're working under the
24  contract with OSF or the contract with DCFS, is

Page 142

- - -

1  there a way that you have to either keep track of
2  your time or bill your time so that it's clear
3  whether or not it's work done pursuant to the OSF
4  contract or work done pursuant to the DCFS contract?
5      **A.   The work done through the physician**
6  **service agreement is just general work.  It's not**
7  **like per patient.  It's not kept track of that way.**
8  **It's a very small amount of my time.  But the DCFS**
9  **contract is kept by units, which is how they do it,**
10 **so it's chunks of time, and so that is generally**
11 **kept track of.  It never comes even close to the**
12 **amount of hours I put in on a case, but we can only**
13 **bill a certain amount of time.**
14     Q.   If someone wanted to go back and look at,
15 you know, how much time you spent on the OSF
16 contract compared to how much time you spent on the
17 DCFS contract in a given year, would there be
18 sufficient records to do that?
19     **A.   No, and the amount of hours would exceed**
20 **more than either one of them are paying me.**
21     MR. RAPIER:  Okay.  So this is kind of for
22     the group.  Just want to be mindful of the time
23     and whether people want to break for lunch.  I
24     was gonna go into next the letter from the

Page 143

- - -

1  Mayerson Clinic, but if folks want to take a
2  break for lunch, this might be a good time
3  because it'll be a new exhibit, even if not a
4  entirely new subject matter.  But before I dive
5  into it, I figured I'd kind of throw that out
6  there to the group.
7      MR. HEIL:  Aaron, we're okay here with
8  continuing on for a little bit.  Nevertheless,
9  if the group wants to take a break, that's
10 fine, too.
11     MR. RAPIER:  And so, Ambrose, Peter, okay
12 with you guys?
13     MR. QUIGLEY:  I'm okay with continuing.
14     MR. McCALL:  Go with whatever the majority
15 decides.  We're all good.
16 BY MR. RAPIER:
17     Q.   Okay.  So the -- Doctor, the next exhibit
18 I have, Exhibit 4, is a September 6, 2018 letter
19 from Dr. Makoroff.  It has some Bates stamp numbers,
20 Petrak 53 through 55.  Doctor, do you recognize
21 Exhibit 4?
22     **A.   Yes.**
23     Q.   And is it a fair and accurate copy of a
24 letter from Dr. Makoroff back in September 6, 2018?

Page 144

- - -

1      **A.   Yes.**
2      Q.   There's some handwriting in the bottom
3  right-hand corner there.  Do you recognize that
4  handwriting?
5      **A.   Yes.  That was just a notation that it had**
6  **been received in our office, and that's the person**
7  **who received it, basically.**
8      Q.   Is one of the individuals who received it,
9  or maybe the individual who received it, Ms. Moore?
10     **A.   Yes.**
11     Q.   Was this -- I understand the letter is
12 addressed "to whom it may concern," but was this
13 letter addressed -- sent to PRC?
14     **A.   No, it wasn't.**
15     Q.   Do you know who it was sent to?
16     **A.   It was sent to DCFS, I believe.**
17     Q.   In the first paragraph -- actually, the
18 first sentence -- it refers to Mayerson Center being
19 asked to consult on the **BB** [redacted] because of
20 concerns raised by many providers who care for him.
21 Do you know who asked for the consultation with
22 Dr. Makoroff?
23     **A.   I don't specifically, but, as you note, it**
24 **says, "have been asked to consult on BB** [redacted]

Page 145

- - -

1  **again," so there must have been a prior request for**
2  **consultation, and I don't know specifically who**
3  **requested the consultation.**
4      Q.   Other than the use of the term "again"
5  here, which I understand what you're saying, before
6  seeing this letter, were you aware that Dr. Makoroff
7  had previously consulted on the **BB** [redacted] case?
8      **A.   No, I don't believe I was.**
9      MR. HEIL:  Aaron, can you make it a little
10 bigger?
11     MR. RAPIER:  Yeah.
12     MR. HEIL:  Thank you.
13 BY MR. RAPIER:
14     Q.   Dr. Makoroff states she has not examined
15 **BB** [redacted] or talked with his mother.  She has performed
16 a chart review and talked with providers in
17 Cincinnati and Illinois who have evaluated **BB** [redacted].
18 Are you one of those Illinois providers that
19 Dr. Makoroff would have spoken with prior to
20 authoring this letter?
21     **A.   I don't recall if I spoke to her before or**
22 **after this letter because, again, I don't recall**
23 **when she initially became involved.**
24     Q.   And the second paragraph, you know, it

- - -

1  says, "[BB] is now" -- "is a now
2  18-month-old male who carries the diagnoses of
3  obstructive sleep apnea and central sleep apnea" --
4  boy, how do you say that next word?
5      A.   Laryngomalacia.
6      Q.   And a history of constipation.  It goes on
7  to say, "[BB] has also been found to have a gene
8  mutation."  Says in parentheses "AHDC1".
9  Dr. Makoroff then says, "Although there is not a
10  question that [BB] has these medical diagnoses,
11  many providers caring for [BB] have concerns that
12  because of his mother's actions, [BB] receives
13  inappropriate and unnecessary care."  Did I read
14  that correctly?
15      A.   Yes.
16      Q.   So is this one of those instances that we
17  were talking about before where there can still be
18  concerns for a diagnosis of medical child abuse even
19  when there is no dispute about the child's
20  underlying medical diagnosis?
21      A.   That is possible, yes.
22      Q.   And do you agree with the statements that
23  Dr. Makoroff made in this second paragraph?
24      A.   Based on the information she had, I can't

- - -

1  say whether that is or is not the fact, but that is
2  the -- that is what she is stating.
3      Q.   Gonna scroll down in the same exhibit to
4  the bottom of page one, and here at the bottom does
5  it say, "The use of oxygen when it is not needed can
6  cause complications including cellular damage and
7  skin breakdown from wearing a nasal cannula"?  Did I
8  read that correctly?
9      A.   Yes.
10      Q.   Do you agree with that?
11      A.   Yes.
12      Q.   Did either one of those two things
13  actually happen to [BB]?
14      A.   I don't recall if it happened
15  intermittently.  It was not -- well, I can't tell
16  you that he didn't have cellular damage.  I don't
17  know that that did or did not happen.  I don't
18  recall specific skin breakdown.
19      Q.   When you spoke with Dr. Makoroff, did you
20  take any notes?
21      A.   Probably minimal.  Whatever she and I
22  talked about would have been included in my report.
23      Q.   In instances where you take notes and
24  they're ultimately incorporated into a report, do

- - -

1  you maintain your notes?
2      A.   I tend to put my notes directly into
3  whatever I'm working on, so I don't like extraneous
4  notes.
5      Q.   Does that mean that, in this instance, any
6  notes you would have taken from your conversation
7  with Dr. Makoroff would have just gone into a draft
8  of your report?
9      A.   That is how I tend to work.  I would have
10  cleaned up the typos, but, beyond that, yes.
11      Q.   And, similarly, the conversation you had
12  with the geneticist at Vanderbilt, if you took
13  notes, it would have just gone directly into the
14  draft of your report?
15      A.   Yes.
16      Q.   Gonna scroll down to the bottom of the
17  exhibit.  All right.  And it says here, "From our
18  review of the medical records and discussions with
19  his providers, we agree that, because of his
20  mother's actions, [BB] is receiving some
21  unnecessary care.  Many of these interventions and
22  treatments have risks and side effects."  Did I read
23  that correctly?
24      A.   Yes.

- - -

1      Q.   So Dr. Makoroff here is referencing that
2  she or "we" agree with something.  Do you know if
3  that is an agreement with PRC, DCFS, or anyone else
4  in particular?
5      A.   I don't know.
6      Q.   There's a statement there that [BB] is
7  receiving some unnecessary care.  Did you ever
8  conclude that [BB] had received unnecessary care?
9      A.   Yes.
10      Q.   And what care did [BB] receive that was
11  unnecessary?
12      A.   He was on oxygen when he did not need to
13  be at a level that was in excess of what was
14  prescribed, and it -- for an extended length of
15  period, that was not prescribed.  That's just one of
16  the things that was excessive.
17      Q.   Can you identify any other care [BB]
18  received that was unnecessary?
19      A.   There was reported interventions for
20  constipation that were reported to be excessive but
21  weren't, I don't believe, actually being carried out
22  because the prescriptions weren't being filled
23  and/or the equipment needed to carry them out was
24  not being filled.  So although it seemed as if he

Page 150

- - -

1  was getting excessive treatment for constipation,
2  the care was not actually being given, although at
3  the end he didn't really seem to have excessive
4  problems with constipation.  His feedings were being
5  given through a preemie nipple even at the age of
6  two, which was not correct for his age nor
7  appropriate, and yet the history was that he could
8  not eat, did not eat, but had a BMI over the 95th
9  percentile for a medical reason, which was not the
10  case.
11      Q.  Do you know at which hospitals BB would
12  have received oxygen that he did not need?
13      A.  He was on oxygen at home, so he was just
14  on oxygen at baseline.
15      Q.  Did BB receive any unnecessary care at
16  any hospitals?
17      A.  There was a request for a G-tube and an NG
18  tube, so a nasogastric tube, that were not necessary
19  because his growth was adequate.  His weight was
20  adequate.  There was no need for it.  He multiple
21  times was given IV fluids based on history of not
22  drinking.  There were times that reported intake was
23  incorrect or fabricated.  The output in pediatrics
24  is tracked through diapers, and diapers were not

Page 151

- - -

1  given to medical staff to weigh, so he was receiving
2  fluids, IV fluids sometimes, based on history of
3  dehydration, and everything we do in medicine has
4  morbidity attached to it, so he was placed at risk
5  based on fabricated histories provided by his
6  parents.
7      Q.  I want to just make sure I understand.
8  What services specifically did BB receive at a
9  hospital that were unnecessary?
10      A.  IV fluids, chest X-rays.  I -- I don't
11  recall if he had a nasogastric tube placed.  I
12  believe he might have at one point.  He did have
13  multiple airway surgeries that were repetitive.
14  Based on history, I don't -- I can't determine
15  whether those truly were needed, but they appeared
16  to be excessive for a child who appeared otherwise
17  healthy and based on history, so just multiple
18  interventions.  So X-rays have risk, oxygen has
19  risks, IVs have risks, medications have risks.  All
20  of those things have risks, and they were done at
21  multiple different hospitals.
22      Q.  Let's just pick OSF Saint Francis.  Did
23  BB receive any unnecessary medical services or
24  interventions at OSF Saint Francis?

Page 152

- - -

1      A.  IV fluids, laboratory studies, X-rays,
2  oxygen.  All of those things were done at Saint
3  Francis, and I'm sure I don't recall off the top of
4  my head, but there were medications given as well.
5      Q.  Just want to make sure I've got those.  I
6  might have missed one.  So at OSF, did BB receive
7  IV fluids unnecessarily?
8      A.  As I recall, he did.  I would have to look
9  at my report for further detail.
10      Q.  At OSF, did BB receive lab studies
11  unnecessarily?
12      A.  Yes.
13      Q.  At OSF, did BB receive oxygen that was
14  unnecessary?
15      A.  Yes.
16      Q.  At OSF, did BB receive medications that
17  were unnecessary?
18      A.  Yes.
19      Q.  I thought you mentioned one other thing,
20  but I didn't get it in my notes.  Is there anything
21  else you can identify that BB received at OSF
22  that was unnecessary?
23      A.  Unless you left out X-rays, I think you
24  got it all.

Page 153

- - -

1      Q.  Now, are you familiar, even generally,
2  with how hospitals bill for the medical services
3  that are provided to patients?
4      A.  In general, yes.  There's coding for the
5  principal problem and subsequent problems, and then
6  I believe -- and I am not intimately familiar with
7  it -- that there are diagnosis-related groups and --
8  I don't specifically do hospital billing for
9  hospitals, so I can't answer any deep detail about
10  it.
11      Q.  Do you have an understanding that a
12  hospital may not bill Medicaid, Medicare, or private
13  insurance for services that are medically
14  unnecessary?
15      MR. McCALL:  Foundation.
16      MR. HEIL:  Join.  You can answer if you
17  understand it.
18      THE WITNESS:  I mean, I don't do -- I'm
19  not a hospital.  I don't do hospital billing.
20  I only bill for my services, so I don't know
21  what the hospital can or cannot do
22  [indiscernible].  I don't do hospital billing.
23  BY MR. RAPIER:
24      Q.  If OSF had billed for IV fluids provided

Page 154

- - -

1  to BB and been reimbursed for that billing, would
2  that mean to you that OSF and the insurance company
3  had concluded that the IV fluids were necessary?
4         MR. McCALL:  Foundation, speculation.
5         MR. HEIL:  Join in that objection.  Go
6     ahead.
7         THE WITNESS:  What it tells me is that the
8     medical providers felt that, based on the
9     history they were being provided, that the
10    fluids may be necessary, but the history they
11    were provided and the ability to track the
12    input and output was altered due to a
13    fabricated history and a inaccurate history of
14    intake and a, basically, deception by not
15    providing the actual output in the diapers for
16    nursing staff to weigh.  So because of the
17    alteration of the history and the accurate
18    information on input and output, they go with
19    the information they have, which was not
20    accurate, and in that case made a decision to
21    provide IV fluids based on false information.
22 BY MR. RAPIER:
23    Q.   Now, with respect to the lab studies, do
24 you have an understanding that OSF would have billed

Page 155

- - -

1  for those, and the payer source would have
2  reimbursed for those on the basis that the lab
3  studies were medically necessary?
4         MR. McCALL:  Foundation, speculation, and
5     assumes facts not in evidence.
6         MR. HEIL:  Join.
7         THE WITNESS:  Again, in pediatrics in
8     particular, much of the decision-making is
9     based on the history that is provided by the
10    parents, particularly in a nonverbal child.  So
11    if a history is not correct -- it is
12    inaccurate, it is falsified, it is fabricated
13    or exaggerated -- then the medical
14    decision-making is predicated on that
15    inaccurate, falsified, exaggerated history.  So
16    laboratory studies are done in good faith based
17    on a fabricated history.  So, yes, they would
18    have been done.  Yes, they probably were
19    billed, I'm assuming, and it was all in good
20    faith because it is presumed that the parent is
21    acting in the best interest of their child, but
22    they're providing a fabricated history.
23 BY MR. RAPIER:
24    Q.   Is it your understanding that OSF would

Page 156

- - -

1  have billed for oxygen for BB, and the payer
2  source would have reimbursed OSF for that oxygen on
3  the basis that it was medically necessary?
4         MR. HEIL:  Objection --
5         MR. McCALL:  Foundation, speculation,
6     assumes facts not in evidence.  Sorry.
7         MR. HEIL:  And I would remind you not to
8     speculate.
9         THE WITNESS:  I presume they billed for
10    it.  Again, I don't do the hospital billing.
11        MR. HEIL:  And, again, don't speculate.
12    If you don't know, you don't know.
13 BY MR. RAPIER:
14    Q.   Do you understand that OSF would have
15 billed for medications, and the payer source would
16 have reimbursed OSF for those medications based on
17 the medical necessity of the prescriptions?
18        MR. McCALL:  Foundation, speculation,
19    assumes facts not in evidence.
20        MR. HEIL:  Join those objections.  You may
21    answer.
22        THE WITNESS:  I have no idea what was
23    billed or paid for.
24 BY MR. RAPIER:

Page 157

- - -

1     Q.   Do you have an understanding that OSF
2  would have billed for X-rays, and the payer source
3  would have reimbursed OSF for those X-rays on the
4  basis that the X-rays were medically necessary?
5         MR. McCALL:  Foundation, speculation,
6     assumes facts not in evidence.
7         THE WITNESS:  Again, I don't know what was
8     billed, and I don't know what was paid.
9  BY MR. RAPIER:
10    Q.   If OSF billed and was paid for IV fluids,
11 lab studies, oxygen, medication, and X-rays for
12 BB, would you say that each one of those
13 things was medically unnecessary?
14        MR. HEIL:  Objection as to form.  It's
15    almost a double negative.  You can answer if
16    you understand it.
17        MR. McCALL:  And foundation.
18        THE WITNESS:  I can't answer because there
19    were multiple hospitalizations, multiple
20    visits.  I can't speak to -- I can't answer one
21    thing for multiple different visits.
22 BY MR. RAPIER:
23    Q.   For those interventions that you testified
24 were unnecessary at OSF -- and that is IV fluids,

- - -

1  lab studies, oxygen, medications, and X-rays -- do
2  you believe if OFS [sic] was reimbursed for those on
3  the basis that they were medically necessary, that
4  that money should be returned to the insurance
5  companies?
6         MR. McCALL:  Speculation, assumes facts
7     not in evidence, misstates the testimony, and
8     compound.
9         THE WITNESS:  I don't believe I can answer
10    that question.
11 BY MR. RAPIER:
12    Q.  Do you think that in a situation where an
13 insurance company determines an intervention is
14 medically necessary, that that's something you
15 should take into consideration before saying it's
16 unnecessary?
17        MR. HEIL:  Objection as to form.  It
18    misstates the evidence, and this is clearly by
19    now asked and answered and beyond the scope of
20    this witness's knowledge.
21        MR. McCALL:  I'll join in those
22    objections.
23        THE WITNESS:  I don't have any way to
24    answer that.

- - -

1  BY MR. RAPIER:
2     Q.  I mean, is it your opinion today, your
3  testimony today, that OSF gave unnecessary IV fluids
4  to BB , did lab studies on BB that were
5  unnecessary, gave oxygen to BB that was
6  unnecessary, gave him medications that were
7  unnecessary, and did X-rays on him that were
8  unnecessary?
9         MR. McCALL:  Mischaracterizes the
10    testimony, argumentative.
11        MR. HEIL:  Join.
12        MR. McCALL:  Foundation.
13        MR. HEIL:  You can answer if you
14    understand.
15        THE WITNESS:  The treatments that were
16    given were based on falsified or fabricated,
17    exaggerated history.  We're talking care over
18    months, and each individual decision was made
19    in good faith.  I can't speak to each one, so I
20    can't -- I can't answer for each individual
21    test or X-ray or intervention.
22 BY MR. RAPIER:
23    Q.  Did BB receive a skeletal survey at
24 OSF?

