IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| KRUEGER, | ) |
| | ) |
|        Plaintiffs, | ) |
| | ) |
| vs. | ) Case No.: 22 CV 1016-JBM-JEH |
| | ) |
| PETRAK, et al, | ) |
| | ) |
|        Defendants. | ) |

**PLAINTIFFS' SUPPLEMENTAL BRIEFING IN SUPPORT OF THE MOTION FOR SANCTIONS AGAINST OSF FOR FAILURE TO PRESERVE ESI (DCKT. #187)**

**I.      INTRODUCTION**

On May 29, 2025, the Court ordered supplemental briefing regarding Dckt. #187. In accordance with that order, Plaintiffs supplement the motion for sanctions by addressing the following issues: (1) Inspections of electronic medical records is becoming increasingly customary. (2) The privacy rights of patients are protected during such inspections. (3) Inspections result in the retrieval of electronically stored information that is missing or claimed to be deleted. (4) The missing or deleted information at issue is material to the claims and defenses in this case. Each one of those four issues is addressed *ad seriatim*, as are the OSF evidentiary admissions which compel this Court to grant the inspection Plaintiffs seek in their motion.

**II.      OSF'S PRIOR ADMISSIONS**

OSF's corporate representatives made four controlling admissions. First, Robyn Goetze Bradley testified that regarding deleted ESI, "you need to be able to recover that information if treatment team members could have potentially made decisions off of it." (Dckt. # 189-5, Page 14 of 65). Second, Ms. Goetze testified it would be "speculation" on her part to answer which version of a record the treatment team should have been relying upon contemporaneously with BB's

hospitalization at OSF. (Id., Pages 52 & 53 of 65). Third, the metadata or audit trails OSF produced in discovery were missing essential information needed to cross-reference the audit trails with the corresponding versions of BB's medical records. (Dckt. # 189-2, Page 81 of 149). Fourth, 18 of the 19 Sticky Notes, or treatment related communications identified in this case, were deleted by an authorized user of the OSF EPIC system. (Id., Page 104 of 149; Dckt. #189-7).

### III. ARGUMENT

Based on the admissions of OSF's corporate representatives, the inspection Plaintiffs seek is warranted. As is more fully set forth below, that type of inspection is becoming increasingly customary in cases involving electronic medical records (or EMRs), the inspection will protect patient privacy, and it will retrieve electronically stored information (or ESI) that is material to the claims and defenses in this case.

(1) <u>Usual and Customary</u>

The inspection is guided by protocols Donald Hanson and his team at EMR Discovery drafted. Mr. Hanson submitted a Declaration in support of Plaintiffs' motion. (Dckt. #193-2). Now, and in support of this filing, Mr. Hanson submitted a Supplemental Declaration attached hereto as Exhibit A. The proposed protocols for the inspection in this case are attached to that Declaration as Supp. Dec. Exhibit 1. Those protocols are substantially similar to protocols that have been successfully used to inspect patient's EMRs in other cases in Illinois and nationwide. (Ex. A, p. 1).

EMR Discovery has participated in approximately 15 inspections in Illinois and approximately three dozen inspections nationwide. Inspecting patient records has become increasingly more customary as litigation involves patient EMRs such as EPIC, an Office of the National Coordinator for Health Information Technology (or ONC) - certified EMR used by OSF Hospital in this case. This year alone, EMR Discovery has performed 3 inspections in Illinois and

2

a dozen inspections nationwide, with half of those inspections being with facilities using the Epic EMR system. (Ex. A, p. 2).

Courts sometimes participate in the inspections. This can be done by Zoom. In this case, Plaintiffs invite the Court to participate in the inspection. In EMR Discovery's experience, participation by the Court addressed and resolved many of the typical defense concerns that inspections are burdensome, costly, or intrusive. (Id.).