- - -

1     A.  I -- I don't recall if he did.  It is
2  possible, but I don't recall.
3     Q.  Okay.  I'm gonna go to another exhibit.
4  All right.  Exhibit 5 are Defendant Channing
5  Petrak's answers to plaintiff's first set of
6  interrogatories in this case.  It's a seven-page
7  PDF.  Dr. Petrak, do you remember answering written
8  questions or interrogatories in this case?
9     A.  Yes.
10    Q.  Is the signature on the screen your
11 signature that accompanied the answers to
12 interrogatories?
13    A.  Yes.
14    Q.  I want to ask you about interrogatory
15 number nine and number 17.  Here, I'll increase the
16 font.  Okay.  So did you review some video of Patti,
17 Jacob, or BB       at OSF?
18    A.  Yes.
19    Q.  And where were you when you reviewed that
20 video?
21    A.  In my office.
22    Q.  Where is your office?
23    A.  At 1800 North Knoxville.
24    Q.  How were you provided with the video?

- - -

1     A.  It's an OSF laptop that allows me to view
2  the video in the room that BB was in.
3     Q.  What is a flat top in this context?
4     A.  A laptop?
5     Q.  Oh, laptop.  I beg your pardon.  That
6  makes more sense.  Okay.  And so who owns that
7  laptop?
8     A.  It's an OSF laptop.
9     Q.  And the OSF laptop is at your office at
10 the PRC?
11    A.  Yes.
12    Q.  Does OSF give you any other technology or
13 equipment?
14    A.  That lap -- no.  That laptop is
15 specifically for viewing the video that was in
16 BB 's room or to review sensitive sexual abuse
17 exams, so it's very specific to two very sensitive
18 items that are OSF.
19    Q.  Is the laptop sort of a way to look in
20 those rooms live, or is it something that you're
21 reviewing on a laptop after the fact?
22    A.  It can be live.  You can also review it,
23 so you can basically rewind and view it then.  It's
24 not stored on the laptop in any way though.

Page 162

--- 

1    Q.    In this instance with BB▮▮▮▮▮▮▮, were
2  you reviewing video live, or were you reviewing it
3  after it happened?
4    A.    Both.
5    Q.    When you reviewed video of BB▮▮▮▮▮,
6  was anyone else with you?
7    A.    I was in my office.  I can't tell you that
8  one of my staff members didn't walk in or out to put
9  something in my office, but it was primarily myself.
10 The only other person who would have been in the
11 office for any length of time would have been the
12 resident who was rotating with me, but only for a
13 few minutes.
14   Q.    Is the family told in advance that they
15 are in a room that's under surveillance that you're
16 able to view with an OSF laptop from your office at
17 PRC?
18   A.    No.
19   Q.    Is the family told they're under
20 surveillance at all?
21   A.    No.
22   Q.    When you're reviewing surveillance under
23 these circumstances, is that something you're doing
24 pursuant to the contract with OSF, or is that

Page 163

--- 

1  something you're doing pursuant to the contract with
2  DCFS?
3    A.    It's not really pursuant to any contract.
4  It is just part of child abuse work, so it is part
5  of looking for certain types of maltreatment.
6    Q.    How much time did you spend reviewing
7  video of BB▮▮▮▮?
8    A.    Many hours.  I couldn't even tell you how
9  many.
10   Q.    Did you take any notes of what you saw on
11 the video?
12   A.    I have a summary of what I observed in the
13 video in my report.  That would have been the notes
14 I took.
15   Q.    What did you see on the video?
16   A.    I mean, it encompassed several days.  So I
17 saw basic lack of attention by Jacob -- sorry -- by
18 BB▮▮ 's parents to him unless he was asleep, and
19 then there were photos taken of him by his parents.
20 There were many, many, many hours where he was not
21 offered food or drink, or if he was offered drink,
22 it was just a soda, and so he would just be in the
23 room tethered to the oxygen cord, going as far as he
24 could, but no real interaction unless there was

Page 164

--- 

1  another person in the room, and then speech therapy
2  would come in the room or other people would come in
3  the room, and then parents would be interactive,
4  but, otherwise, they virtually ignored him.  Once
5  the oxygen was removed, BB▮▮ was very active,
6  appeared to be a typical toddler, was able to eat
7  and drink with no difficulty, and was acting as I
8  would expect for a two-year-old.
9    Q.    Are you saying that the hospital was not
10 providing BB▮▮ with meals in this room?
11   A.    No.  I'm saying his parents did not
12 request them.  So when a child is hospitalized, the
13 parents order meals for toddlers.  It's up to them
14 to order them, and they were not ordering food for
15 BB▮.
16   Q.    And surely this is something that the
17 nurses at OSF would have noticed, right?
18   A.    Well, they're busy caring for multiple
19 other patients, so I don't know that they would
20 necessarily have noticed that a lunch tray didn't
21 come for BB▮ or that his parents weren't providing
22 him food because they went out and got food for
23 themselves.  There's no way for the nurse to know
24 that he wasn't being offered some.  I observed it on

Page 165

--- 

1  the video.  At some point on one of the days I was
2  watching, I called over and made sure that a dinner
3  tray went in because it was late.  It was well after
4  the dinner hour, but I made the nurse order a dinner
5  tray.
6    Q.    How many meals did you see BB▮▮ miss in
7  the hospital at OSF?
8    A.    I don't recall exactly.  There were meals
9  provided, especially if speech therapy was in the
10 room with him or if someone else was in the room.
11   Q.    Do you remember seeing anything else on
12 the video that you think is important to your review
13 of the video under these circumstances?
14   A.    I did note that after BB▮▮ 's oxygen was
15 weaned and it was removed, that the parents
16 basically rearranged the room so that he could have
17 only a limited space to maneuver in rather than the
18 entire room, which I thought was unusual, and there
19 was another episode of -- they brought in food, and
20 they syringed out some of the drink they had into
21 another cup, and I could not discern why, but then
22 gave him a very large soda to drink, but no food.
23   Q.    And so, in addition to viewing these
24 things, did you then order or ask the nurses to feed

Page 166

- - -

1  him and give him something to drink?
2      A.   When I noted he had gone for many, many
3  hours without any food, I did call over and ask that
4  they order a dinner tray for him, yes.
5      Q.   And did you do that each time this
6  happened, or did this happen once?
7      A.   I distinctly remember the one day.  I
8  don't recall if there were other time periods where
9  it was extended periods where he had no food.
10     Q.   If you had seen BB going extended
11 periods without food each time, would you have
12 ordered him something to eat?
13          MR. HEIL:  Objection.  Calls for
14 speculation at this point.  You can answer if
15 you [inaudible].
16          THE WITNESS:  If I had -- if I had noted
17     it, yes.
18 BY MR. RAPIER:
19     Q.   There was some mention somewhere along the
20 line that -- did you see any video that showed
21 anyone throwing a diaper away or not throwing a
22 diaper away?
23     A.   The way the room is set up with the
24 cameras, it's difficult to see areas -- certain

Page 167

- - -

1  areas.  There were definitely diapers that were
2  missing based on reports of intake and output.
3  There were diapers that were missing from the pack,
4  but were not weighed, so clearly they were missing.
5      Q.   And did you see that on any video?
6      A.   Again, the video doesn't show like the
7  bathroom or certain areas, and so I don't recall if
8  I saw someone actually throw it away or if it was
9  that there was a diaper that was not put on the
10 scale.  I'd have to check my report.  I honestly
11 can't recall the detail of it.
12     Q.   Did you tell anyone at DCFS that you saw a
13 video of Patti throwing away a diaper?
14     A.   I don't recall at this time.  I'd have to
15 check my report.
16     Q.   Did you tell anyone at OSF that you saw a
17 video of Patti throwing away a diaper?
18     A.   Again, I would have to check my report.  I
19 don't recall off the top of my head.
20     Q.   In this situation, what would have been
21 the issue with Patti throwing away a diaper?
22     A.   So in young children, the easiest way, the
23 best and least invasive way, to check input and
24 output is to keep track of what they're taking in by

Page 168

- - -

1  mouth -- the amount of fluids, anything they eat --
2  and then to weigh the diapers because that tells you
3  what their output is.  But if the parents are not
4  putting the diaper on the scale and they are
5  throwing the diapers away, then you do not have an
6  accurate input and output to assess fluid status.
7      Q.   At the time that you were reviewing the
8  video, was there an order or a written plan in place
9  for what BB 's parents were supposed to do with
10 these diapers?
11     A.   In every hospital admission parents are
12 instructed, if the child is in diapers, that the
13 diapers have to be weighed.  That are educated and
14 shown where to put the diaper when they change it.
15 That is education that is given during every
16 hospitalization for every child in a diaper.
17     Q.   And are you saying that because you
18 witnessed that firsthand in this case, or are you
19 saying that's your experience?
20     A.   I'm saying that that is what happens.  If
21 I change a diaper on an infant, I put the diaper on
22 the scale so that the nurse can weigh it.  That is
23 the standard of care.  That is the policy.  It is
24 the only way to track input and output on young

Page 169

- - -

1  children who are in diapers without putting in a
2  Foley catheter, which is invasive.
3      Q.   I just want to make sure I understand what
4  you're saying.  Were you present when anyone from
5  OSF told Patti or Jacob what to do with BB 's
6  diapers?
7      A.   I was not present, but in the medical
8  record there were multiple instances of nursing
9  notes that they had been educated, but yet diapers
10 were not being put on the scale.
11     Q.   And so, let me just ask, if -- if a diaper
12 gets thrown away, while it may be inconvenient, I
13 mean, couldn't that diaper just be picked up and put
14 on a scale?
15     A.   It could be, yes.
16     Q.   So like what's the big deal about these
17 diapers then?
18     A.   The problem became that when the nursing
19 staff would ask to take the trash so they could do
20 that, that the parents would object and were
21 becoming belligerent.
22     Q.   So who told you that when the nursing
23 staff wanted to go into the garbage to grab diapers,
24 Patti or Jacob became hostile and interfered with

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 170

- - -

1  that?
2      A.   The medical staff, and it was also
3  documented.
4      Q.   Who on the medical staff told you that?
5      A.   The physicians on the treating team, so
6  the primary team, the hospitalists, and the case
7  manager at the hospital.  There were multiple
8  documented instances in the record.
9      Q.   And so, in those instances, did they just
10  say, okay, you're trying to, you know, frustrate
11  this, but I'm just gonna go around you and grab the
12  diaper out of the trash?
13          MR. HEIL:  Objection as to form; if you
14     can answer.
15          THE WITNESS:  I can't tell you what the
16     specifics of the occurrence was.
17  BY MR. RAPIER:
18      Q.   Are you saying somebody told you that
19  Patti or Jake physically prevented someone at OSF
20  from going through the garbage?
21      A.   I can tell you what was in the medical
22  record.  It's in my report, and it's quoted.
23      Q.   In that situation, couldn't OSF just ask
24  them to step out of the room so they could go in the

Page 171

- - -

1  garbage and grab the diapers?
2          MR. HEIL:  Objection as to form.
3          MR. McCALL:  Speculation.  Join.
4          MR. HEIL:  [Audio distortion] it's
5     argumentative at this point.  You can answer if
6     you can.
7          THE WITNESS:  I can't speak for what other
8     people would or would not do.
9  BY MR. RAPIER:
10      Q.   I mean, don't you think it'd be
11  reasonable, if someone really wanted to pull a
12  diaper out of the garbage and the parents wouldn't
13  let them, to just ask the parents to leave the room
14  so they could pull the diaper out of the garbage?
15          MR. HEIL:  Objection.  Asked and answered.
16     Don't answer it.
17          MR. RAPIER:  I didn't hear that.  Are you
18     instructing her not to answer?
19          MR. HEIL:  Well, you repeated this about
20     three times now, Aaron.  If you can answer, go
21     ahead, but I'm sure the answer will be the
22     same.
23          THE WITNESS:  I think it would be
24     reasonable for parents to put the diaper on the

Page 172

- - -

1     scale and to allow the nurse to take the trash
2     out, but that was not happening.
3  BY MR. RAPIER:
4      Q.   All right.  So you do have some thoughts
5  on reasonableness, so let me ask you about that.
6  Wouldn't it also be reasonable for the hospital to
7  just ask them to step out in the hallway so they
8  could grab the diapers out of the garbage?
9          MR. McCALL:  Speculation, argumentative,
10     assumes facts not in evidence.
11          MR. HEIL:  Join.
12          THE WITNESS:  I can't speak to what
13     someone else would or would not do.
14  BY MR. RAPIER:
15      Q.   At any point during the hospitalization,
16  was either Patti or Jake asked to leave the room or
17  leave the hospital?
18      A.   There was discussion by staff that if they
19  continued to be argumentative or belligerent, that
20  the nursing staff was going to make them leave,
21  going to ask them to leave, remove them from the
22  floor, and then at some point a DCFS safety plan was
23  put in place that made them leave the hospital
24  floor.

Page 173

- - -

1      Q.   And was this whole thing about the diapers
2  one of the reasons this safety plan was put in
3  place?
4      A.   I don't believe so.
5      Q.   I guess that's what I'm trying to
6  understand is are you saying that, hey, the parents
7  should have just let them do it, or are you saying
8  like that's evidence of abuse or neglect that they
9  wouldn't let some nurse pull a diaper out of the
10  garbage?
11      A.   I don't think it was solely related to the
12  diaper.  There were other instances where the
13  parents were interfering with care.  There was an
14  issue with home thermometer versus hospital
15  thermometer, and the parents were becoming
16  belligerent and cursing and yelling at staff, and so
17  there were multiple things that came up where
18  nursing staff documented problems with the family
19  interfering with care.
20      Q.   And do those problems, either individually
21  or in their totality, constitute abuse or neglect?
22      A.   Those specific instances are not
23  necessarily abuse or neglect, but they can be part
24  of a pattern.

Page 174

- - -

1   Q.   So, in this case, was it abuse or neglect
2   for Patti to want to use a thermometer from home?
3   **A.   It is interfering with the care because**
4   **there's a reason we use hospital equipment for care**
5   **provided to children.**
6   Q.   So was it -- was it -- was that instance
7   of interference abuse or neglect?
8   **A.   That specific instance, no, but it is part**
9   **of a pattern.**
10  Q.   Was interfering with nurses pulling
11  diapers out of the garbage abuse or neglect?
12  **A.   It is part of the fabrication and**
13  **alteration of the medical staff's ability to**
14  **accurately assess input and output and, in the**
15  **actual intake, the oral intake of a child, to**
16  **medically assess them and determine whether their**
17  **diet is adequate or their oral intake is adequate.**
18  **So it was interfering with care, and that was part**
19  **of the abuse and neglect.**
20  Q.   And what about the confrontation and/or
21  being belligerent with staff?  In this instance, was
22  that in and of itself abuse or neglect?
23  **A.   No.  I leave that up to the medical staff**
24  **to deal with.**

Page 175

- - -

1   Q.   If the -- if Patti or Jake had interfered
2   with the staff getting diapers out of the garbage in
3   order that they could weigh them, and nothing else,
4   you know, happened, would that in and of itself be
5   abuse or neglect?
6        MR. HEIL:  Objection as to form.  It's an
7   incomplete hypothetical; if you can answer.
8        **THE WITNESS:  I can't answer that.**
9   BY MR. RAPIER:
10  Q.   In other words, if the only evidence you
11  had was that Jake or Patti had interfered with staff
12  pulling diapers out of a garbage can, in your
13  opinion, would that be abuse or neglect?
14       MR. HEIL:  Same objection.  You can answer
15  if you can understand.
16       **THE WITNESS:  I don't know that I can**
17       **answer it because I'm not sure what you are**
18       **excluding or including other than that**
19       **particular instance.**
20  BY MR. RAPIER:
21  Q.   I'll tell you everything.  I'm asking if
22  just that, in and of itself, is abuse or neglect.
23  **A.   I don't know that I could -- I don't --**
24  **there's so many factors.  I don't know that I could**

Page 176

- - -

1   **necessarily make that determination because there's**
2   **a lot of other information that needs to be**
3   **considered.**
4   Q.   If someone else wanted to sort of retrace
5   how you came to a conclusion of medical abuse in
6   this case, is that something that they'd be able to
7   do based on the reports that you prepared?
8   **A.   I --**
9        MR. HEIL:  Objection as to what some other
10       person might be able to do.  Calls for
11       speculation; if you can answer.
12       **THE WITNESS:  I believe so.  I hope that**
13       **they're clear enough.**
14  BY MR. RAPIER:
15  Q.   Did you put everything in your report that
16  was available to you as of that time that you
17  consider to be pertinent to the issue of whether or
18  not there was medical child abuse in this case?
19  **A.   Everything I considered pertinent, yes.**
20  Q.   I'm gonna scroll down to number 17, and,
21  you know, were you asked this question, and did you
22  give this answer:  "Prior to March 29, 2019, had you
23  concluded in a written report (dated March 8, 2019)
24  that you were unable to determine whether BB" --

Page 177

- - -

1   which is ▮▮ -- "had been abused or neglected,"
2   and to that question was your answer, "Yes".
3   **A.   Yes.**
4   Q.   And is that your testimony today?
5   **A.   Yes.**
6   Q.   Is it your testimony that as of March 8,
7   2019, based on all information available to you, you
8   were unable to determine whether ▮▮ had been
9   abused or neglected?
10  **A.   That is what my opinion was at that time.**
11  **There was information that was missing, and I could**
12  **not make a determination.**
13  Q.   And is that your testimony here today as
14  well, that based on the information that was
15  available to you, as of March 8, 2019, you were
16  unable to determine whether ▮▮ had been abused or
17  neglected?
18  **A.   That is correct.**
19       MR. RAPIER:  I'm just getting ready to go
20       to another exhibit.  Do you guys want to keep
21       going, or do you want to rethink the lunch
22       issue?
23       MR. HEIL:  How much longer do you think
24       you have, Aaron?

- - -

1    MR. RAPIER:  For the day?

2    MR. HEIL:  Yes.

3    MR. RAPIER:  All of it.

4    MR. HEIL:  Okay.  Then we'll take a break.

5  We'll take a lunch break.

6    MR. RAPIER:  How long do you all want to

7  break?

8    MR. HEIL:  I'd love to say 30 minutes, but

9  why don't we say 40 just to be careful, just to

10  be sure.

11    THE TECHNICIAN:  Stand by.  We are now off

12  the record.  The time is 1:48 p.m. Central

13  Time.

14    - - -

15    (Whereupon there was a recess in the

16  proceeding from 1:48 p.m. to 2:32 p.m.)

17    - - -

18    THE TECHNICIAN:  We are now on the record.

19  The time is 2:32 p.m. Central Time.

20  BY MR. RAPIER:

21    Q.  Dr. Petrak, wanna follow up on, I think,

22  where we left off on the first report that you

23  authored in this case, and I'll share my screen with

24  you.  Dr. Petrak, are you able to see my screen?