As set forth in Mr. Hanson's initial Declaration (Dckt. # 193-2), the patient's right to conduct an inspection of their medical record includes, but is not limited to:

- The HIPAA Privacy Rule[1], which details patient rights to inspect their EMRs.
- The 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program, which intends to further protect the right of the patient to inspect their medical record, record and/or photograph the inspection, as well as prevent information blocking.
- Facility Notice of Privacy Practices, which detail a patient's right directly under facility practices to inspect or look at their own protected health information. At OSF, inspections are clearly stated as a patient's "right." See excerpt below:

> **Your Right to Inspect and Obtain a Copy.** You generally have the right to inspect and obtain a copy of any individually identifiable health information in your designated record set, with the exception of psychotherapy notes, information compiled in anticipation of use in a civil, criminal, or administrative proceeding and certain other health information which the law restricts OSF from disseminating. However, if you are a patient of certain types of providers or facilities, you may have a right to access your patient records or information on an unqualified basis. Specifically, the following:

[2]

---

[1] https://www.healthit.gov/topic/privacy-security-and-hipaa/your-health-information-rights#:~:text=Yes.%20The%20HIPAA%20Privacy%20Rule%20gives%20you%20the,plans%20and%20health%20care%20providers%20covered%20under%20HIPAA

[2] https://www.osfhealthcare.org/media/filer_public/93/cb/93cb5077-75cd-45e7-968f-90b58e83afe9/final_npp_2013_exhibit_a_10-01-2015.pdf

(2) <u>Privacy Concerns</u>

Counsel for OSF raised potential privacy concerns with the Court. However, not only does federal law and OSF's own Privacy Practices grant to its patients the right to inspect their medical records, *supra*, but also, the inspection proposed in this case is HIPPA compliant.

As set forth in the initial Declaration of Mr. Hanson, HIPAA Business Associate Agreements (or BAAs) have been created by the Federal government to, among other things, allow third parties to perform live inspections in circumstances such as these. Live inspections are routinely performed in the following ways:

- A live inspection for BB's case can be completed within 1-2 business days, usually within 6-8 hours.
- Most inspections are conducted via Zoom to allow remote participation so as not to expend unnecessary resources. The Zoom recording capability, as well as screenshot tools (such as Snippet), provide an extra layer of privacy and security as to what was accessed during the live inspection.
- A live inspection requires basic questioning of the facility representative; these questions are critical for a timely inspection. Examples of these questions pertain to the representative's access to site navigation, the availability of feature functions, and the specific installation of the facility's system.
- **The facility representative is given screensharing control,** *i.e.*, *OSF controls when the screen is shared and stopped, assuring there is <u>no risk</u> for accessing other patients' protected health information and/or violating patient confidentiality.*
- An audit trail is performed before and after each live inspection. This provides an extra layer of security by showing what was accessed during the inspection. Audit trails are also used to ensure that the integrity of the medical record is intact post-inspection.

(3) <u>Retrieval of Missing or Deleted Information</u>

OSF has a Health Information Management (or HIM) Department. The HIM Dept. is responsible for processing requests for medical records.

In his Supplemental Declaration, Mr. Hanson addressed two different requests for BB's medical records. OSF's responses to the requests show that the OSF HIM Dept. responded to requests for records differently when asked for "all versions" of the records.

The first request was made by Patricia Krueger on April 18, 2019. A copy of the related Release of Information from the HIM Dept. is attached as Supp. Dec. Exhibit 2. Mrs. Kreuger requested that all records be sent to MyChart, which is the patient portal feature of Epic's EMR system. The Release of Information from the HIM Dept. shows which records were released, including records from the 2/22/2019 Admission at OSF. This is shown on page 5 of Supp. Dec. Ex. 2, and the reference is highlighted.

On pages 4 and 5 of the exhibit, there are references to "NO VER/DEL". Those references are also highlighted and show that other versions (i.e. the reference to "NO VER") and deletions (*i.e.*, "DEL") of documentation contained in the medical record were *not* provided to Mrs. Krueger.

The second request addressed by Mr. Hanson is one made by Randi L. Parcel, Central Region Risk Manager for OSF, on February 18, 2022. Ms. Parcel requested "all versions" of the medical record from 2/16/17 to present. Ms. Parcel's email is attached as Supp. Dec. Exhibit 3.

While OSF produced some, albeit incomplete, audit trails in this case, OSF did not produce an audit trail for February 2019 (when the following clinical note was deleted and when an Overnight Oximetry Result was modified to show a fictitious admission date). Based on available information (which excludes complete audit trails or metadata), reference to a deleted medical record was included in the version provided to Ms. Parcel. However, the deleted clinical note was not included or referenced in the version of the records OSF provided to Mrs. Krueger in response to the request above.