1    A.  Yes.  It's a little small, but I can see

2  it.

3    Q.  All right.  I'll scroll through it.

4  There's a few reports that I have in here as a group

5  exhibit.  This will be Exhibit 6.  I'll go through

6  the reports one at a time, so I'll just focus on the

7  first one for now.  Okay.  Scrolling down to page 13

8  of Exhibit 6, is that your signature under the

9  recommendations?

10    A.  It is.

11    Q.  Do the first 13 pages of the exhibit

12  appear to be a fair and accurate copy of your

13  March 8, 2019 report?

14    A.  Yes.

15    Q.  I want to ask you about some of the

16  records you reviewed in preparation of the report.

17  Let me increase the font.  So I'm on page one under

18  "Medical Record Review".  Are the facilities listed

19  there all of the facilities whose records you had

20  access to and reviewed in preparation of the report?

21    A.  At that time, yes.

22    Q.  And did each one of those facilities

23  provide you with some volume of records related to

24  BB?

1    A.  Yes.

2    Q.  To your knowledge, are there any other

3  facilities whose records you reviewed prior to the

4  March 8, 2019 report?

5    A.  Everything I would have reviewed is listed

6  here in this report.

7    Q.  And we looked at one of your answers to

8  interrogatories previously.  I believe it was number

9  17.  And so, in that answered interrogatory, you

10  confirmed that as of March 8, 2019, based on the

11  information accessible to you, you were unable to

12  determine whether or not BB had been abused or

13  neglected; is that correct?

14    A.  Correct.

15    Q.  Does that mean then that, based on the

16  records you reviewed from Lurie's, Cincinnati

17  Children's, Vanderbilt, Nationwide, Saint John's,

18  Children's Hospital of Illinois, Saint Mary's

19  Hospital Decatur, Decatur Memorial Hospital, and

20  Illinois Intervention, based on all those records --

21  and you reviewed them all -- you were unable to

22  determine whether or not BB had been abused or

23  neglected?

24    A.  At that time, yes.

1    Q.  Scroll down to page 13, and I'll ask you

2  about this language at the end of the paragraph

3  right above the recommendations.  Do you write in

4  your report here, "At this time I cannot determine

5  with medical certainty whether by doing so, BB's

6  mother and father have engaged in medical child

7  abuse until BB has undergone a sleep study

8  without oxygen"?

9    A.  Correct.

10    Q.  Does that mean that the missing piece of

11  information you needed in order to assess whether or

12  not there was medical child abuse as of that time

13  was a sleep study without oxygen?

14    A.  At that time, I felt that there was a

15  missing piece to making the diagnosis, and that was

16  having a time period, at least, without oxygen.

17    Q.  Did BB eventually have a sleep study

18  without oxygen?

19    A.  He did have a sleep study done.  He also

20  had just a time period in the hospital when he was

21  off oxygen.

22    Q.  What was the result of the sleep study?

23    A.  I believe it was normal.  There was no

24  indication that he needed any further intervention.

1  Q.  And did the results of that sleep study
2  provide the missing piece of information you needed
3  whether or not to determine whether ██ had been
4  abused or neglected?
5  **A.  I made my determination before the**
6  **official sleep study was performed.  He had been**
7  **hospitalized where there was no oxygen, which**
8  **allowed me to make my determination.**
9  Q.  Was the additional information that was
10  made available to you after March 8, 2019 that
11  allowed you to conclude that there had been medical
12  child abuse that period of time when ██ was in
13  the hospital without oxygen and how he did during
14  that time without oxygen?
15  **A.  That was a component of it, yes.**
16  Q.  The next page in this group exhibit --
17  Bates is Petrak 14 -- is this a note that you
18  electronically signed on March 29, 2019 regarding
19  ██████?
20  **A.  Yes.**
21  Q.  And in that first sentence, "I have been
22  peripherally involved with ██," what does that
23  mean in this particular context?
24  **A.  Meaning that I had not been actively**

1  **seeing him on a daily basis, so I wasn't actively**
2  **involved in his care during the hospitalization.**
3  Q.  You know, you mentioned that ██ did
4  okay or did -- was normal without oxygen.  Did you
5  understand that there had been a surgical procedure
6  performed on ██ that would have addressed that
7  issue of whether or not he would have needed oxygen
8  or not?
9  **A.  I don't know what surgical procedure**
10  **you're referring to.**
11  Q.  To your knowledge, was there any surgical
12  procedure done that would have improved ██'s
13  oxygen saturations without the nasal cannula?
14  **A.  ██ had several airway surgeries, but**
15  **those were prior to this time frame.  His oxygen was**
16  **not specifically at this time used for any airway**
17  **issue.  It was for sleep apnea.**
18  Q.  Could both procedures have assisted or
19  improved this issue of whether or not ██ needed
20  oxygen?
21  **A.  Potentially, the tonsillectomy,**
22  **adenoidectomy could have improved obstructive sleep**
23  **apnea, yes.**
24  Q.  In the second sentence of this page of

1  Exhibit 6, it states, "I attempted to discuss a
2  medical plan for ██ with the primary team in an
3  effort to be able to discharge ██ to his
4  parents."  Did I read that correctly?
5  **A.  Yes.**
6  Q.  And who was the primary team?
7  **A.  It was the CHOI hospitalist service.**
8  Q.  And at this time was ██ at OSF Saint
9  Francis?
10  **A.  He was at the Children's Hospital of**
11  **Illinois, which is at Saint Francis.**
12  Q.  And this is a note that was entered when,
13  in the evening of March 29, 2019?
14  **A.  Correct.**
15  Q.  As of March 29, 2019, were you discussing
16  discharging ██ to his parents with the primary
17  team at Children's Hospital of Illinois?
18  **A.  As a consultant, I only give advice on**
19  **whether I think the patient is able to be discharged**
20  **from my perspective.  They make the ultimate**
21  **decision on discharge, but, yes, we were discussing**
22  **if there was any further intervention that was**
23  **necessary, and could he be discharged.**
24  Q.  As of the time of this note, was the

1  primary team telling you they needed anything else
2  done before discharging ██ to his parents?
3  **A.  I don't believe they had any other**
4  **interventions that they had planned at that time,**
5  **so, no, they were looking at discharge as well.**
6  Q.  As of this time, were you looking at
7  discharging or at least providing your input on
8  ██'s discharge to his parents?
9  **A.  That was the discussion.  My input is**
10  **simply he's medically ready for discharge from my**
11  **standpoint and that I don't have anything else I**
12  **need to do.**
13  Q.  Is that what you communicated to the
14  primary team?
15  **A.  Yes.**
16  Q.  There's, below that, a description of a
17  meeting or interaction with ██'s father and
18  paternal grandmother.  Do you remember that
19  interaction?
20  **A.  I do.**
21  Q.  Other than what is detailed in this note,
22  do you remember anything else that occurred or was
23  said that's not captured in this note?
24  **A.  It's not a verbatim transcript of the**

Page 186

- - -

1  discussion, but it was basically about the medical
2  plan as it stood for discharge and the possibility
3  of discharge.
4      Q.    During that meeting with Jacob and his
5  mother, did you mention to them that [BB] had been
6  in a hospital room at OSF that was under video
7  surveillance?
8      A.    No.
9      Q.    During that meeting, did you mention to
10 them that you had watched videos of Patti and Jake
11 and [BB] under video surveillance?
12     A.    No.
13     Q.    During that meeting, did you address with
14 Jake any of the concerns that you mentioned earlier,
15 including, you know, interference with nurses
16 accessing diapers?
17     A.    I don't believe that was specifically
18 discussed, no.
19     Q.    Did you say anything to Jake during that
20 meeting about his behavior toward the staff?
21     A.    No, I don't recall.
22     Q.    Did you say anything to Jake during that
23 meeting about why [BB] wasn't getting the food that
24 you thought was appropriate?

Page 187

- - -

1      A.    The medical plan was discussed as far as
2  his ability to eat, what he needed as far as diet,
3  the not needing oxygen.  That was the medical plan
4  that was discussed.
5      Q.    The next page of this group exhibit is
6  your supplemental report dated April 1, 2019, and
7  that report goes through Bates stamp page 26.  Let
8  me jump down there.  At page 26, is that your
9  e-signature?
10     A.    Yes.
11     Q.    Go up to page 19.  Do you say in this
12 report -- wait a minute.  I can highlight it so you
13 can see it in here.  Do you say in this report, "It
14 is my medical opinion that by providing either
15 inaccurate or overstated histories, as well as
16 keeping information from medical staff for [BB], he
17 has undergone procedures and medical therapies that
18 place him at serious risk of harm, which constitutes
19 medical child abuse"?
20     A.    Yes.
21     Q.    Was that medical opinion based on any of
22 the hospital records that you identified as a part
23 of your March 8, 2019 report?
24     A.    Yes.

Page 188

- - -

1      Q.    So on April 1st, you were saying that you
2  had some additional information, and that additional
3  information, in combination with what you already
4  knew, was enough for you to determine there was
5  medical child abuse?
6      A.    Yes.
7      Q.    Was your diagnosis of medical child abuse
8  on April 1, 2019 based on the records that you had
9  reviewed prior to making your conclusion on March 8,
10 2019?
11     A.    Yes.
12     Q.    And did you discuss your diagnosis of
13 medical child abuse with anyone at DCFS?
14     A.    Yes.
15     Q.    Who did you discuss that with?
16     A.    It would have been Jennifer Inness and her
17 supervisor.
18     Q.    What did you tell Ms. Inness and her
19 supervisor?
20     A.    That I had come to the conclusion that
21 there was medical child abuse for [BB].
22     Q.    If you believed that there had been
23 medical child abuse for [BB], would you have sent
24 him home to his parents?

Page 189

- - -

1      A.    Again, I'm not the person who discharges
2  the patient, and I don't make decisions about
3  placement.
4      Q.    Let me ask it this way:  If you had
5  concluded, or when you concluded, that [BB] would
6  be diagnosed with medical child abuse, at that point
7  in time, would you have told the primary team at
8  Children's Hospital of Illinois that, from your
9  perspective, [BB] was medically cleared for
10 discharge to his parents?
11     A.    I would have told them that he was
12 medically cleared for discharge from my standpoint.
13 I don't make placement decisions.  That's a DCFS
14 decision if they're investigating, and my
15 recommendations are as they stand in my report.
16     Q.    I want to make sure I understand that.  So
17 when you diagnosed medical child abuse in this case,
18 at that point in time were you still saying that,
19 from your perspective, [BB] was medically clear to
20 be discharged home to his parents?
21     A.    If DCFS had determined that to be a safe
22 placement, then that would have been acceptable to
23 me.
24     Q.    And so without focusing on what DCFS might

Page 190

- - -

1  have done, I really just want to understand what you
2  would have told the primary team upon the diagnosis
3  of medical child abuse.  Would you have told the
4  primary team, "From my perspective, [BB] is
5  medically clear to be discharged home to his
6  parents"?
7      A.  I don't tell the primary team who to
8  discharge a patient to.
9      Q.  In your report from April 1st, do you
10  mention the video that you reviewed from your office
11  at PRC with that OSF Saint Francis laptop?
12      A.  I would have to review the report to
13  ensure that it's in this particular report and not
14  some other report.
15      Q.  Do you make any mention of the issue with
16  these diapers in this report?
17      A.  I would have to review it in more detail
18  to determine whether this is where it's detailed or
19  not.
20      Q.  Did you ever tell Patti or Jacob that you
21  had made a diagnosis of medical child abuse?
22      A.  No.
23      Q.  Did you tell any of [BB]'s grandparents
24  you'd made a diagnosis of medical child abuse?

Page 191

- - -

1      A.  No.
2      Q.  Is there any basis for you making a
3  diagnosis of medical child abuse that is not
4  contained in your April 1, 2019 report?
5      A.  It would be in the prior March 8th, 2019
6  report because it's referenced in this report.
7      Q.  Other than that, anything available to you
8  at that time that was a basis for your diagnosis
9  that's not included in the April 1, 2019 report?
10      A.  No.
11      Q.  Did you ever report one or more of [BB]'s
12  parents for suspected abuse or neglect?
13      A.  No.
14      Q.  After meeting with Jacob and his mother on
15  March 29th, did you call someone at DCFS?
16      A.  There was a conversation with Jennifer
17  Inness.  I believe it was prior to my discussion
18  with Jacob and [BB]'s grandmother.  It may have
19  been in close proximity to that time.
20      Q.  Let's go back to page 14, try and get this
21  timeline.  When did you electronically sign your
22  March 29, 2019 note?
23      A.  5:18 p.m.
24      Q.  Does that mean that prior to 5:18 p.m.,

Page 192

- - -

1  you would have spoken with Jacob and his mother
2  about discharging [BB] to his parents?
3      A.  I was -- yes.  I attempted to discuss that
4  plan prior to 5:18 p.m., which is when I did the
5  note.
6      Q.  And by this time, had you reviewed the
7  video that you mentioned, either live or reviewing
8  it after the fact, on that OSF laptop from your
9  office at PRC?
10      A.  Yes.
11      Q.  Did you tell Jennifer Inness on March 29th
12  that you had made a diagnosis of medical child
13  abuse?
14      A.  I believe I had told her by that point,
15  yes.
16      Q.  In your experience, when you make a
17  diagnosis of medical child abuse and communicate
18  that to DCFS, what types of actions will DCFS take?
19          MR. HEIL:  Objection as to form.  Calls
20  for speculation.  You can answer if you know.
21          THE WITNESS:  They have various options at
22  their disposal, and I can't speak to which
23  options they will take.
24  BY MR. RAPIER:

Page 193

- - -

1      Q.  And, yeah, I understand that, you know,
2  you're saying that, at the end of the day, it's
3  DCFS's call which option to take, but I'm asking
4  you, like, did you know, you know, in March of 2019
5  what those options were?
6      A.  The options that DCFS has when they are
7  involved in an investigation, yes, I know what those
8  options are.
9      Q.  What are those options?
10      A.  They can choose to unfound an
11  investigation, meaning they don't find any abuse or
12  neglect.  They can indicate it, meaning they find
13  that there is abuse or neglect.  If they are in a
14  stage where they are unsure at that point, they can
15  do a safety plan where they set parameters for the
16  safety of the child.  They can take protective
17  custody.  They can offer in-tech [phonetic]
18  services.  Those are the most common choices that
19  they have.
20      Q.  Were you aware in March 2019 that if there
21  was an indicated finding by DCFS, one of the options
22  it has is to remove the child from his or her
23  parents?
24      A.  I am aware that is an option, yes.

Page 194

- - -

1    Q.   Did you discuss removal of [redacted] from his
2  parents with anyone at DCFS?
3    A.   There was a discussion with Jennifer
4  Inness and her supervisor regarding potential for
5  safety plan or protective custody and potential
6  placement options for his medical needs.
7    Q.   Was one of the placement options that you
8  discussed for [redacted]'s medical needs with Ms. Inness
9  and her supervisor the removal of [redacted] from his
10 parents?
11   A.   That was one of the questions that they
12 had asked, but it's their decision.
13   Q.   What was the question that they asked you?
14   A.   If he was removed, what needs would he
15 have?  That's one of the medical questions that they
16 usually ask.
17   Q.   What was your answer to that question?
18   A.   It's basically the recommendation I had at
19 the bottom of my letter.
20   Q.   Did either Ms. Inness or her supervisor
21 ask for any input from you on whether or not it
22 would be safer for [redacted] to be removed from his
23 parents' custody?
24   A.   I don't recall them specifically asking

Page 195

- - -

1  that.
2    Q.   Did you ever tell Ms. Inness that, in your
3  opinion, [redacted] -- and for his safety -- should be
4  removed from his parents' custody?
5    A.   No, I don't recall saying that.
6    Q.   Did you ever tell -- whether you used
7  those exact words or not, did you ever tell
8  Ms. Inness in one form or another that you think
9  it'd be safer for [redacted] if he was removed from his
10 parents' custody?
11   A.   No.
12   Q.   Did you say anything like that to anyone
13 else at DCFS other than Ms. Inness?
14   A.   No.  She would have been my primary
15 contact.
16   Q.   Just so the record is clear on that, did
17 you ever tell anyone at Illinois DCFS that either
18 [redacted] should be removed from his parents' custody or
19 that it would be safer for [redacted] if he was removed
20 from his parents' custody?
21   A.   No.  I don't make placement decisions.
22   Q.   And I understand it's not your decision,
23 but did you provide that type of input to anyone at
24 DCFS, knowing, ultimately, it was not going to be

Page 196

- - -

1  your decision?
2    A.   No.
3    Q.   Other than what's bullet pointed under the
4  recommendations on the last page of your April 1st
5  report -- and let me put those on the screen so you
6  can see them here again.  Other than what's stated
7  in those written recommendations, at this time did
8  you make any other recommendations regarding [redacted]
[redacted] to anyone at DCFS?
10   A.   No.  Those are my recommendations.
11   Q.   Gonna jump down to the last two pages of
12 this exhibit.  Are pages 27 and 28 of Exhibit 6 a
13 copy of your May 17, 2019 report?
14   A.   Yes.
15   Q.   In summary, does this report conclude that
16 mold would not explain any of [redacted]'s symptoms?
17   A.   Yes.
18   Q.   Next, want to ask you about Exhibit 7.
19 It's a 16-page PDF.  Looks like it's got a cover
20 page, "Pediatric Resource Center Cross Reference
21 Information," and then it's Bates-stamped 29
22 through, well, 74, so the pages must not be in a
23 consecutive Bates stamp order, but includes case
24 entries.  In other words, does Exhibit 7 include the

Page 197

- - -

1  case entries related to [redacted]?
2    A.   Yes.
3    Q.   Now, other than these case entries and the
4  reports that we saw as Exhibit 6, what other types
5  of documents would we find regarding [redacted]
6  in the PRC file?
7    A.   Our file at this point is very limited as
8  far as paper.  It's typically case entries, an
9  intake form.  The rest is in the electronic medical
10 record.
11   Q.   On the first page of Exhibit 7, there's a
12 case number here, 18-173.  Is that an internal PRC
13 case number?
14   A.   Yes.
15   Q.   Does that mean, by chance, that in the
16 year 2018, [redacted]'s case was the 173rd case
17 that had an intake at PRC?
18   A.   That's fiscal year '18, so fiscal year
19 2018, and it would be the number assigned as 173,
20 which may or may not be the 173rd intake we got, but
21 that's the number assigned.
22   Q.   Again, just so I understand that, you
23 don't know one way or the other if the 173 means
24 it's the 173rd case in sequence, right?