When a clinical note within an EMR is deleted, a version of that clinical note is created. For example,

```
Progress Notes by Mackey, Joseph R, MD at 2/23/2019 11:46 AM                              Version 3 of 3
Author: Mackey, Joseph R, MD          Service: Pediatrics                    Author Type: Physician
Filed: 2/23/2019  4:00 PM             Date of Service: 2/23/2019 11:46 AM    Status: Deleted by Mackey, Joseph R, MD at
                                                                             2/23/2019  4:00 PM
Editor: Mackey, Joseph R, MD (Physician)
Related Notes: Original Note by Mackey, Joseph R, MD (Physician) filed at 2/23/2019 11:55 AM

Error[JM.1]

Attribution Key
JM.1 - Mackey, Joseph R, MD on 2/23/2019  4:00 PM
```

This part of the EMR shows a deleted progress note. No content is included in the note, and it is shown as "Version 3 of 3". The records provided to Mrs. Krueger in response to her request above did not include this information (either "Version 3 of 3" or that the status of the note was "deleted") and this is indicated in the Release of Information as "NO VER/DEL." (Ex. A, p. 4). In other words, the HIM Dept. did not provide "all versions" of the chart, including any "deleted" notes, to Mrs. Krueger in response to the request above.

Defendants may claim "no harm, no foul" because multiple versions of notes were produced *in this case.* That argument, however, ignores the fact that Patricia and Jacob requested all records and needed complete records when they were defending themselves against the false accusations of child abuse in the underlying Macon County Case.

In addition, numerous communications between treatment team members were deleted. This includes the note text of Epic Sticky Notes (see screenshot excerpt on the following page from Sticky Notes – Krueger (OSF 004608-4611)). An Epic Sticky Note Audit Trail shows the deletions. The audit trail is attached as Supp. Dec. Exhibit 4. The Epic Sticky Note Audit Trail details the content of all sticky notes seen in the audit trail. Sticky notes are digital versions of paper sticky notes commonly used in paper documentation. (Ex. A, p. 4).

The content of the 1 Sticky Note that was <u>not</u> deleted shows that the treatment team was discussing BB's test results in this communications medium. Additionally, there were secure chat communications (similar to common text messaging), which Mr. Payne identified as having automatic deletion settings set by OSF. All such digital communications are considered patient protected health information (or PHI). (Ex. A, p. 4).



An inspection would achieve either one or both of the following results: First, deleted items may be retrievable. That is one function of the inspection. In EMR Discovery's experience, clinical notes and other similar communications have been retrieved after the hospital stated they had been "deleted." Second, Mr. Hanson plans to retrieve certain items that OSF has not produced, or claims it cannot or does not know how to produce, such as:

- Clinical decision support tool audit trails for
    - Best Practice Advisories
    - FYI flags
- A Problem List Revision History

- An audit trail report for the time periods:
    - from 2/1/19 to 2/28/19[3]
    - from 2/17/22 to 1/20/23.

This type of information is routinely retrieved during inspections of patient records in the EMR. (Ex. A, pp. 3-5).

The inspection will also be able to determine whether certain specific records and/or documentation elements were produced and/or withheld in prior disclosures. For example, there is a 2/22/2019 Overnight Oximetry Record that has been exhibited to depositions and a court filing in this case. A copy is attached as Supp. Dec. Exhibit 5. This version of the Oximetry Record shows an admission date of 1/23/2019 even though the test was clearly performed overnight on 2/22 – 2/23/2019. Another version of the same Oximetry Record shows a Visit Date of 11/3/2020. (See Outpatient Chart, attached as Exhibit B).

The inspection sought in Plaintiffs' motion will be able to determine whether this record was produced to Mrs. Krueger or her counsel in response to requests made in 2019. The inspection will also determine *inter alia* whether the Oximetry Record was modified or omitted from the medical records provided to the Plaintiffs. (Id., p. 5).

Based on the audit trails produced and discovery deficiencies documented, many questions about the completeness of BB's medical records have not been answered. Forty (40) depositions have been taken in this case, and still OSF cannot identify which version(s) of the medical records the treatment team relied upon contemporaneously with BB's hospitalizations at OSF.