Page 198

- - -

1      A.    It may not be.
2      Q.    Okay.  And then under "Date of Service,"
3  says "11/1/17"; next to that, "Date of Request".  Do
4  you know what that means in this context?
5      A.    That was -- it's because it was requested
6  as a record review and not a physical examination of
7  the child.  That is the date that the request for
8  the record review was made.
9      Q.    Now, with respect to the additional case,
10  19-306, how did that case originate based on the
11  notation here?
12      A.    That was an inpatient consultation.  So he
13  was hospitalized, and it would have been an
14  inpatient consultation.
15      Q.    And who asked for that consultation?
16      A.    Dr. Matthew Mischler.
17      Q.    Where is Dr. Matthew Mischler?
18      A.    I'm sorry.  I'm not sure what you're
19  asking.
20          MR. HEIL:  Yeah.  Objection as to form.
21      Can you restate?
22  BY MR. RAPIER:
23      Q.    So in the -- what does it say in the
24  parentheses next to "3/29/19"?

Page 199

- - -

1      A.    "OSF IP," which would be OSF inpatient.
2  It's just an identifier for location.
3      Q.    And does that mean that on March 29, 2019,
4  someone at OSF asked for a -- your consult regarding
5  BB?
6      A.    That is the date of service listed.  The
7  consult date was actually 3/24/19, as I recall.  It
8  wasn't -- that's a mistake there, but that is when
9  we received a consult from an inpatient person.
10      Q.    So are you saying that with respect to the
11  March 29, 2019 entry, Ms. Moore entered the date
12  incorrectly?
13      A.    It appears so, or it could be a
14  handwriting issue.
15      Q.    What do you mean by that?
16      A.    Some people's fours look like nines.  I
17  don't know, but I believe the date to be 3/24.
18      Q.    Are you saying this nine is a four?
19      A.    I can't speak to that, but I don't believe
20  that is a correct date.
21      Q.    Yeah, and that's what I'm trying to
22  understand.  Does Ms. Moore have the date wrong?
23      A.    Potentially.
24      Q.    Let me ask it this way:  So if that date

Page 200

- - -

1  is supposed to be 3/24/19, as we go through these
2  case entries, is any case entry prior to 3/24/19
3  part of case 18-173?
4      A.    Anything that would have been prior to the
5  report issued on 3/8 is part of 18-173.  I'm gonna
6  take that -- although there sometimes is follow-up
7  call -- there are follow-up calls related to a case,
8  so there could potentially be issues related to the
9  18-173 that were after the date of the report being
10  issued.  People have questions; they call.  So there
11  may be a date after that.
12      Q.    All right.  So let's look at the second
13  page of the exhibit.  Is the font large enough for
14  everybody?  Okay.  So let's look at the second entry
15  for March 5, 2019.  Are these case entries from
16  Catherine Moore?
17      A.    Yes.
18      Q.    Who is Catherine Moore?
19      A.    She was a case coordinator at PRC.
20      Q.    Do you enter case entries like the ones
21  that we see here entered by Ms. Moore?
22      A.    Sometimes, yes.
23      Q.    Did you do any of those in the BB
          case?

Page 201

- - -

1      A.    The only case entries are the ones that
2  you would have.
3      Q.    All right.  So in this 3/5/19 entry,
4  towards the end, it says, "Will close out the
5  investigation at this time."  Do you know what that
6  is referring to in this context?
7      A.    That was Jennifer from DCFS, Jennifer
8  Inness, relaying to Catherine Moore that at that
9  point in time on 3/5, she intended to close out the
10  investigation and that, if there were any new
11  concerns, the hotline could be called.
12      Q.    Was the investigation that was being
13  closed an investigation of the Krueger family?
14      A.    Yes.
15      Q.    Was that an investigation involving an
16  allegation of medical child abuse?
17      A.    I don't know what the allegation number
18  was, but, presumably, yes.
19      Q.    So does this entry mean that, as of
20  March 5, 2019, DCFS was telling PRC it was closing
21  out its investigation of the Krueger family?
22      A.    That is what was relayed to us as their
23  intent.
24      Q.    And, if you know, what is meant by

Page 202

- - -

1  Ms. Moore's entry, "Can call the hotline if needed
2  for something new"?
3  **A.    Exactly what it says, that anybody,**
4  **including us, could call the hotline if there was a**
5  **concern for some new allegation.**
6  Q.    The next entry from 3/7/19 references a
7  phone call with a Ms. Collins at DCFS, and that,
8  according to Ms. Moore, Ms. Collins called to ask if
9  you could write up a note of concerns and what ██
10  needs.  Is that the report that we looked at
11  previously from March 8, 2019?
12  **A.    Yes.**
13  Q.    And then that next entry shows that you
14  faxed the report to DCFS on March 8, 2019?
15  **A.    It's actually a reference to my report**
16  **being faxed.  I didn't personally fax it.**
17  Q.    Then, that last entry on 9/8/19, "Chart
18  reviewed.  Services are complete.  Case closed."
19  Would that be case number 18-173?
20  **A.    Yes.**
21  Q.    What services were being provided after
22  DCFS told you that it was closing the investigation
23  on March 5th?
24  **A.    There are case coordination services that**

Page 203

- - -

1  occur, so Ms. Moore would have performed some other
2  services in the charts.  That's her notation that
3  she's closing the chart.  I don't know exactly all
4  of the things that she would have done to close the
5  chart, but there's a process that they go through to
6  do that.
7  Q.    Next page is Bates stamp 31, and it looks
8  like these actually, you know, are working
9  backwards, so the beginning of the note on the top
10  of page 31 looks like it's actually a continuation
11  from the bottom of page 32, but this is just -- I'm
12  presenting them to you this way because they were
13  Bates-stamped in this way.  So I'll just stick with
14  the order that they were given to us and ask you
15  about that first entry for 1/9/19, and is this
16  Ms. Moore saying that DCFS has called and is asking
17  if you would finish the report or whether they
18  should keep the case open?
19  **A.    That is correct.**
20  Q.    And would that have been up to PRC whether
21  to keep the case open or not?
22  **A.    No.  They can make their own determination**
23  **about what they do with the case.**
24  Q.    Does this show that the DCFS, while it

Page 204

- - -

1  maintained that decision-making authority, wanted
2  PRC's input on whether or not to keep the case open?
3  **A.    They're asking if a medical opinion can be**
4  **formed.**
5  Q.    Jump down to 1/31/19.  There's a [audio
6  distortion] here.  "Spoke with Dr. Petrak.  No one
7  called Dr. Petrak when he was admitted on 1/24."
8  Tell me what that means, if you know.
9  **A.    I was hoping that while ██ was**
10  **hospitalized at Children's Hospital of Illinois,**
11  **there could be coordination with pulmonology and**
12  **good monitoring of his oxygen to be able to make a**
13  **determination.  That did not happen.**
14  Q.    And who would have called you when he was
15  admitted?
16  **A.    The hospitalist service.**
17  Q.    Which hospital is that?
18  **A.    Children's Hospital of Illinois.**
19  Q.    How would they know to call you upon
20  admission?
21  **A.    I would have notified them.  I can also**
22  **put in an alert in the EMR.  I did not do that, but**
23  **I could have, but I just asked them to let me know.**
24  **It was a planned admission.**

Page 205

- - -

1  Q.    Who planned the admission?
2  **A.    At this -- I honestly don't recall at this**
3  **point.**
4  Q.    And what's the alert in the EMR that, I
5  understand, you did not do in this instance, but you
6  could have done?
7  **A.    I can send myself an In Basket reminder to**
8  **look at the chart -- look at the chart or look in**
9  **the census and see if he's been admitted.**
10  Q.    The bottom part of that entry from the
11  31st says, "Either keep at Vanderbilt or come here
12  and be admitted and get off everything and tell her
13  to stop."  So, in this sentence, when it says "come
14  here," where is that?
15  **A.    Children's Hospital of Illinois.**
16  Q.    And, "Tell her to stop."  Who is the "her"
17  in that sentence?
18  **A.    I did not write that, so I'm not quite**
19  **sure.  It's probably a paraphrasing.  I don't know**
20  **for sure.**
21  Q.    And then it says, "Dr. Petrak to call Deb
22  at Vanderbilt."  Who is Deb at Vanderbilt?
23  **A.    Would be Dr. Lowen.  She's the child abuse**
24  **pediatrician at Vanderbilt.**

Page 206

1    Q.   Did you call Dr. Lowen at Vanderbilt?
2    **A.   I was unable to reach her.**
3    Q.   Is that reflected in the entry from 1/31
4    here below, "Dr. Petrak stated would try to contact
5    the child abuse doctor at Vanderbilt to see if they
6    can intervene"?
7    **A.   To see if we -- it was more if we could**
8    **coordinate.  Not really intervene, but coordinate.**
9    Q.   Is this -- do you think this was something
10   that Ms. Moore got incorrect when she said
11   "intervene"?
12   **A.   It's a paraphrase of how she understood**
13   **it.**
14   Q.   Let's go down to February 2nd, 2019.  "Per
15   Dr. Petrak, they are going to have to admit."  In
16   this context, what is Ms. Moore saying?
17        MR. HEIL:  I object, Aaron, just based on
18   the fact that I believe you said February 2nd.
19        MR. RAPIER:  Oh, okay.  Yeah.  22nd.
20        MR. HEIL:  Thank you.
21        **THE WITNESS:  This was basically an**
22   **attempt to coordinate an admission and discuss**
23   **it with pulmonology and neurology and attempt**
24   **to do the studies I felt were necessary for me**

Page 207

1    to make a determination.
2    BY MR. RAPIER:
3    Q.   Who was gonna have to be admitted and
4    where?
5    **A.   BB would have to be admitted at the**
6    **Children's Hospital of Illinois with a coordinated**
7    **effort to get the studies done we needed.**
8    Q.   Scroll down in the next page of the
9    exhibit to 12/5/18.  Does this show that Ms. Moore
10   left a voicemail for Jennifer Inness at DCFS that
11   your report was not ready, but that you were still
12   working on it?
13   **A.   Yes.**
14   Q.   Is that the March 8, 2019 report that we
15   exhibited earlier?
16   **A.   Yes.**
17   Q.   Now, on that same page, if we go to
18   1/9/19, shows that -- did Ms. Moore participate in a
19   phone staffing with Jennifer, and maybe that's
20   Allison, at DCFS?
21   **A.   Yes.**
22   Q.   And did you tell Ms. Moore that the report
23   will either say "medical neglect for not filling out
24   prescriptions"?

Page 208

1    **A.   This is a discussion with all of the**
2    **people on the phone.  So Catherine Moore would have**
3    **been in my office, and the DCFS people would have**
4    **been on the phone, so everybody's present at once.**
5    Q.   And so did you tell DCFS on January 9,
6    2019 that your report would state there was medical
7    neglect for not filling out prescriptions?
8    **A.   That was a possibility, yes.**
9    Q.   And was that your conclusion, or was that
10   something where you were relying upon Dr. Makoroff,
11   who addressed that in her letter?
12   **A.   No.  It was my opinion.**
13   Q.   And where it says here "clearly making
14   things up," who is that referring to?
15   **A.   Again, this is not my wording.  This is**
16   **someone else's paraphrase of my description of what**
17   **medical child abuse is, which is fabrication or**
18   **overexaggeration of medical symptoms.**
19   Q.   Do you think that's an accurate entry by
20   Ms. Moore based on that meeting?
21   **A.   It's her wording for what I would have**
22   **described.**
23   Q.   There's a reference on that same date
24   about a discussion for covert surveillance.  What is

Page 209

1    that a reference to?
2    **A.   One of the possibilities when evaluating**
3    **medical child abuse is to do covert video**
4    **surveillance.**
5    Q.   Where would that be done?
6    **A.   Most children's hospitals have capability**
7    **to do that.**
8    Q.   In BB 's case, where would that have
9    been done?
10   **A.   It was done at the Children's Hospital of**
11   **Illinois, but it could have also been done in**
12   **Cincinnati or at Vanderbilt or other children's**
13   **hospitals.**
14   Q.   Is that what you discussed with Illinois
15   DCFS was covert surveillance at some out-of-state
16   hospital?
17   **A.   No.  I discussed what it was, what it**
18   **entailed, what the possibilities were, the places it**
19   **typically is done.**
20   Q.   The folks at Illinois DCFS, were they
21   unaware of covert surveillance on January 9, 2019?
22   **A.   I don't know what their full understanding**
23   **was, but I was educating on medical child abuse and**
24   **what the possibilities for evaluation included.**

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 210

- - -

1    Q.   In the next sentence, at least the
2 beginning of it, "Dr. Petrak doesn't think mom is
3 doing anything".  In this context, what does that
4 mean?
5    A.   That's the difference between induction
6 versus fabrication, so either induction of symptoms
7 where you cause vomiting, or you inject insulin to
8 cause hypoglycemia.  That would be induction of
9 symptoms as opposed to fabrication, exaggeration,
10 which is not induction of symptoms.
11    Q.   I'm gonna scroll down to the next page,
12 ask you about some entries.  First one is on
13 9/12/18, "Received a fax from Undiagnosed Diseases
14 Network".  We mentioned that earlier.  That's the
15 same organization we were talking about, and that
16 was discussed between you and the geneticist at
17 Vanderbilt?
18    A.   Yes.
19    Q.   And were records then sent by PRC to the
20 Undiagnosed Diseases Network?
21    A.   No, because we had not generated records.
22 Therefore, we did not send records.  We don't send
23 other people's records.
24    Q.   Okay, okay.  And so let's look down at

Page 211

- - -

1 10/4/18 on the same page:  "Patricia from UDN
2 called."  UDN is the Undiagnosed Diseases Network.
3 "She wants the records from PRC to determine if this
4 is a Munchausen case, and she has a release signed
5 by mom."  Did I read that correctly?
6    A.   Correct.
7    Q.   And did Ms. Moore discuss that with you?
8    A.   Yes, and then the release was faxed to us.
9    Q.   So then you received a signed consent to
10 release the records to UDN; is that correct?
11    A.   Correct.
12    Q.   And then after receiving that signed
13 consent, did you release records to UDN?
14    A.   No.  As I said, we didn't have any records
15 to release.
16    Q.   And then on 11/1/18, does this entry show
17 that, you know, PRC was consulted to do a record
18 review, and then PRC is asking the Undiagnosed
19 Diseases Network to provide it with records,
20 including a genetic test?
21    A.   The genetic test is what we were
22 requesting.
23    Q.   And is that something you requested from
24 UDN?

Page 212

- - -

1    A.   Yes, from Dr. Morgan's office.
2    Q.   So are you saying UDN and Dr. Morgan in
3 this context are the same?
4    A.   He is part of the UDN, yes.
5    Q.   And let's go down on the next page.  I
6 want to ask you about an entry on 8/21/18.  This is
7 about the middle of this entry.  I'm gonna put some
8 highlighting on it.  Okay.  And so this is about a
9 hospitalization at Cincinnati Children's.  Is this
10 saying that GI doctor at Cincinnati Children's
11 wasn't aware of Patti's behaviors?
12    A.   That is what is documented, yes.
13    Q.   And was PRC providing information to
14 Cincinnati Children's and the GI doctor in
15 particular about Patti's behaviors?
16    A.   No.  These were documented instances in
17 the Cincinnati record.
18    Q.   And, in this case, is Heidi from
19 Cincinnati Children's?
20    A.   She is.
21    Q.   And is Heidi telling Ms. Moore if -- is
22 Heidi asking Ms. Moore if she should call in another
23 report?
24    A.   I don't recall her asking about another

Page 213

- - -

1 report, but I was present during this conversation.
2 So Heidi is part of the child abuse team at
3 Cincinnati, and so the discussion was about
4 behaviors that had happened, instances that had
5 happened at Cincinnati that the GI doctor had been
6 unaware of that they had had a discussion about in
7 Cincinnati.
8    Q.   So in that conversation did Heidi ask you
9 if she should call in another report?
10    A.   It does say we discussed that.  There was
11 already a pending allegation.
12    Q.   And so did Cincinnati Children's make the
13 initial hotline report against Patti Krueger?
14    A.   That's confidential information.  I'm not
15 privy to that.
16    Q.   Well, meaning you're unaware whether or
17 not Cincinnati Children's made a hotline report
18 against Patti?
19    A.   What I'm unaware of is if there was only
20 one hotline call or if there were multiple.
21    Q.   And are you aware whether Cincinnati
22 Children's made a hotline report?
23    A.   I believe they did make a hotline report,
24 yes.

Page 214

- - -

1    Q.  And when Heidi asked if they should make
2  another one, what did you say?
3    **A.  I advised waiting since there was a**
4  **current allegation still pending.**
5    Q.  And is that reflected in this last
6  sentence here, "Dr. Petrak advised waiting to call
7  in a new complaint"?
8    **A.  Yes.**
9    Q.  There's a mention in that paragraph, too,
10  about covert video.  Is that covert video that would
11  be done at Cincinnati Children's?
12    **A.  Yes.**
13    Q.  Scrolling down to the next page, want to
14  ask you about an entry on 5/25/18.  Okay.  All
15  right.  And so there's a mention here about you're
16  waiting on some genetic tests from Vanderbilt, and
17  then does Ms. Moore write, "Once that is received
18  and depending on what it says, might request
19  admission to do covert surveillance.  Mom shouldn't
20  be made aware of this possibility"?  Did I read that
21  correctly?
22    **A.  That is what it says.**
23    Q.  And where would ██ be admitted for
24  purposes of covert surveillance?