The audit trails produced in this case do not answer the location and content of deleted items, or when some of the deletions were made; nor do they inform whether the Oximetry Record

---

[3] This is the same time period when BB was admitted to OSF for "legal problems" and when the Overnight Pulse Oximetry Results went missing or were deleted.

8

was modified, whether a fictitious admission date was, or dates were, provided, and, if so, who provided the incorrect admission dates. Plaintiffs -- frankly, all parties -- require the aforementioned deleted items (clinical notes, Sticky Note content, Secure Chat messages, etc.), and clinical decision support tool audit trails for Best Practice Advisories and FYI flags, a Problem List Revision History, and an audit trail from 2/1/19-2/28/19 as well as 2/17/22-1/20/23 to conduct expert discovery. (Id., pp. 5-6).

In summary, the EMR produced in this case is incomplete. ESI was deleted after February 22, 2019, when OSF admitted BB to its hospital for "legal problems", *infra*. An inspection is necessary to obtain complete medical records. In addition, an inspection will uncover who, or what process, deleted the ESI and when. (Id., p. 6).

(4) The Missing and Deleted ESI in this Case

### *OSF Anticipated Litigation During the Relevant Time Period*

On February 22, 2019, an OSF physician sent BB to OSF in Peoria by ambulance for "legal problems":

| Narrative |
|---|
| Responded to 1231 Kleemen, OSF Clinton for a transfer to OSF Peoria. Arrived on scene, EMS is met by Dr. Rauch. He states the patient is being sent to St. Francis in Peoria as a direct admit due to "legal" problems. He also reports the patient has been to several other children's hospital throughout Illinois and Ohio for hypoxia in the middle of the night that is only witnessed by the patients mother. Dr Rauch advises the patient is completely stable and he is being sent to OSF for a 24 hour evaluation and possible diagnosis of Munchausen syndrome by proxy. EMS makes patient contact, patient is visible upset and crying. patient is acting like any other 2 year old would act with strangers in the room. Patient is not cyanotic. Patient does have a NC on at 0.5 lpm. Patient is moved to the cot and secured with a commercial child's seat. Patient is wheeled to the ambulance. |
| Once in the ambulance, vitals are taken. Patient is now more calm and tired. patient is in no obvious respiratory distress. |
| Began transport. Patient sleeps most of the transport. Monitored the patients airway and vitals. Called report. Remainder of transport is uneventful |
| Arrived at OSF, there is no change in the patient condition. patient is wheeled to room 401. Turned patient care over to a RN with staff. |
| Placed unit back in service. |

(Dckt. # 191-1).

*Petrak Used OSF's Facilities to Conduct her Investigation*

That same day (i.e., 2/22/19), Dr. Petrak told a colleague that BB would need to be admitted to OSF:

| 2/22/19 | Per Dr. Petrak, theya going have to admit. Need to coordinate and admission w/pulmonolo and EEG and sleep study should work. Will make calls. |
|---|---|

(Dckt. # 199-4). Regarding this entry, Dr. Petrak testified, "[t]his was basically an attempt to coordinate an admission and discuss it with pulmonology and neurology and attempt to do the studies I felt were necessary for me to make a determination." (Deposition Transcript: Channing Petrak, attached as Exhibit C, 206:21-24, 207:1-7).

*Petrak's Contemporaneous Reports*

As of March 8, 2019, Dr. Petrak was unable to determine whether BB had been abused or neglected. (Ex. C, p. 177:6-18). Regarding the Oximetry Results from the February 22-23 hospitalization at OSF, Dr. Petrak told her colleague, "The child [BB] did have the video EEG however, they could not take him off his 02, so they could not see if he would turn blue or if there are underlying causes." (DCFS Contact Notes, attached as Exhibit D, p. 3).

By March 8, 2019, the investigation of the Krueger family had been ongoing for over sixteen (16) months and Dr. Petrak had reviewed voluminous medical records from BB's birth through 3/2/19. (The 3/8/19 Report is attached as Exhibit E).[4] The Oximetry Results from the February 22-23 hospitalization (coordinated by Petrak and OSF for "legal problems") were not referenced in Dr. Petrak's report. (Dckt. # 192-1).

---

[4] About this same time (between March 6-11, 2019,) DCFS told Plaintiffs, BB's primary care physician (Dr. Howse), Cin. Children's Hosp. (the reporter of the suspected abuse), and PRC that the investigation was "unfounded" and the case would be "closed". (Ex. D).