Page 215

- - -

1    **A.  It could be at any of the children's**
2  **hospitals he was going to.  It could be at the**
3  **Children's Hospital of Illinois.  That is always a**
4  **possibility.**
5    Q.  And did Ms. Moore accurately document here
6  that, based on this phone call, mom, or Patti,
7  should not be made aware of the possibility that her
8  son would be admitted to a hospital for the purpose
9  of covert surveillance?
10       MR. HEIL:  I'll object to form.  I think
11  that misstates the witness's testimony.  You
12  can answer.
13    **THE WITNESS:  Obviously, they would be**
14  **notified of the admission, but you cannot do**
15  **covert video surveillance if the parents are**
16  **aware of the video surveillance.**
17  BY MR. RAPIER:
18    Q.  Did you discuss with Ms. Moore that Patti
19  should not be made aware of the possibility that an
20  admission might be requested for the purpose of
21  performing covert surveillance?
22    **A.  This is information that is being passed**
23  **on to DCFS.  So whenever this talks about staffings,**
24  **this is information that is including myself and**

Page 216

- - -

1  **DCFS and Catherine Moore.**
2    Q.  So is it more accurate to say then that
3  PRC was telling DCFS Patti shouldn't be made aware
4  of the possibility of covert surveillance?
5    **A.  This is Catherine Moore's representation**
6  **of a discussion.  That is what covert video**
7  **surveillance is.**
8    Q.  And who in that discussion said Patti
9  shouldn't be made aware of it?
10    **A.  That would have been me because that is**
11  **the definition of covert video surveillance.**
12    Q.  Scroll down on the same page.  Want to ask
13  you about an entry on August 8, 2018.  Okay.  And so
14  there's a reference here to calling a Dr. Makaroff
15  back.  Makaroff's at the Mayerson Clinic at
16  Cincinnati Children's.  Then there's a note here:
17  "The doctors at OSF are to call PRC if ██ comes
18  into the hospital."  Did I read that correctly?
19    **A.  That is what it says, yes.**
20    Q.  And how would the doctors at OSF know that
21  they're supposed to call PRC if ██ comes into the
22  hospital?
23    **A.  That would be very difficult.  I had only**
24  **at this point spoken with his gastroenterologist and**

Page 217

- - -

1  **his pulmonologist, so there's no discussion with all**
2  **of the doctors at OSF.**
3    Q.  But as to those doctors, did you tell them
4  that they needed to call you or someone at PRC if
5  ██ were to come into the hospital?
6    **A.  I did ask them to let me know, yes.**
7    Q.  And in this entry where there's a
8  discussion of covert testing, what testing is being
9  discussed, and who's involved in that discussion?
10    **A.  Again, that would be covert video**
11  **surveillance, and it's just a discussion of the**
12  **possibilities in the evaluation of medical child**
13  **abuse.**
14    Q.  I'm gonna scroll down a few pages in the
15  same exhibit.  This will be the Bates stamp page 38.
16  Okay.  Where are we here?  Okay.  So this is
17  regarding a phone call on November 2nd, 2017.  Does
18  it say, "Dr. Petrak stated she attempted to call the
19  child abuse doctor at Cincinnati Children's
20  Hospital.  Doctor stated that in these cases, we get
21  all records and get all the doctors on board" [as
22  read]?
23    **A.  Correct.**
24    Q.  And is that what you told Catherine Moore

Page 218

- - -

1  on November 2nd, 2017?

2  **A.    This was a staffing that included myself,**

3  **Jennifer Inness, and Catherine Moore.**

4  Q.    And did you tell all those folks that in

5  these cases you get all the records and get all the

6  doctors on board?

7  **A.    That is the standard evaluation, yes.**

8  Q.    Gonna scroll down in the same exhibit, ask

9  you about an entry on April 26, 2019.  Okay.  And so

10  did Jennifer Inness call PRC on April 26, 2019 and

11  ask for something in writing regarding the issue

12  with mold?

13  **A.    Yes.**

14  Q.    And is that what led to you sending that

15  two-page report that we looked at in a prior

16  exhibit?

17  **A.    Yes.**

18  Q.    Now, at the bottom there's a handwritten

19  note, 9/8/19, "Chart reviewed.  Services are

20  complete.  Case closed."  That same entry appeared

21  in a typed format on page one.  Do you know if

22  that's a closer of the 18 case or the 19-306 case?

23  **A.    That would be closing the 19 -- whatever**

24  **number case.**

Page 219

- - -

1  Q.    Gonna go down now to Bates stamp page 71.

2  Gonna ask you about this entry on April 1st, 2019:

3  "Spoke with Ashley King."  Who is Ms. King?

4  **A.    She was a social worker at the Children's**

5  **Hospital of Illinois.**

6  Q.    And as of April 1st, does that say, "Per

7  Dr. Petrak, BB will be home by Wednesday and not

8  today"?

9  **A.    That is what it says, yes.**

10  Q.    Does that mean that, as of April 1st, you

11  were telling either Ms. Moore or Ms. King that BB

12  would not be home on the 1st, but that he would be

13  home by Wednesday?

14  **A.    That was the information I had at the time**

15  **based on the medical team, what DCFS was planning.**

16  **That was the current plan for discharge.**

17  Q.    And did you discuss or did Ms. Moore

18  discuss with Ashley King that this was a medical

19  child abuse case?

20  **A.    Yes.**

21  Q.    And was that something that you said to

22  Ms. King, or is that something that Ms. Moore said

23  to Ms. King?

24  **A.    This would be Catherine Moore relaying the**

Page 220

- - -

1  **information.**

2  Q.    Relaying information from you?

3  **A.    Yes.**

4  Q.    So did you tell Ms. Moore that this was a

5  medical child abuse case, and BB's caregiver

6  would need training?

7  **A.    Yes.**

8  Q.    And what training would BB's caregiver

9  need, you know, as of this date, April 1, 2019?

10  **A.    At that point, there was concern that he**

11  **would still need a pulse ox and oxygen potentially**

12  **and need to know how to use a pulse oximeter.  There**

13  **was still some thought about using EleCare and**

14  **whatever medications he needed for home.  So they**

15  **would need to understand, you know, what his**

16  **discharge regimen was at the time that he was going**

17  **home.**

18  Q.    And did you know as of April 1st, 2019

19  that DCFS had taken protective custody of BB's

20  brother?

21  **A.    We had been informed of that by DCFS, yes.**

22  Q.    Did DCFS inform you that it was planning

23  to take protective custody of BB upon discharge

24  from OSF?

Page 221

- - -

1  **A.    We had been informed of that, yes.**

2  Q.    And so, between these two entries, which

3  one happened first, the one on top or the one on

4  bottom?

5  **A.    They probably happened very close in**

6  **proximity.**

7  Q.    Just gonna scroll down to the next page,

8  ask you about some entries on March 29, 2019.  Okay.

9  It's that middle one in particular.  Did Ms. Moore

10  enter on March 29, 2019, "Dr. Petrak coming to the

11  hospital to see BB is not beneficial.  Will call

12  Dr. Gootee" -- G-O-O-T-E-E -- "and DCFS.  If the

13  parents do not agree, they are not going home."  Did

14  I read that correctly?

15  **A.    You did.**

16  Q.    And, if you know, what does this mean,

17  "Dr. Petrak coming to the hospital to see BB is

18  not beneficial"?

19  **A.    There was a discussion with Dr. Jurow, who**

20  **was the hospitalist at the time.  Ms. Moore was**

21  **present, I was present, and then there was also a**

22  **discussion that had been had with the pulmonologist**

23  **about what the options were.  At that point,**

24  **Dr. Jurow was uncomfortable with how things had been**

Page 222

\- - -

1  going with the family over the week and was asking
2  that I come and discuss things with the family.  At
3  that point, I did not think that that would
4  necessarily be helpful.  I was coordinating things
5  with Dr. House, with Cincinnati, with other places
6  to make sure that the care plan was set, and so I
7  did not feel that it was necessarily beneficial for
8  me to come and discuss things with the family at
9  that point.
10      Q.    In that discussion with Dr. Jurow --
11  J-U-R-O-W -- was it discussed that if the parents do
12  not agree to the care plan, then they are not going
13  home?
14      A.    I'm not exactly sure what that wording
15  refers to.
16      Q.    In the conversation that you had with
17  Dr. Jurow, do you remember discussing with that
18  doctor anything along those same lines, whether the
19  parents agree or not may impact whether or not they
20  are going home?
21      A.    There was a discussion, as there is in any
22  case where DCFS is involved, that if parents are
23  being particularly problematic, that DCFS should be
24  contacted, and they can potentially intervene in

Page 223

\- - -

1  some way to help with the evaluation.  I did not
2  specifically say these words, so I'm not quite sure
3  why it's phrased this way.
4      Q.    Do you think that is something that
5  Ms. Moore entered incorrectly as a case entry?
6      A.    No, I wouldn't say it was incorrect.  I
7  would say it's a paraphrase of how she may have
8  understood it.
9      Q.    In the next entry from 3/29, the very
10  bottom, does it say, "Per Dr. Petrak, ██ 's
11  parents have to agree to all of the plan.  If not,
12  it's up to DCFS to handle"?
13      A.    That is what it says, yes.
14      Q.    Was that discussed in this phone staffing
15  with you, Ms. Moore, and Jennifer Inness?
16      A.    Yes.
17      Q.    Now, on the next page, I want to ask you
18  about couple entries on March 27, 2019.  Did you
19  tell Ms. Moore on 3/27/19 that your -- you have been
20  watching the covert video surveillance?
21      A.    Again, this is a phone staffing, and so
22  this is a discussion with DCFS and myself, and
23  Ms. Moore's present, so she is paraphrasing that
24  discussion.

Page 224

\- - -

1      Q.    Did you tell Ms. Inness on March 27, 2019
2  what you had seen in the covert video surveillance?
3      A.    I did describe some of what was seen, but
4  I also relayed information about concerns expressed
5  from staff at the hospital.
6      Q.    And is the statement here that there is
7  enough to say medical child abuse, is that something
8  that you communicated to Jennifer Inness on
9  March 27, 2019?
10      A.    Yes.
11      Q.    The statement from that same date, "The GI
12  nutritionist don't know there is surveillance," is
13  that referring to the GI nutritionist at OSF?
14      A.    At Children's Hospital of Illinois, yes.
15      Q.    As you understand it, what's the
16  difference between Children's Hospital of Illinois
17  and OSF?
18      A.    Children's Hospital of Illinois is a
19  hospital within a hospital, so it would be similar
20  to -- OSF Saint Mary's is a hospital, but it is not
21  OSF Saint Francis.  OSF is a very large institution
22  that has numerous hospitals, but they're not all one
23  thing.  So Children's Hospital of Illinois is the
24  children's hospital.  OSF Saint Francis is the rest

Page 225

\- - -

1  of the hospital where the adults go.  It's not the
2  same thing.
3      Q.    And so would it have been important for
4  the GI nutritionist to know that there was
5  surveillance ongoing?
6      A.    No.
7      Q.    I want to ask you now on the same page
8  about March 28, 2019.  Does it say here, "They are
9  going to stop the video as it is not needed
10  anymore"?
11      A.    Correct.
12      Q.    And so does that mean that by March 28,
13  2019, you had stopped reviewing the video
14  surveillance of ██ and his parents at Children's
15  Hospital of Illinois?
16      A.    Correct.  The video had been stopped.
17      Q.    So any video you would have reviewed would
18  have been on or before March 28, 2019?
19      A.    Correct.
20      Q.    Scroll down on March 26, 2019, talking
21  about a phone call with Jennifer Inness, and is
22  Ms. Inness here saying the DCFS case is still open?
23      A.    That is correct.
24      Q.    Do you know, is that the same one that she

Page 226

- - -

1  said on March 5th will close out the investigation
2  at this time?
3      A.   I believe it is, yes.
4      Q.   Did she explain to you how or why the
5  investigation was gonna be closed on March 5th, but
6  that it was still open as of March 26th?
7      A.   No.
8      Q.   And where it says they received another
9  hotline call from a hospital, is that referring to
10  DCFS receiving another report of suspected abuse or
11  neglect regarding [BB]?
12      A.   Correct.
13      Q.   And do you know who made that report?
14      A.   No.  That is confidential information.
15      Q.   I understand that, but do you know who it
16  was?
17      A.   No.
18      Q.   Let me ask you about this part of the
19  March 26, 2019 entry.  This is -- is this Jennifer
20  Inness telling PRC that if there is surveillance and
21  they put a monitor in there, they're not gonna
22  capture everything that needs to be captured?
23      A.   That is what it says.
24      Q.   And is the difference between

Page 227

- - -

1  surveillance with a monitor in the room versus
2  covert surveillance?
3      A.   That is what it appears to be referring
4  to, yes.
5      Q.   What did Ms. Inness say needed to be
6  captured as a part of this surveillance?
7      A.   I'm not -- I can't speak to that.  I'm not
8  sure what she's referring to.
9      Q.   Do you know who "Tara-DCFS AA" is?
10      A.   It's the DCFS area administrator at the
11  time.  I don't know which Tara that was.
12      Q.   Does this show that Ms. Inness talked with
13  an intern at Children's Hospital of Illinois and
14  told the intern that if the parents try to leave,
15  they are to call DCFS immediately?
16      A.   Correct.
17      Q.   And, do you know, were the parents told
18  that if they attempted to leave against medical
19  advice, DCFS would take protective custody of [BB]?
20      A.   I can't verify that for sure.
21      Q.   Gonna ask you about another exhibit now.
22  Exhibit 8 is 20 pages of In Basket messages.
23  Dr. Petrak, does this appear to you to be an In
24  Basket message from the Epic system?

Page 228

- - -

1      A.   It looks like it is, yes.
2      Q.   Is this what it looks like when you're
3  looking at it on the screen?
4      A.   No.
5      Q.   What does it look like if you're sending
6  or receiving an In Basket message?
7      A.   It looks more similar to how your email
8  would look as you look at it on your screen.  It
9  doesn't look like this, but...
10      Q.   And do you know who -- there's an Ian K.
11  Kang, MD.  Do you know who Dr. Kang is?
12      A.   Ian Kang is a gastroenterologist.
13      Q.   And by "Staff Message" -- is he on staff
14  at Children's Hospital of Illinois?
15      A.   He is.
16      Q.   And so on August 20, 2018, did you tell
17  Dr. Kang that the parents are unaware of your
18  involvement, although they do know that DCFS is
19  involved and that you prefer this time to keep your
20  involvement quiet until you can gather all of the
21  info you need?
22      A.   I can't really read that.  It's too small.
23  Thank you.
24      Q.   Yeah.

Page 229

- - -

1      A.   That is what the message says, yes.
2      Q.   Is that what you wrote to Dr. Kang on
3  August 20th, 2018 at 6:16 p.m.?
4      A.   That is correct.
5      Q.   And what was the advantage to your
6  preference of keeping your involvement quiet until
7  you could gather all the information you needed?
8      A.   Typically, with medical child abuse, it's
9  advantageous and expeditious if you can review
10  medical records prior to discussing with the family
11  any findings because it allows you to do your work
12  without -- you know, without limitations.  I was
13  incorrect that the parents actually were aware of my
14  involvement, but I did not -- I don't think I
15  realized that at the time.
16      Q.   And as of this time, which, again, is
17  August 20, 2018, you were unable to conclude whether
18  [BB] had been abused or neglected?
19      A.   Correct.
20      Q.   And it was your preference to keep your
21  involvement quiet while you were looking into
22  whether or not he had been abused or neglected?
23      A.   In so many words, it's easier to not have
24  other physicians documenting inappropriately in the

1  chart or documenting in a way that is not beneficial
2  to the patient.
3      Q.   Was Dr. Kang gonna be interacting with
4  ██ and his parents?
5      A.   Yes.
6      Q.   In this message, are you telling Dr. Kang
7  to -- it is your preference that he not mention to
8  the parents that you are involved?
9      A.   I'm sorry.  Can you repeat that?
10     Q.   Sure.  Are you telling in this message
11 Dr. Kang that it is your preference that he not
12 mention to the parents you are involved?
13     A.   I'm not -- I'm not telling him what to do,
14 but I'm letting him know that I would prefer to not
15 discuss my involvement.
16     Q.   Have you ever testified in court or in a
17 legislative session that when you get involved in a
18 case, you always tell the parents who you are and
19 where you're from?
20     A.   I have testified in legislative
21 committees.  I don't know if I've testified in
22 court; I probably have.  But if I am meeting a
23 family, yes, I do tell them who I am and introduce
24 myself and discuss my role.

1      Q.   Do you find sometimes that it's
2  advantageous to not meet the family and keep your
3  involvement quiet?
4      A.   There are certainly going to be cases
5  where not discussing or introducing yourself to
6  certain parents is advantageous, yes.
7      Q.   Was that your conclusion in the ██
8  ██ case?
9      A.   In a case of medical child abuse, that is
10 typically preferred while you're trying to review
11 medical records, yes.
12     Q.   Scroll down to a message from May 28,
13 2019.  Just give me a minute to get there, please.
14 There we go.  On May 28, 2019, did you send an In
15 Basket message to Dr. Christopher James Howse?
16     A.   Yes.
17     Q.   And who is Dr. Howse?
18     A.   He is ██ 's primary care physician.
19     Q.   Is he on staff at Children's Hospital of
20 Illinois?
21     A.   No.
22     Q.   Did you say to Dr. Howse on May 28, 2019
23 that you see that ██ is with his paternal
24 grandmother now and that you were concerned about

1  this?
2      A.   Yes.
3      Q.   What was the concern you had about ██
4  being with his paternal grandmother?
5      A.   There had been concern expressed
6  previously through DCFS that there -- that his
7  paternal -- ██ 's paternal grandmother may not be
8  appropriate to care for him and may allow some of
9  the same medical interventions to occur that had
10 happened in the past, which would place him at risk.
11     Q.   And did you discuss that with DCFS?
12     A.   That had been discussed with DCFS in the
13 past, yes.
14     Q.   I want to jump ahead to an entry now from
15 10/28/19.  Was there a time where a Dr. Weiner from
16 New York reached out to either you or some of
17 ██ 's treating physicians?
18     A.   I'm sorry.  Can you repeat that?
19     Q.   Sure.  It may not be exactly the same, but
20 was there a time where a Dr. Weiner from New York
21 reached out to you about ██ r?
22     A.   No.
23     Q.   Was there a time where Dr. Weiner from New
24 York reached out to any of ██ 's doctors?