Then, and less than a month later, on April 1, 2019, Dr. Petrak reported there was sufficient information for her determination of "medical child abuse". A copy of the report is included in Ex. E. While the February 22-23 Oximetry Results were not referenced in this report either, events occurring during a March hospitalization at OSF were. Defendants claim BB's parents refused to feed him while he was in the hospital and hid his diapers from OSF staff. However, during that same hospitalization (i.e., March 21, 2019, through April 1, 2019), there are multiple versions of the medical records and multiple treatment team communications were deleted, (Dckt. # 189-7), including communications on the date of BB's admission to OSF and the night Dr. Petrak called co-Defendant Collins and told her she had diagnosed medical child abuse. (Investigation B Notes, attached as Exhibit F). Regarding her telephone call with Dr. Petrak on the night of March 29th, Ms. Collins testified that it was Dr. Petrak's diagnosis that led to the removal of the Krueger children. (Deposition Transcript: Alisa Collins, p. 20, lines 20-25; p 21, lines 1-4).[5]

### *Petrak's Investigative Finding is Rejected by DCFS*

Dr. Petrak investigated the allegations of neglect and abuse in this case pursuant to the PRC contract with DCFS. (Ex. C, 60:3-4, 98:23-24, 99:1, 129:15-20). After Dr. Petrak completed her investigation and submitted both of her reports, DCFS rejected her findings and stipulated that neither Patricia nor Jacob neglected or abused BB (or any of his siblings),

---

[5] What Dr. Petrak told co-Defendant Collins on March 29, 2019, is different than what she told co-Defendant Galassi. At 10:50 p.m. on the evening of March 29, 2019, Dr. Petrak told Ms. Galassi there were "concerns" for Munchausen by Proxy and that "parents have not been open or cooperative with DCFS services and there is a concern that if [BB] is released to the parents they will not continue to allow DCFS access to him to follow up." (Dckt. # 193-1).

g. ☒ The minor is abused, neglected as defined by 705 ILCS 405/2-3 in that the minor:

- ☐ suffers from a lack of support, education, remedial care as defined by 705 ILCS 405/2-3(1)(a)
- ☒ is in an environment that is injurious to the welfare of the minor as defined by 705 ILCS 405/2-3(1)(b)
- ☐ as a newborn was exposed to illicit drugs as defined by 705 ILCS 405/2-3(1)(c)
- ☐ is under 14 years of age and unsupervised for an unreasonable period of time as defined by 705 ILCS 405/2-3(1)(d)
- ☐ is physically abused as defined by 705 ILCS 405/2-3(2)(i)
- ☐ is in substantial risk of physically abused as defined by 705 ILCS 405/2-3(2)(ii)
- ☐ is sexually abused as defined by 705 ILCS 405/2-3(2)(iii)
- ☐ has been tortured as defined by 705 ILCS 405/2-3(2)(iv)
- ☐ has been the subject of excessive corporal punishment as defined by 705 ILCS 405/2-3(2)(v)

This finding is based on the following facts: *one of 3 children had serious health issues of undetermined cause. Home was later found to be full of mold within the walls. Child has recovered from most of the issues.*

h. ☒ The abuse or neglect
- ☒ was **not** inflicted by a parent, guardian, or legal custodian
- ☐ was inflicted by:
- ☐ a parent or parents, specifically *mold in home unknown to parents*
- ☐ a guardian specifically _____
- ☐ a legal custodian specifically _____

(Dckt. # 94-2).

## IV.     CONCLUSION

WHEREFORE, Plaintiffs pray for an Order granting the Motion for Sanctions (Dckt. # 187) and awarding such other and further relief for Plaintiffs as the Court deems equitable and just.

Respectfully submitted this 12th day of June 2025

By: /s/ Aaron W. Rapier

*One of Plaintiffs' Attorneys*

Rapier Law Firm, PLLC
1770 Park Street, Suite 200
Naperville, IL 60563
(630) 853-9224 (phone)
IL No. 6270472
arapier@rapierlawfirm.com

Julie A. Murphy (ARDC No. 6290303)
**HART MCLAUGHLIN & ELDRIDGE**
One S. Dearborn, Suite 1400
Chicago, IL 60603
(312) 971-9236
jmurphy@hmelegal.com