1      A.   Yes.
2      Q.   And was that brought to your attention?
3      A.   Yes.
4      Q.   What was your response?
5      A.   I responded to the people who reached out
6  to me about being contacted by Dr. Weiner, that he
7  was -- ██ was still a youth in care and that they
8  needed to discuss with legal or risk, you know, who
9  could consent to that discussion, and that they
10 should do that prior to having a discussion or
11 sending any records.
12     Q.   Did you have any input on whether or not
13 ██ 's doctors should speak with Dr. Weiner?
14     A.   No.  I just was advising that, as far as I
15 understood, he was still a youth in care, and they
16 should clarify that.
17     Q.   Okay.  The last message I want to ask you
18 about in this exhibit is also from 10/28/19 -- let
19 me find it; here we go -- at 3:18 p.m., and did
20 Dr. Kang send you and a Dr. Arnett -- A-R-N-E-T-T --
21 and Dr. Mannaa or Mannaa -- M-A-N-N-A-A -- the
22 following message: "Channing, thanks for the
23 update.  Could I have the information for his
24 caseworker?  I think the caseworker should contact

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 234

- - -

1  the physician from New York so that the family
2  cannot say we are ignoring them.  If the caseworker
3  tells that physician that DCFS is not allowing the
4  communication, at least we are off the hook."
5      **A.    He did send that message, yes.**
6      Q.    And what did that mean to you about being
7  off the hook?
8      **A.    I don't know exactly what he meant.  Those**
9  **are his words.**
10      Q.    Do they have any meaning whatsoever to
11  you?
12      **A.    I can't speak for what he meant.**
13      Q.    All right.  I'm gonna jump to some DCFS
14  case notes now, and I think I can streamline a lot
15  of these.  Exhibit 9 are case notes from
16  Investigation 2324824A.  Do you remember there was a
17  period of time where DCFS was reaching out to you
18  looking for updates on your report, and you needed
19  more time to complete the report?
20      **A.    Yes.  I needed more time or more records,**
21  **yes.**
22      Q.    And is that something that persisted for
23  months?
24      **A.    Yes.**

Page 235

- - -

1      Q.    I want to ask you about some of these, but
2  I won't go through each one of them.  Let's look at
3  page two of Exhibit 9.  Were you aware of someone
4  from Heritage Behavioral Health Center reporting
5  that she does not feel Patricia Krueger has
6  Munchausen syndrome?
7      **A.    I can't speak to this.  I've never seen**
8  **it.**
9      Q.    Did Ms. Inness or Maxwell ever tell you
10  that Kim Cochran reported prior to November 30, 2017
11  that she does not feel Patti Krueger has Munchausen
12  syndrome?
13      **A.    I don't recall if I ever had this**
14  **information.**
15      Q.    Do you have access to DCFS case notes at
16  PRC?
17      **A.    No.**
18      Q.    When you work with DCFS on a record
19  review, do you expect that they would keep you
20  updated on issues related to the subject matter
21  you're reviewing?
22      **A.    They will update me, but they don't send**
23  **me their notes.**
24      Q.    Did anyone from DCFS ever update you that,

Page 236

- - -

1  according to Kim Cochran, Patti does not have
2  Munchausen syndrome, and Ms. Cochran has no concerns
3  about Patti caring for her two children?
4      **A.    I don't recall being aware of this, but**
5  **Munchausen syndrome is different than what people**
6  **would term Munchausen syndrome by proxy.  I also**
7  **don't know who Kim Cochran is.**
8      Q.    And that she's from Heritage Behavioral
9  Health Center, does that help you in any way to know
10  who she is?
11      **A.    Not at all.**
12      Q.    Okay.  Do you know who Dr. Howse is?
13      **A.    Yes.**
14      Q.    And did anyone from DCFS make you aware
15  that he reported by 12/14/17 that Patricia Krueger
16  does not have Munchausen by proxy syndrome?
17      **A.    I don't -- no, I was not made aware of**
18  **that.**
19      Q.    Did he later communicate to you a contrary
20  opinion?
21      **A.    He later relayed to me multiple concerns,**
22  **yes.**
23      Q.    Do you know if he ever told the family
24  that he had changed his mind on that?

Page 237

- - -

1      **A.    I can't speak to what he would have told**
2  **the family.**
3      Q.    There's a reference here from January 10,
4  2018.  "Records will be sent to Dr. Petrak and the
5  other specialist at OSF in Peoria."  Do you know who
6  the other specialist is at OSF?
7      **A.    I don't know who that would be, no.**
8      Q.    I'm just scrolling through these because
9  they -- I'm characterizing them this way.  You don't
10  have to agree with me.  A lot of these just deal
11  with if they -- more time was needed.  You know,
12  DCFS has certain deadlines.  Looks like they're
13  waiting on your report and just asking if it's ready
14  or not, and if it isn't, then they'll need to grant
15  an extension.  If you want me to stop on any one of
16  them so you can read them, just let me know.  Now,
17  were you aware during this time that DCFS was
18  waiting for you and your report in order to decide
19  what it was doing with this case?
20      **A.    I was aware that they were waiting for my**
21  **report.  They can make a determination without my**
22  **report, but they were waiting for it.**
23      Q.    Did anyone from DCFS, you know, make you
24  aware that they still didn't have your report, that

Page 238

- - -

1   that's been an ongoing issue?
2       **A.   Yes, I was aware that it was an ongoing**
3   **issue.**
4       Q.   Who is Catherine at PRC?
5       **A.   Catherine Moore, case coordinator.**
6       Q.   That's who -- her case entries is what we
7   were looking at previously?
8       **A.   Correct.**
9       Q.   And is Catherine telling DCFS here that if
10  something more should come up that would suggest
11  some type of neglect, to make a new hotline call?
12          MR. HEIL:  Objection.  Foundation.  If you
13      can just identify where you are for the
14      purposes of the record, please, Aaron.
15          MR. RAPIER:  Sure.  I was trying to
16      highlight it, but it's -- my cursor's doing
17      some kind of funny --
18  BY MR. RAPIER:
19      Q.   Here, it's the next -- well, no.  It's
20  beginning on the third line from the bottom.  Does
21  this contact note state, "Catherine told" -- oh, I
22  beg your pardon.  Does it state, "Catherine told
23  that if something more should come up that would
24  suggest some type of neglect, to make a new hotline

Page 239

- - -

1   call"?
2       **A.   That is correct.  Catherine Moore was**
3   **being told by Jennifer Inness that if something new**
4   **came up, to make a hotline report.**
5       Q.   And let's look at this page.  It's
6   Bates-stamped 384, and it's the 24th page in this
7   exhibit.  Does it say that there's a final finding
8   with respect to the report for allegation 10-D and
9   allegation 60?
10      **A.   Yes.**
11      Q.   And are you familiar with what those
12  allegations are?
13      **A.   Yes.  10-D is under neglect, but it is the**
14  **medical child abuse allegation, and 60 is a neglect**
15  **allegation.**
16      Q.   And is it accurate that as of March 6th,
17  2019, ██'s medical reports were sent to PRC for
18  review, and they have been doing ongoing reviews for
19  over one and a half years?
20      **A.   Correct.**
21      Q.   Also accurate that as of that time, there
22  was no medical consistency or response by PRC?
23      **A.   That is what is documented.  I don't agree**
24  **with that characterization.**

Page 240

- - -

1       Q.   And is -- this is a supervisor note.  Is
2   Ms. Collins saying in this record, "This report is
3   being closed out recommended unfounded.  PRC will
4   continue reviewing reports and make new DCFS report
5   if there are medical outcomes that would
6   substantiate an indicated allegation"?
7       **A.   That is what it says.**
8       Q.   And was that your understanding as of
9   March 6th?
10      **A.   That is what was relayed to us, yes.**
11      Q.   And were you aware that on March 7th,
12  Ms. Inness met with Patti and Jake at their home and
13  told them the case will finally be closed out as
14  unfounded?
15      **A.   I was not aware of that, no.**
16      Q.   So when you spoke with Jake at the
17  hospital on March 29th, did he tell you, hey, DCFS
18  told us the investigation was closed and that it was
19  unfounded?
20      **A.   There was information relayed to hospital**
21  **staff that the case had been closed, yes.**
22      Q.   And do you see now that even DCFS is
23  saying in writing that is what they told the
24  parents?

Page 241

- - -

1           MR. HEIL:  Objection as to form.
2       Argumentative.  You can answer.
3           **THE WITNESS:  I agree that is what the**
4       **note says, yes.**
5   BY MR. RAPIER:
6       Q.   And if DCFS goes to your house and tells
7   you that the investigation is going to be closed and
8   that it is unfounded, is it reasonable for the
9   parents to believe what DCFS is telling them?
10          MR. HEIL:  Objection as to form.
11          **THE WITNESS:  I can't speak to what people**
12      **would or would not understand or believe.**
13  BY MR. RAPIER:
14      Q.   Having been told by DCFS that the
15  investigation would be closed out as unfounded, is
16  there anything wrong with Jake or Patti telling the
17  folks at OSF that during that hospitalization later
18  in March?
19      **A.   No, no.**
20      Q.   And were you aware that as of March 7th,
21  Inness and -- Ms. Inness and Ms. Collins had
22  assessed the children as safe as of case closing?
23          MR. McCALL:  Aaron, I'm sorry to
24      interject.  Could you magnify the text a little

Page 242

- - -

1    bit?  Maybe it's just me.  It seems to be
2    getting smaller.  Thanks.
3  BY MR. RAPIER:
4    Q.  So were you aware that as of March 7,
5  2019, Ms. Collins had assessed the children as safe
6  at case closing?
7    **A.  No.  As I said, I was not given these**
8  **notes, so I would not have been aware of that.**
9    Q.  And can you see how it might be a little
10  odd to the parents to be told by DCFS the kids are
11  safe, investigation's over, the allegations are
12  unfounded, and then to have covert surveillance of
13  them in the hospital two or three weeks later?
14      MR. HEIL:  Objection as to form.
15      **THE WITNESS:  I can't speak to what they**
16      **did or did not think.**
17  BY MR. RAPIER:
18    Q.  Well, is it understandable to you that it
19  would be upsetting to a parent to learn that there
20  was covert surveillance of them involving DCFS after
21  DCFS told them the investigation was over and their
22  kids were safe?
23      MR. HEIL:  Objection.  Argumentative.
24      MR. QUIGLEY:  Aaron, I'm gonna come up

Page 243

- - -

1    with an objection saying can we read the
2    entirety of this note into the record just for
3    completeness because it seems you're picking
4    out the last sentence here, and there's a bit
5    more to it.
6      MR. RAPIER:  Sure.  All right.
7  BY MR. RAPIER:
8    Q.  Doctor, you mind reading the note into the
9  record for Mr. Quigley?
10      MR. HEIL:  Wait a minute, wait a minute.
11      The witness need not read the entirety of the
12      note.  If the question involves the content of
13      the note, please just provide that as part of
14      the question.
15      MR. RAPIER:  I don't know, Peter.  Do you
16      want her to read it or not?
17      MR. QUIGLEY:  Withdrawn.
18  BY MR. RAPIER:
19    Q.  And were you made aware that DCFS was
20  closing the case?
21    A.  Yes.
22    Q.  And does it say here, as of March 7, 2019,
23  that you were okay with closing the report and is
24  going to voice any concerns?

Page 244

- - -

1    **A.  That is what it says, yes.**
2    Q.  And when you were told that DCFS was
3  closing the report, did you make any objection to
4  DCFS about doing that?
5    **A.  Yes.  As the last sentence comments, my**
6  **concern was, while he had had a video EEG, he was**
7  **not taken off his oxygen, so there would have been**
8  **no way to tell whether he actually still needed his**
9  **oxygen or not.**
10    Q.  Did you tell DCFS it was -- that you were
11  okay with them closing the case?
12    **A.  Those are not my words.  I would not have**
13  **used those words.  They can close a case if they**
14  **want.  It's their choice.  I probably would have**
15  **used the words -- I'm sure I used the words, I**
16  **understand and will voice any concerns if I have**
17  **them.  I did voice the concern that the video EEG**
18  **was not sufficient for determining whether he needed**
19  **oxygen or not.**
20    Q.  And do you understand from this note on
21  March 11th that a message was left for the reporter,
22  the person who made the initial hotline report, that
23  the investigation would be closed out as unfounded?
24    **A.  Yes.**

Page 245

- - -

1    Q.  And after March 11th, did that reporter
2  ever reach out to you?
3    **A.  I believe there were -- I believe I talked**
4  **to Heidi after that date, yes.**
5    Q.  And who is Heidi?
6    **A.  She's the social worker from Cincinnati**
7  **Children's.**
8    Q.  And did Heidi say anything about whether
9  or not she agreed or disagreed with the case being
10  closed?
11    **A.  I didn't discuss that with her.**
12    Q.  All right.  Jump to another exhibit.  This
13  will be Group Exhibit 10 and -- okay -- and so this
14  is a note from March 26th, 2019 created by Alisa
15  Collins, and it states here that the CPSW spoke with
16  Dr. Petrak office by speaking to Catherine.  Is that
17  Ms. Moore?
18    **A.  Yes.**
19    Q.  And that they -- you and Catherine were
20  aware that BB was in the hospital and aware of
21  the diapers and thermometer.  Are those the same
22  issues that you had raised earlier today?
23    **A.  Yes.**
24    Q.  And did you or Catherine tell Ms. Collins

Page 246

- - -

1  that you were concerned that Patti may take [REDACTED]
2  against medical advice?
3      A.   That was a concern that was passed on
4  because hospital staff had raised that concern.
5      Q.   And then it says, "They were advised to
6  call the hotline immediately."  Who was advised to
7  do that?
8      A.   The hospital staff.  We are not present in
9  the hospital all the time, so the hospital staff was
10  advised to do that.
11      Q.   And then it says, "Dr. Petrak is watching
12  all videos.  She will call the hotline if the mother
13  leaves AMA."
14      A.   That is what it says.
15      Q.   And is that something that you discussed
16  with her, that you would call the hotline if Patti
17  tried to leave against medical advice?
18      A.   Someone would call the hotline.  It could
19  be me, or it could be someone on the floor who's
20  present right at the moment.
21      Q.   All right.  Now, this is a note from
22  March 29, 2019.  It's part of Exhibit -- Group
23  Exhibit 10, and I understand you haven't seen these
24  notes.  I just want to ask you if you're familiar

Page 247

- - -

1  with the underlying content.  So --
2          MR. HEIL:  Can you make it bigger, please,
3  Aaron?  I can't see.
4          MR. RAPIER:  Yeah, yeah, yeah.
5  BY MR. RAPIER:
6      Q.   Okay.  So PSA Black -- Arnold M. Black
7  from DCFS called PSA/reporter Alisha Collins.  Who
8  is Alisha Collins?
9      A.   She's a DCFS investigator, potentially
10  supervisor, at that time.
11      Q.   And then does the note say, "And was
12  informed that Dr. Petrak at OSF Hospital has
13  diagnosed with child abuse to minor [REDACTED] by
14  his mother"?
15      A.   That is what it says.
16      Q.   And is that contact at around 10:00 p.m.
17  on March 29, 2019?
18      A.   Correct.
19      Q.   Does it then say, "The mother has been
20  seen on camera taking the victim's diaper and not
21  allowing the hospital to check the diaper for feces
22  and urine"?
23      A.   That is what it says.
24      Q.   Other than you, to your knowledge, did

Page 248

- - -

1  anyone else review those videos?
2      A.   Yes.  There would have been nursing staff
3  monitoring the video in realtime.
4      Q.   Did you ever see on the video Patti taking
5  [REDACTED]'s diaper and not allowing the hospital to
6  check the diaper for feces and urine?
7      A.   As I said earlier, it's difficult to see
8  all areas of the room.  There were times when it
9  appeared that, yes, she was not putting the diaper
10  on the scale.  What happened with that diaper was
11  difficult to discern based on the camera angle in
12  the room.
13      Q.   Did you ever tell anyone that you saw
14  Patti on camera taking the victim's diaper and not
15  allowing the hospital to check the diaper for feces
16  and urine?
17      A.   It was not placed on the scale is the only
18  thing I could be able -- the only thing I could see
19  on the camera.  I could not determine what happened
20  with it after that.  Then I relied on the medical
21  records to determine that it was not accessible to
22  staff.
23      Q.   If we were to depose Arnold Black and ask
24  Arnold, did Dr. Petrak tell you that she saw Patti

Page 249

- - -

1  on camera taking [REDACTED]'s diaper and not allowing the
2  hospital to check the diaper for feces and urine,
3  and Arnold says, yes, that is what Dr. Petrak told
4  me, would that be truthful or untruthful?
5      A.   I can't speak to what Mr. Black believes
6  is truthful or not.  I don't believe I talked to
7  Arnold Black that evening.
8      Q.   Did you speak with Ms. Collins on the
9  29th?
10      A.   I may have spoken with her earlier on the
11  29th.  I did not speak with her that evening, as I
12  recall.
13      Q.   On March 30, 2019, did you speak with
14  Dr. Lillian Gonzalas, a night resident at OSF
15  Children's Hospital?
16      A.   Yes.
17      Q.   And did you tell Dr. Gonzalas there were
18  concerns with Munchausen by proxy?
19      A.   I did not.  I would have used the term
20  "medical child abuse," but this is the information
21  that DCFS is documenting based on their discussion
22  with Dr. Gonzalas.
23      Q.   Okay.  So, if you know, at the bottom of
24  this note it says, "Doctors are very involved in

Page 250

- - -

1  this case and contacts are Dr. Petrak with PRC and
2  Dr. Howse in Clinton" -- parenthetically, "primary
3  care physician" -- and then it says, "Copy of note
4  written by PSA Taylor is in hard copy file for
5  review." Any idea what that means?
6      A.  I have no idea.
7      Q.  Were you familiar that there were some
8  court proceedings related to the allegation of
9  medical child abuse of ██████?
10     A.  I was aware that there was potential for a
11 juvenile proceeding.
12     Q.  All right. Let me show you Exhibit 11,
13 and this is part of an order from Saint Francis
14 Medical Center. It's Bates-stamped OSF 7420. This
15 font's pretty small. Let me increase that. And
16 there's -- there's a reference here to an Andrew
17 Wylie, Dr. Wylie -- W-Y-L-I-E. Do you know who that
18 is?
19     A.  He is a physician at Children's Hospital
20 of Illinois. He was.
21     Q.  And do you know at all what this consult
22 was for?
23     A.  Yes. It was an inpatient consult to case
24 management, and the reason was prior concern and

Page 251

- - -

1  prior DCFS involvement for what he termed Munchausen
2  concern, which would be medical child abuse.
3      Q.  Would that be the same investigation that
4  DCFS told the family had been closed and unfounded?
5      A.  I can't speak to what he's referencing.
6  He is referencing a prior concern that existed. I
7  don't know that he would have referenced a specific
8  investigation.
9      Q.  Let me ask you about another note from
10 Saint Francis Medical Center. This will be Exhibit
11 12. The Bates is OSF 7327 and it's this section in
12 particular. Does this pediatric progress note show
13 that as of March 25, 2019, the patient was moved to
14 a room with camera and monitor for Munchausen by
15 proxy activity?
16     A.  It does say that, yes.
17     Q.  And, to your knowledge, was there any
18 video surveillance prior to March 25, 2019?
19     A.  I believe there was. I was not the one
20 who initiated it, but, yes, I believe it was
21 initiated prior to the 25th.
22     Q.  Exhibit 13 -- and I'll increase the font
23 before I ask you any questions about it -- is a
24 note -- an order -- I beg your pardon -- from

Page 252

- - -

1  3/27/19, and it's OSF 8138. And do you know who
2  Dr. Kelsey Jurow is, J-U-R-O-W?
3      A.  Yes. She was the hospitalist at the time.
4      Q.  And did Dr. Jurow [audio distortion] --
5      A.  I didn't understand --
6          MR. QUIGLEY:  Aaron, you were breaking up
7      there.
8          MR. HEIL:  Yeah. You broke up throughout
9      that question.
10         MR. RAPIER:  Oh, I beg your pardon. I'm
11     just waiting a second because I'm getting a
12     notice that said my connection was unstable.
13     Can you hear me okay now?
14         MR. HEIL:  Yes.
15 BY MR. RAPIER:
16     Q.  Does this show that Dr. Jurow entered an
17 order on 3/27/19 continuing the video monitoring due
18 to continued concerns for Munchausen by proxy?
19     A.  That is what it says, yes.
20     Q.  Then the last one of these records, an
21 order from 3/25/19. This is OSF 8150. Did
22 Dr. Mischler order that video monitoring be
23 instituted for concern of Munchausen by proxy on
24 3/25/19?

Page 253

- - -

1      A.  That is correct.
2      Q.  And did you discontinue that monitoring on
3  4/1/19?
4      A.  Yes. It was actually discontinued before
5  that, but that's the nursing communication that was
6  discontinued.
7      Q.  Okay. Got a few more of these. I can get
8  through them, I think, pretty quickly. In fact,
9  I'll -- this is gonna say Exhibit 15, but we'll mark
10 this as -- it's gonna say 16, but it'll actually be
11 15. Okay. So are you aware that there were some
12 juvenile court proceedings in Macon County related
13 to ██████?
14     A.  I was aware that there was a potential for
15 that. I was never notified of anything beyond that.
16     Q.  And do you see here that this is a First
17 Supplemental Petition filed in the Macon County
18 Court on March 9, 2020 regarding ██████?
19     A.  Yes.
20     Q.  And do you understand that the allegation
21 that was made is that ██ was neglected due to an
22 environment that was injurious to his welfare and
23 that one of the three siblings suffered several
24 serious health issues of undetermined cause?

---

Page 254

- - -

1    **A.   That is how it reads, yes.**
2    Q.   And are you gonna testify in this case
3    that BB suffered any health issues due to a
4    determined cause?
5         MR. HEIL:  Objection as to form; form and
6    foundation.  Also, it's a vague question.  You
7    can attempt to answer it if you'd like.
8         **THE WITNESS:  I only testify if I am**
9    **subpoenaed to testify.**
10   BY MR. RAPIER:
11   Q.   Okay.  If you're subpoenaed to testify in
12   this case, are you gonna testify that BB was
13   injured or suffered health issues due to a
14   determined cause?
15   **A.   Yes.**
16   Q.   So will you be testifying contrary to the
17   allegation in this petition?
18   **A.   The allegation is based on DCFS allegation**
19   **numbers, and, unfortunately, medical child abuse**
20   **falls under a neglect allegation, but I would be**
21   **testifying that there was medical child abuse.**
22   Q.   The supplemental petition also says, "A
23   possible cause was found in the home, which was
24   found to be full of mold throughout, located behind

---

Page 255

1    the walls and not visible."  Do you disagree with
2    that possible cause of BB's health issues?
3    **A.   I wrote a report that talked about the**
4    **mold being a possible cause, and I determined that**
5    **that was not a reason for all of his health issues.**
6    Q.   And so the -- is the case number on this
7    petition 2019-JA-92?
8    **A.   That is what it says, yes.**
9    Q.   And was this petition verified by Mary
10   Bolton, Assistant State's Attorney?
11        MR. HEIL:  Objection.  How could this
12   witness possibly know whose signature that was?
13        MR. RAPIER:  Because she can read the
14   English language.  What do you mean?  Says
15   "Mary Bolton" right there --
16        MR. HEIL:  [Audio distortion] which is a
17   signature.  How does she know who signed that?
18        MR. RAPIER:  John, I don't even know what
19   you're talking about.  Are you saying some
20   state's attorney's name was forged on a court
21   document?
22        MR. HEIL:  I'm certainly not.  I'm just --
23   I'm wondering why you're asking this witness
24   about it.

---

Page 256

- - -

1         MR. RAPIER:  Okay.  Are you instructing
2    her not to answer, or you just gonna --
3         MR. HEIL:  I'm certainly not.  She can --
4    she can attempt to if she'd like.
5         MR. RAPIER:  All right.
6         **THE WITNESS:  It says "Mary Bolton".  That**
7    **is what it says.**
8    BY MR. RAPIER:
9    Q.   Okay.  And so we saw on that last page the
10   number 2019-JA-92.  Does that same number appear on
11   the top of this page of the exhibit?
12   **A.   Yes.**
13   Q.   And does it say next to 3/9/20, "Assistant
14   State's Attorney Mary Bolton present.  DCFS present.
15   Guardian ad litem Brian Finney present.  Mother and
16   Father present accompanied by Attorney Brad Rau"?
17   **A.   It does.**
18   Q.   Does it also say, "The Department present
19   by Attorney Ms. Paige and Ms. Barker"?
20   **A.   Yes.**
21   Q.   And for this docket entry does it say, "On
22   motion of Ms. Bolton" -- the assistant state's
23   attorney -- "the Amended Petition and the original
24   Petition are dismissed and stricken"?

---

Page 257

- - -

1    **A.   That's what it says.**
2    Q.   And does it say here, "Finding the minor
3    child is neglected"?
4    **A.   Yes.**
5    Q.   And that's as of 3/9/2020, correct?
6    **A.   Correct.**
7    Q.   Scroll down the same document to July 8,
8    2020.  Does it say, "Assistant State's Attorney Mary
9    Bolton present.  DCFS present.  And GAL Brian Finney
10   present" [as read]?
11   **A.   Yes.**
12   Q.   Does it say here, "Prior finding of
13   neglect is vacated"?
14   **A.   It does.**
15   Q.   Does it also say, "The Court finds it is
16   safe and in the best interest of the minor that the
17   minor be returned to the Mother and Father"?
18   **A.   Yes.**
19   Q.   Are you gonna testify in this case that it
20   was not in the best interest of BB to be
21   returned to his mother and father?
22   **A.   Excuse me?  Can you repeat that?**
23   Q.   Sure.  Are you gonna testify in this case
24   that it was not in BB's best interest to be

Page 258

- - -

1  returned to his mother and father?
2      **A.   That is not a determination I would make.**
3      Q.   And, so there's no surprise, you're not
4  gonna tell a jury that it was not in BB 's best
5  interest to be returned to his parents?
6      **A.   I do medical evaluations.  I don't make**
7  **determinations about placement at all.**
8      Q.   Are you gonna testify in this case that it
9  was unsafe for BB to reside with his parents?
10     **A.   Again, I do a medical evaluation.  I am**
11 **not going to make a determination about placement**
12 **decisions.  Those are not mine to make.**
13     Q.   And I just don't want to be surprised at
14 trial, so let me -- let me see if I can get you to
15 answer the question.  Are you gonna testify at the
16 trial in this case that it was unsafe for BB to
17 reside with his parents?
18     **A.   I don't think I can answer that as you're**
19 **asking it.  I will make a medical -- I made a**
20 **medical determination.  That has been stated in**
21 **writing.  That is my determination.**
22     Q.   In your assessment, is your medical
23 determination inconsistent with the court's
24 findings?

Page 259

- - -

1          MR. HEIL:  Objection as to form.  You can
2  answer it if you [inaudible].
3      **THE WITNESS:  I don't think I can answer**
4  **that because I've only seen a very small**
5  **portion of what their determination was based**
6  **on and how they're -- and their decision**
7  **making.**
8  BY MR. RAPIER:
9      Q.   So you're unwilling to accept the court's
10 findings as is; you want to know more about why the
11 court made that finding?
12         MR. HEIL:  Objection, form.  Answer it if
13 you'd like.
14     **THE WITNESS:  I didn't testify, and I**
15 **don't know what the decision was based on, so I**
16 **don't know that I can agree or disagree.**
17 BY MR. RAPIER:
18     Q.   You understand that you're a defendant in
19 this case, correct?
20     **A.   Yes.**
21     Q.   And someday there's gonna be a trial where
22 you're gonna be called to testify, right?
23     **A.   Yes.**
24     Q.   When that happens, are you gonna tell the

Page 260

- - -

1  jury that it was unsafe for BB to reside with his
2  parents?
3          MR. HEIL:  Objection as to form,
4  foundation.  When?  With what circumstances?
5  The question is unanswerable, in my opinion, as
6  stated, but you can attempt to answer it if you
7  wish.
8      **THE WITNESS:  I agree with that.  It's**
9  **very difficult to discern when you're asking.**
10 **I have made my medical opinion.  I have made my**
11 **recommendations.  They are in writing, and that**
12 **is what I would testify to.**
13 BY MR. RAPIER:
14     Q.   Sure.  So let's -- we'll take John's
15 objection like this:  At any point in time, are you
16 gonna testify to the jury in this case that it was
17 unsafe for BB to live with his parents?
18         MR. HEIL:  Objection as to what she will
19 testify at trial.  I will object to that as
20 well.  If you --
21         MR. RAPIER:  Isn't the point of a
22 deposition to learn what someone's gonna
23 testify to at trial so there isn't surprise?
24         MR. HEIL:  Again --

Page 261

- - -

1          MR. RAPIER:  Isn't that what we're doing
2  here, John?
3          MR. HEIL:  Again, your question is -- you
4  just added the word "at any time".  You didn't
5  add any specifics as to how the evidence will
6  come out or anything else.  She's already
7  testified here repeatedly that her -- all of
8  her opinion in this case, her medical judgment,
9  is in writing, and you have it.  Please answer
10 if you'd like.
11     **THE WITNESS:  Agree.  I will testify to**
12 **what my medical opinion was and my**
13 **recommendations at the time.  That is -- that**
14 **is what I will testify to.**
15 BY MR. RAPIER:
16     Q.   Let me show you Exhibit 16.  Again, it
17 says 18 on the tab.  It's 16.  I'll scroll down to
18 the second page.  Were you aware that the court
19 determined that BB was [audio distortion] in that
20 BB was in an environment that is injurious to the
21 welfare of the minor as defined by an Illinois
22 statute?
23     **A.   I was not aware of any findings from court**
24 **until you showed me what you've shown me today.**

Page 262

- - -

1    Q.   And does this court order state that that
2  finding is based on the following facts?  And I'll
3  increase the font so everybody can see it.
4         MR. HEIL:  Can I interpose a foundational
5         objection at this point, Aaron?  This -- this
6         is federal court.  Can you identify the
7         document, the Bates numbers, the date that it
8         was entered just so we -- the record is clear
9         as to what you're talking about?
10        MR. RAPIER:  Sure.  It's a March 10, 2020
11        adjudicatory order, Macon County.  I think it
12        was previously Exhibit 30 to the Maxwell
13        deposition, and the order is signed by the
14        judge on March 10.
15 BY MR. RAPIER:
16   Q.   So, Dr. Petrak, were you aware that the
17 court made that finding based on the following
18 facts:  One of three children had serious health
19 issues of undetermined cause.  Home was later found
20 to be full of mold within the walls.  Child is
21 recovered from most of the issues.
22   A.   No.
23   Q.   And do you disagree with the court's
24 finding?

Page 263

- - -

1    A.   I can't speak to their findings.  I was
2  unaware of them.  I can't speak to them.
3    Q.   Are you gonna testify in this case
4  contrary to those findings?
5    A.   I'm going to testify to what was in my
6  medical report, my medical opinion, and my
7  recommendations.
8    Q.   Were you aware that the court found that
9  the abuse or neglect of ██ was not inflicted by a
10 parent, guardian, or legal custodian?
11   A.   No.
12   Q.   Do you disagree with that finding?
13   A.   Again, I was unaware of it.
14   Q.   Are you gonna try and testify in this case
15 that ██ was abused or neglected by one of his
16 parents?
17   A.   I'm going to testify to my medical opinion
18 that is in my written report and my recommendations.
19   Q.   And is your medical opinion that ██ was
20 a victim of medical child abuse by one or both of
21 his parents?
22   A.   Yes.
23   Q.   And do you see that that testimony is
24 directly contradicted by a court's finding?

Page 264

- - -

1         MR. HEIL:  Objection.  Foundation.  She
2         has no idea of the basis of the court's
3         finding.
4  BY MR. RAPIER:
5    Q.   Dr. Petrak, do you think this court owes
6  you an explanation for why it made a finding?
7         MR. HEIL:  Objection.  Argumentative.  She
8         already testified she didn't appear at this,
9         she didn't testify at this, and she's not
10        seeing this until you showed it to her.  She
11        has no understanding of the basis of the
12        court's finding.  She doesn't know what
13        evidence was presented to the court.
14 BY MR. RAPIER:
15   Q.   Well, we saw in the document -- who was
16 there on this day?  DCFS was there, right?
17   A.   They were listed, yes.
18   Q.   The assistant state's attorney was there,
19 right?
20   A.   Yes.
21   Q.   JAL [phonetic] was there, right?
22   A.   Yes.
23   Q.   And they all stipulated that the abuse or
24 neglect was not inflicted by a parent, guardian, or

Page 265

- - -

1  legal custodian, and what I want to know is, are you
2  gonna testify contrary to that stipulation in this
3  case?
4    A.   I'm gonna testify to my medical opinion.
5    Q.   Even if it's completely contradicted by a
6  stipulation from DCFS and the state of Illinois?
7    A.   I'm gonna testify to my medical opinion as
8  a medical physician.
9    Q.   And the work you did in this case was
10 pursuant to a contract with DCFS, right?
11   A.   And a consultation by a medical colleague
12 at Children's Hospital of Illinois.
13   Q.   And DCFS, the party that contracted with
14 PRC, stipulated completely contrary to your opinion
15 that the abuse or neglect was not inflicted by a
16 parent, guardian, or legal custodian, right?
17        MR. HEIL:  Objection.  Argumentative and
18        asked and answered at this point.
19 BY MR. RAPIER:
20   Q.   I mean, here, I'll show you.  It says
21 right here, "Stipulation".  So the party that
22 contracts with PRC has stipulated to something
23 completely contrary to your conclusion.
24        MR. HEIL:  Objection.  Is there a question

```
- - -
```

1    pending?
2    BY MR. RAPIER:
3        Q.   Isn't that correct?
4        A.   **That is what this document says.**
5        Q.   So the company that hired you, DCFS,
6    disagrees with you --
7            MR. HEIL:   Objection as to form.  Company?
8    BY MR. RAPIER:
9        Q.   The state of Illinois, the person who
10   employs you, completely disagrees with you, right?
11           MR. HEIL:   Objection as to form and
12       argumentative.
13   BY MR. RAPIER:
14       Q.   I mean, Dr. Petrak, you see that, don't
15   you?  The state of Illinois --
16           MR. HEIL:   I'm instructing --
17   BY MR. RAPIER:
18       Q.   -- the same state that pays your salary,
19   said it was not the parents.  That's what this order
20   says, right?
21           MR. HEIL:   Objection.  I'm instructing the
22       witness not to answer that question.
23   BY MR. RAPIER:
24       Q.   Dr. Petrak, do you know what a stipulation

```
- - -
```

1    is?
2            MR. HEIL:   You can answer if you know.
3        **THE WITNESS:   Yes.  A stipulation agrees**
4        **that there is a preponderance of evidence that**
5        **exists that could prove abuse or neglect.  It**
6        **doesn't say who or when or how, but simply**
7        **abuse or neglect exists.**
8    BY MR. RAPIER:
9        Q.   But it does, right?  It says it was not
10   the parent; it was not the guardian; it was not the
11   legal custodian, right?  That's what it says?
12       **A.   That is what this document says.  That's**
13   **not generally what a stipulation is.**
14       Q.   But in this case, whether it's generally
15   done or not, do you see that the state of Illinois
16   stipulated --
17           MR. HEIL:   Objection.  Asked and answered.
18   BY MR. RAPIER:
19       Q.   -- that the abuse or neglect was not
20   inflicted by a parent, guardian, or legal custodian?
21       **A.   I can see what the document says.  My**
22   **medical opinion is my medical opinion.**
23       Q.   And after the state stipulated to that, on
24   March 10, 2020, did you continue your investigation

```
- - -
```

1    of Patti and Jacob Krueger?
2        **A.   I have not continued any work past the**
3    **provision of my medical opinion to DCFS.**
4        Q.   So were you done working on this case by
5    March 10, 2020?
6        **A.   I don't recall the date of the last report**
7    **I gave them, but I have not done any work certainly**
8    **by the date of this court date.**
9        Q.   So when the state stipulated that the
10   abuse and neglect was not done by ███'s parents,
11   that was after all of your work in this case, right?
12       **A.   Yes.**
13       Q.   Thank you.  Dr. Petrak, that's all I have
14   for you.
15           MR. HEIL:   Does anybody else have any
16       questions?
17           MR. QUIGLEY:   I might have a couple, but
18       if -- Ambrose or John, if you want to do any
19       redirect questions, you can go ahead.  You
20       might actually cover some of what I was looking
21       to ask.
22           MR. HEIL:   Ambrose, do you have any?
23           MR. McCALL:   I do.  I just have a few.
24       Aaron, if you could remove your exhibit, that

```
- - -
```

1        would be helpful.  Thank you.
2            MR. RAPIER:   Yeah.  One second here.
3        There we go.
4                    - - -
5    BY MR. McCALL:
6        Q.   Thank you for your patience, Dr. Petrak.
7    Where do you have privileges to practice medicine
8    outside of the University of Illinois College of
9    Medicine Peoria?
10       **A.   Children's Hospital of Illinois in Saint**
11   **Francis, and then Carle -- what is now Carle**
12   **Methodist.**
13       Q.   And where are you currently employed?  Who
14   pays your pay stub checks and provides you benefits?
15       **A.   University of Illinois College of Medicine**
16   **in Peoria.**
17       Q.   And you were asked about whether you had
18   an OSF supervisor, and you testified that you do not
19   and do not have an OSF office; is that correct?
20       **A.   Correct.**
21       Q.   Who is your supervisor within the
22   University of Illinois College of Medicine Peoria
23   organizational structure?
24       **A.   It would be Dr. Manu Sood.  He's the head**

Page 270

1  of the Department of Pediatrics.
2      Q.   Does the -- Dr. Sood, the head of
3  pediatrics at the University of Illinois College of
4  Medicine Peoria, does he evaluate your job
5  performance at the University of Illinois College of
6  Medicine Peoria?
7      A.   Yes.
8      Q.   And within these different contexts that
9  you work within -- for example, when you are
10  performing work that involves providing reports to
11  the Department of Children and Family Services, the
12  state of Illinois agency, do you provide any of your
13  DCFS report information to OSF personnel?
14     A.   If they were also a consultant.  So if a
15  child was in the hospital and it was an inpatient
16  consult and DCFS was a referent -- there are
17  sometimes multiple referents -- then, yes, they
18  would also receive a copy or the primary care
19  physician.  So, yes, it could go to more than one
20  place.
21     Q.   In this instance, the reports from
22  Pediatric Resource Center to the personnel at
23  Department of Children and Family Services, none of
24  those reports showed that they were copied to OSF

Page 271

1  HealthCare System, correct?
2      A.   Other than what would have been in Epic.
3  So because a colleague consulted, any information
4  for them would be in Epic; otherwise, no.
5      Q.   Okay.  And as far as your own website
6  identity, does the University of Illinois College of
7  Medicine Peoria provide your website and your
8  publicity for your practice at the Pediatric
9  Resource Center?
10     A.   Yes.
11     Q.   And is it your understanding that you
12  function outside of the University of Illinois
13  College of Medicine in Peoria as an independent
14  physician that is not under -- not under the control
15  of any health care system like Carle Clinic or OSF
16  HealthCare System other than through medical staff
17  reviews?
18     A.   Correct.
19     Q.   You indicate in your testimony you
20  identify your role and yourself to patients when you
21  see them.  If you can recall, please tell us how you
22  identified yourself to the Kruegers, and if you
23  can't recall specifically with respect to the
24  Kruegers, what's your practice in identifying

Page 272

1  yourself to patients at any hospital you enter, not
2  just Saint Francis Medical Center?
3      A.   My introduction to -- it would have been
4  Jacob Krueger and the paternal grandmother -- and I
5  do not recall her name -- would have been very
6  limited because they knew I was already involved,
7  and also I believe they knew I was coming over
8  because there had been tension with the hospitalist
9  team, and they were asking for my assistance, so I
10  was there to assist them.  So it was a very brief
11  introduction of who I was and where I was from, so,
12  "Dr. Petrak from the Pediatric Resource Center.
13  I've been trying to assist the hospital team."  It
14  would have been very brief because they already were
15  aware of who I was.  We have signed releases.  There
16  had been communication.  They knew my name.  And so,
17  otherwise, though, I introduce myself, I say who I'm
18  with, I say what my role is, so -- and I explained
19  exactly what I'm gonna do.  I'm gonna get a history,
20  I'm gonna do an exam, I'm gonna -- you know, I'd
21  like to review all the records so that I can do
22  proper recommendations.  So I do a full description
23  of everything I'm gonna do.  I leave my business
24  card if I have enough with me.  So I don't hide who

Page 273

1  I am, and it's very easy.  I leave my phone number
2  on the board if I can find a marker.
3      Q.   Oh.  The white board in the patient room,
4  you can write it on there?
5      A.   Yes.
6      Q.   Is that right?
7      A.   Yes.
8      Q.   And when you write a phone number on
9  there, is it the Pediatric Resource Center phone
10  number?
11     A.   Correct.
12     Q.   And when you come into a hospital room at,
13  for example, Saint Francis Medical Center, you are
14  not wearing any OSF garb; fair to say?
15     A.   I don't wear a coat just because a lot of
16  pediatricians don't.  It's sometimes scary for kids.
17  I do have a badge, but I also have a Carle Methodist
18  badge.  I have both badges.  So I just have a badge,
19  and mine says "Doctor," but I still -- I introduce
20  myself and explain who I am and why I'm there.
21     Q.   When you explain that you work at the
22  Pediatric Resource Center, do you include in your
23  explanation the connection between the Pediatric
24  Resource Center and the University of Illinois

Page 274

- - -

1  College of Medicine Peoria?
2      A.   I do explain that we are part of the
3  University of Illinois College of Medicine and not,
4  you know, Saint Francis or Children's Hospital
5  employees, yes.
6      Q.   And in your years practicing medicine,
7  have you come cross the term "independent
8  contractor"?
9      A.   At various times, yes.
10      Q.   Is it your understanding that the services
11  you provide at Saint Francis Medical Center -- OSF
12  Saint Francis Medical Center are through contracts
13  between University of Illinois College of Medicine
14  Peoria and OSF HealthCare System in which you are
15  designated as an independent contractor?
16      A.   Yes.
17      Q.   And for all the sums that are described,
18  the 30,000 or so in the contract that plaintiff's
19  counsel showed you, are those funds paid to
20  Pediatric Resource Center or UICOMP -- University of
21  Illinois College of Medicine Peoria -- not to you
22  directly, and you still get all your pay from
23  University of Illinois College of Medicine Peoria?
24      A.   They are going to the department -- UICOMP

Page 275

1  to the department to the PRC, but I'm not getting
2  any of it personally.  It's just part of my salary.
3      Q.   In other words, you don't receive a W-2
4  form or a 1099 from OSF ever, correct?
5      A.   Correct.
6      Q.   You were referring to the Epic, and let me
7  see if I can share that, and we'll see if we need to
8  mark this.  This is a document dated April 2nd,
9  2019.  It's top right -- left corner, Saint Francis
10  Medical Center, and underneath that, it has your
11  name, Dr. Petrak, correct?
12      A.   Yes.
13      Q.   And underneath your name and the service
14  you're providing, pediatrics, what is the underlying
15  header there?
16      A.   I'm sorry.  Where?
17      Q.   Right underneath -- up here.
18      A.   Oh, "PRC Consult," so they -- that
19  identifies the note and who we are.
20      Q.   And the reason I'm asking that is you were
21  shown a version of this document earlier that did
22  not include the "PRC Consult" header.  To you, what
23  does the "PRC Consult" header mean?
24      A.   It's an identifier for the note.  So it is

Page 276

- - -

1  an initial consultation note.  It identifies PRC
2  versus gastroenterology, nephrology, any of the
3  other subspecialties.  So it is a identifier for the
4  rest of the medical staff to understand what the
5  purpose and content of this note will be.
6      Q.   And in this version of the document you
7  were shown earlier, this version is OSF 7257, Bates
8  label.  Doesn't identify who the physician was who
9  sought your consult.
10      A.   Yes, it does.
11      Q.   And who was that physician?
12      A.   Dr. Mischler.
13      Q.   And does it state the reason for his
14  consultation?
15      A.   Yes.  He had a concern for medical child
16  abuse.
17      Q.   And given the stated concern, is that your
18  understanding what led to your being sought out as a
19  PRC consult?
20      A.   Correct.
21      Q.   And did you have any understanding whether
22  Dr. Mischler sought consults from other specialists
23  at or around the same time with respect to BB
24  Krueger?

Page 277

- - -

1      A.   I believe that there -- I don't think
2  there were formal consults to pulmonology or
3  gastroenterology.  There may have been to
4  gastroenterology, but those were some of the other
5  specialties following BB at the time, but he
6  specifically consulted the Pediatric Resource
7  Center -- I was the only medical provider at the
8  time -- because of his concern and his desire to do
9  further investigation.
10      Q.   Did you have some understanding or
11  awareness on or about April 2nd, 2019 that
12  Dr. Mischler was seeking consults from other
13  specialists outside of your specific area of medical
14  child abuse or child abuse from other specialists,
15  whether pulmonologists or others?
16      A.   No, and at that point, at that date -- so
17  he was the original consulting physician -- he had
18  passed on care to Dr. Jurow by this date.
19      Q.   And is Dr. Jurow someone that you
20  continued to work with through this PRC consult that
21  started with Dr. Mischler?
22      A.   Yes.
23      Q.   And that's part of the continuity of care
24  situation you described earlier today; is that

Page 278

- - -

1  correct?
2  **A.  Yes.**
3  Q.  And through your Pediatric Resource Center
4  and your employment at the University of Illinois
5  College of Medicine Peoria, you have an exclusive
6  relationship, meaning that you can only practice
7  medicine at OSF HealthCare System?
8  **A.  No.**
9  Q.  And does anyone at OSF HealthCare System
10  check on you or tell you how to practice your
11  specialty?
12  **A.  No.**
13  Q.  In the reports you reviewed, you indicated
14  that some of the items that you may have discussed
15  with DCFS may appear in your consulting work that
16  you perform with Dr. Mischler.  Would that include
17  some of these historic findings as to what you were
18  seeing in the prior course of care and treatment
19  involving ██████?
20  **A.  Yes.**
21  Q.  And would some of that information include
22  what's described in here as extensive genetic
23  testing of ██████?
24  **A.  Yes.**

Page 279

- - -

1  Q.  Were there any results from those genetic
2  testings that gave you pause to reconsider where you
3  landed with a diagnosis of medical child abuse?
4  **A.  There was a genetic test that showed a**
5  **variant of unknown significance.  That's not**
6  **uncommon in any of our children who have testing,**
7  **but looking further into that, it is not a**
8  **pathogenic variant.  It is -- I've searched ClinVar**
9  **and looked for that, and based on discussions with**
10  **the geneticist at Vanderbilt, he did not think that**
11  **this was a pathogenic variant or that he had any**
12  **clinical disease.**
13  Q.  If we go up one paragraph from the genetic
14  testing paragraph to the multiple hospital
15  admissions for dehydration and refusing to eat or
16  drink, is that the history of why ██████ had
17  prior admissions that came from his parents?
18  **A.  Yes, which is frequent in pediatrics.**
19  **It's based on history because a child can't tell you**
20  **what's going on, so you base a lot of your diagnosis**
21  **on the history provided.  And so, yes, it was**
22  **absolutely multiple hospitalizations for reportedly**
23  **not eating and drinking very little, yet the weight**
24  **was stable.**

Page 280

- - -

1  Q.  Was there a connection between that
2  history and what you saw on the video with respect
3  to how ██ was eating and drinking?
4  **A.  Yes, other than times when there was a**
5  **lack of food being offered, which was inappropriate,**
6  **but, clearly, he was able to eat and drink**
7  **appropriately.**
8  Q.  And while you were asked by plaintiff's
9  counsel about the stipulation in the court record,
10  were you shown anything from the court record that
11  included a medical opinion that ██████ had
12  not suffered from medical child abuse?  Did that
13  appear in anything shown to you?
14  **A.  No.**
15  Q.  And through today, has anyone provided you
16  with a copy of a report from a licensed Illinois
17  medical doctor, whether a general pediatrician or
18  within your specialty of medical child abuse and
19  child abuse, that says anything you did was wrong or
20  that even questions your conclusions in this case?
21  **A.  No.**
22  Q.  I have nothing further at this time.
23  Thank you, Doctor.
24  MR. QUIGLEY:  John, I believe Ambrose

Page 281

- - -

1  covered most of what I was going to go over,
2  but I guess I do have two questions that I'd
3  like to pose to you, Dr. Petrak.
4  - - -
5  BY MR. QUIGLEY:
6  Q.  One of them would be, before you actually
7  finalized the report, I believe, that you issued on
8  April 1st, you had already been in contact with
9  DCFS, correct, prior to that?
10  **A.  Yes.**
11  Q.  And had you told them the outcome of your
12  determination --
13  **A.  Yes.**
14  Q.  -- prior to [indiscernible] the report?
15  Do you recall when exactly that was?
16  **A.  I believe it was on the 27th of March.**
17  **27th, 28th.**
18  Q.  Twenty-seventh, 28th.  And you met with
19  Jacob Krueger on March 29th, correct?
20  **A.  Correct.**
21  Q.  So you had already known that you didn't
22  have a determination of medical child abuse before
23  you met with Jacob Krueger?
24  **A.  Yes.**

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

- - -

1    Q.  Okay.  I think that's all I had.  Thank
2  you, Dr. Petrak.
3        MR. HEIL:  I have no questions, and we'll
4    reserve signature, unless you have anything
5    else, Aaron.
6                      - - -
7  BY MR. RAPIER:
8    Q.  I'll just follow up on a subject that
9  Ambrose raised.  Ambrose asked you about what you
10  have or haven't seen related to that Macon County
11  court case.  Did your colleagues at DCFS even ask
12  you to participate in that proceeding?
13    A.  I was not subpoenaed to testify, no.
14    Q.  So, in other words, DCFS didn't even want
15  to use your opinion in that court case?
16        MR. HEIL:  Objection.  Form, foundation,
17    and argumentative.
18        THE WITNESS:  I can't speak to their
19    decision-making.
20  BY MR. RAPIER:
21    Q.  At least they never asked you to give an
22  opinion in that case, right?
23        MR. HEIL:  Objection.  Foundation.
24        THE WITNESS:  I provided a medical opinion

- - -

1    for them.
2  BY MR. RAPIER:
3    Q.  But in court; I understand you wrote
4  something up, but, I mean, did they even ask you to
5  come in and testify to what you had said?
6    A.  I stated I was not subpoenaed to testify.
7    Q.  So DCFS, the party that your employer
8  contracts with, never even asked you to testify,
9  right?
10        MR. HEIL:  Objection.  As you know, that
11    was handled by the state's attorney's office.
12  BY MR. RAPIER:
13    Q.  DCFS was present there, no?  That's what
14  it said.  So, just to be clear, did the state's
15  attorney, the GAL, or DCFS ever ask you to testify
16  to an opinion in that Macon County case?
17    A.  As I stated, I was not subpoenaed for
18  testimony.
19    Q.  They certainly could have done that if
20  they wanted to, right?
21        MR. HEIL:  Objection as to form and
22    foundation.
23  BY MR. RAPIER:
24    Q.  Right?

- - -

1        MR. HEIL:  You don't need to answer.  Do
2  you have any other questions, Aaron?
3        MR. RAPIER:  You're instructing her not to
4  answer?
5        MR. HEIL:  I am.
6        MR. RAPIER:  Okay.  Then I don't.
7        MR. HEIL:  All right.  Then that's it.
8        MR. McCALL:  Thank you, Dr. Petrak.
9        MR. QUIGLEY:  Thank you, Doctor.
10      THE WITNESS:  Thank you.
11        THE COURT REPORTER:  Mr. Victorian, I
12  can't hear you if you're talking.
13        MR. HEIL:  We can't hear the videographer
14  or the court reporter at this point.  Is there
15  anything else to go through?
16        THE COURT REPORTER:  Yeah.  You can't hear
17  me?
18        MR. RAPIER:  Now we can.
19        MR. McCALL:  Now we can hear you, Grace.
20        THE COURT REPORTER:  Okay.  Mr. Victorian,
21  are you speaking?  We need to get your orders
22  on the record for the transcript, so --
23        MR. McCALL:  There we go.  Yes.
24        THE COURT REPORTER:  Well, while he's

- - -

1  figuring that out, Counsel, who needs a copy of
2  the transcript?
3        MR. RAPIER:  So I'll -- I noticed it, so
4  I'll order the original.
5        MR. HEIL:  I'll order a copy.
6        MR. McCALL:  Same process.  We've been
7  receiving emails to make the order, and you can
8  tell Mr. Victorian that we'd like to get a
9  quote on the video separate from the
10  transcript.
11        MR. QUIGLEY:  I'm in agreement with
12  Ambrose.  Just instructions on how to get a
13  copy of the transcript, but not a formal order.
14        MR. HEIL:  And so everybody's clear, I
15  have no interest necessarily in the video.
16  It's the transcript -- a copy of the transcript
17  that I'm interested in with PDF exhibits.
18        THE COURT REPORTER:  Okay.  And,
19  Mr. McCall, you said you did want the
20  transcript, right?
21        MR. McCALL:  Yes.  We typically get a
22  email version.  We order it then, and then ask
23  for a quote on the video separate from it,
24  so...

CHANNING PETRAK, M.D.
JULY 10, 2024

JOB NO. 1027581

Page 286

```
         - - -
          - - -
1
2       (Discussion was held off the record.)
3              - - -
4       THE TECHNICIAN:  This concludes the
5  deposition of Channing Petrak in the matter of
6  Krueger [audio distortion].  We are now off the
7  record.  The time is 5:20 Central Time.
8              - - -
9       (Witness excused.)
10             - - -
11      (Deposition concluded at 5:20 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 287

```
1              C E R T I F I C A T E
2                    - - -
3
        I do hereby certify that I am a Notary
4  Public in good standing, that the aforesaid
   testimony was taken before me, pursuant to notice,
5  at the time and place indicated; that said deponent
   was by me duly sworn to tell the truth, the whole
6  truth, and nothing but the truth; that the testimony
   of said deponent was correctly recorded in machine
7  shorthand by me and thereafter transcribed under my
   supervision with computer-aided transcription; that
8  the deposition is a true and correct record of the
   testimony given by the witness; and that I am
9  neither of counsel nor kin to any party in said
   action, nor interested in the outcome thereof.
10
11      WITNESS my hand and official seal this
   24th day of July, 2024.
12
13
14
15
           Notary Public
16
17
18
19
20
21
22
23
24
```

Page 288

```
1              E R R A T A
2                    - - -
3  PAGE       LINE                CHANGE
4  _ _ _     _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
5  Reason for
6  Change:   _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
7  _ _ _     _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
8  Reason for
9  Change:   _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
10 _ _ _     _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
11 Reason for
12 Change:   _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
13 _ _ _     _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
14 Reason for
15 Change:   _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
16 _ _ _     _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
17 Reason for
18 Change:   _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
19 _ _ _     _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
20 Reason for
21 Change:   _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
22 _ _ _     _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
23 Reason for
24 Change    _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _
```

Page 289

```
1                    - - -
2        ACKNOWLEDGMENT OF DEPONENT
3                    - - -
4       I, _____, do hereby certify that
5  I have read the foregoing pages 1 to ___ and that
6  the same is a correct transcription of the answers
7  given by me to the questions therein propounded,
8  except for the corrections or changes in form or
9  substance, if any, noted on the attached Errata
10 Sheet.
11 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
12 DATE                          SIGNATURE
13
14      Subscribed and sworn to before
15 me this _ _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ , 20__.
16
17      My commission expires:
18 _ _ _ _ _ _ _ _ _ _ _
19
20
21 _ _ _ _ _ _ _ _ _ _ _
22 Notary Public
23
24
```